

Transcript of **Courtney Ajinca**

Wednesday, July 8, 2020

*Nicholas McElroy v. Courtney Ajinca Events LLC*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 92992

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4

   NICHOLAS McELROY, an individual, )
5  and BRYAN FLORES, an individual, )
                                    )
6        Plaintiffs,               )
                                    )
7  vs.                             )CIVIL ACTION FILE
                                    )1:19-cv-05094-SDG
8  COURTNEY AJINCA EVENTS, LLC,     )
   a North Carolina limited         )
9  liability company, and COURTNEY  )
   AJINCA, an individual,           )
10                                  )
         Defendants.                )
11 _____ )

12

13              The deposition of COURTNEY AJINCA, taken

14      on behalf of the Plaintiffs, pursuant to the

15      stipulations set forth herein, before Carla J.

16      Hopson, RPR, Certified Shorthand Reporter, at

17      3017 Bolling Way, NE, Atlanta, Georgia, on the

18      8th day of July, 2020, commencing at 9:21 a.m.

19

20

21

22

23

24

25

```
 1                   I N D E X

 2   EXHIBITS  (For the Plaintiff)          Page

 3   A:      10/25/19 letter from Alston to

 4           Sperry                          26

 5   B:      Defendants' Responses           34

 6   C:      7/27/19 email string            61

 7   D:      7/26, 7/27/19 email string      63

 8   E:      Truly Original emails           70

 9

10              E X A M I N A T I O N S

11   Cross Examination

12           (By Ms. Sperry)                  4

13   Direct Examination

14           (By Mr. Barnes)                109

15   Recross Examination

16           (By Ms. Sperry)                109

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    On Behalf of the Plaintiffs:

 3         MARCY L. SPERRY, ESQUIRE

 4         MELISSA FATIMA CASTRO, ESQUIRE

 5         ALEXANDRIA J. ARON, ESQUIRE

 6         Vivid IP

 7         3017 Bolling Way, NE

 8         Atlanta, Georgia 30305

 9         Email: marcy@vividip.com

10         Phone: (404) 788-1976

11    On Behalf of the Defendants:

12         JEFF BARNES, ESQUIRE

13         Barnes Firm, LLP

14         3280 Peachtree Road, N.E., Floor 7

15         Atlanta, Georgia 30305

16         Email: jeff@barnesattorneys.com

17         Phone: (404) 236-5000

18

19

20

21

22

23

24

25
```

1                          * * * * *

2  THEREUPON,

3                          COURTNEY AJINCA,

4  having been first duly sworn, was examined and

5  testified upon her oath as follows:

6                     CROSS EXAMINATION

7       Q     (By Ms. Sperry) Could you please state

8  your full name for the record.

9       A     Courtney Michelle Ajinca.

10      Q     And are you aware you're being deposed

11 today in the case involving McElroy and Flores

12 versus you and your company?

13      A     Yes.

14      Q     Have you ever been deposed before?

15      A     No.

16      Q     And I just want to go over a couple of

17 ground rules.  You understand you're testifying

18 under oath today; correct?

19      A     Yes.

20      Q     Okay.  So that means that you'd be

21 subjected to potential criminal charges if you were

22 giving me false or misleading testimony.  Do you

23 understand that?

24      A     Yes.

25      Q     So the court reporter is transcribing

1    and writing down everything we're saying, so it's

2    important that we wait for each other to finish

3    speaking and try not to talk over each other.  Do

4    you understand that?

5          A    Uh-hmm.

6          Q    Great.  Again, this is an oral

7    transcription, so head nods are not sufficient.  I

8    just need you to give verbal answers for the court

9    reporter.

10         A    Okay.

11         Q    Is there any reason you would not be

12   able to give truthful testimony today such as being

13   under the influence of any drugs or alcohol?

14         A    No.

15         Q    If you need me to repeat a question,

16   please feel free to ask me to rephrase it if you

17   don't understand.

18         A    Okay.

19         Q    And if you need a break, please feel

20   free to ask your counsel or me if you need a break.

21   I just ask if you do, if you wait till I finish my

22   question and not ask in the middle of a question.

23         A    Uh-hmm.

24         Q    Okay.  I'm just going to start with some

25   background questions.  What is your date of birth?

1       A       The date of birth of me or the date of

2   birth of Courtney Ajinca Events?

3       Q       Of you.  When were you born?

4       A       11/12/88.

5       Q       Okay.  And what is your personal current

6   address?

7       A       My personal address is 1801 Funny Cide

8   Drive, Waxhaw, North Carolina 2173 [sic].

9       Q       Okay.

10      A       28173.

11      Q       And what about CAE -- during the

12  deposition I'm going to refer to your company as CAE

13  at times.

14      A       Okay.

15      Q       Is that fair?

16      A       That's fine.

17      Q       Where is CAE's office located?

18      A       CAE's offices are located at 135 Cupped

19  Oak Drive in Stallings, North Carolina.

20      Q       How long have you lived in North

21  Carolina personally?

22      A       Courtney Ajinca Events?

23      Q       Personally.

24      A       Okay.  I have lived in North Carolina --

25  I'm from North Caroline.  I've been there my whole

1   life.  However, you know, we have taken time to live

2   elsewhere and travel in different countries and

3   throughout the United States.

4        Q    Have you personally ever been arrested

5   for a crime?

6        A    Yes.

7        Q    Okay.  What was the arrest crime for?

8        A    It was a matter between my husband and

9   I.

10        Q    Okay.  And were you convicted of a

11   crime?

12        A    No, it was dismissed.

13        Q    Other than in that issue with your

14   husband, has there been any other arrests?

15        A    No.

16        Q    Okay.  Have you ever been involved in

17   any other lawsuits?

18        A    No.

19        Q    And how did you prepare for the

20   deposition today?

21        A    By reviewing the truthful events that

22   happened and practicing with my attorney, Jeffrey

23   Barnes.

24        Q    And did you bring any documents with you

25   today?

1        A     The documents that I have are the

2    documents that I was served and -- I don't know.

3    What are those called?

4        Q     But did you bring any of those with you

5    today?

6        A     Yes, I have them.

7        Q     Okay.

8              MS. SPERRY:  I may want to take a look

9         at anything she brought today.  Can you bring

10        those out?

11             Thank you.

12        Q    (By Ms. Sperry) Have you spoken with

13    anyone other than your counsel about this case?

14        A     Outside of my husband and the other

15    defendant, no.

16        Q     Okay.  Who's the other defendant that

17    you spoke to?

18        A     The defendant that's listed as Ms.

19    Berry.

20        Q     In the original complaint is what you're

21    saying.

22        A     Absolutely.

23        Q     Got it.  Okay.  And may I call you --

24    how do you pronounce your last name?

25        A     Ajinca.

1        Q       Ajinca.

2        A       Uh-hmm.

3        Q       Ms. Ajinca, what is your highest level

4    of education?

5        A       Partial college.

6        Q       And where did you go to college?

7        A       UNCG and Wingate.

8        Q       What was the second one?  I'm sorry.

9        A       Wingate University.

10       Q       Where is that located?

11       A       In Wingate, North Carolina.

12       Q       Okay.  And how much did you complete of

13   that degree?

14       A       Junior.

15       Q       Junior level?

16       A       Uh-hmm.

17       Q       And what was the major you had at the

18   time?

19       A       Biology, pre-med.  Biology pretty much.

20       Q       Okay.  And why did you not complete it?

21       A       Personal family matters at the time.

22       Q       Okay.  Where are you currently

23   personally employed?

24       A       I'm self-employed through Courtney

25   Ajinca Events.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        Q      And when -- how long have you worked for

2   CAE?

3        A      CAE has been in existence for two years

4   before we changed the name, but previously it

5   was Glitz & Glam Social, and that was in existence

6   since 2015.

7        Q      And did you form Glitz & Glam in 2015?

8        A      Yes, Courtney Ajinca formed it, yes.

9        Q      Okay.  Did anyone else -- did you

10  personally have any partners that formed Glitz &

11  Glam?

12       A      No.

13       Q      Okay.  And why did you decide to change

14  the name two years later?

15       A      I changed the name to Courntey Ajinca

16  Events in order to brand myself and the company.

17       Q      Okay.  What is your current title at

18  CAE?

19       A      Owner, managing partner, CEO.  I do

20  everything.

21       Q      Okay.  What does CAE do?

22       A      Courtney Ajinca Events is a luxury event

23  design firm.  We cater to primarily celebrity

24  clients.

25       Q      What type of events do you specialize

1    in?

2         A    I -- Courtney Ajinca Events specializes

3    in every type of events that you can think of.

4    Social, product launches, brands, weddings.

5         Q    Do you have any current partners at CAE?

6         A    That are no other partners at CAE.

7         Q    How many employees does CAE have?

8         A    I am the main employee and then I have

9    other 1099 employees that -- they're not W-2.

10         Q    How many 1099 employees does CAE have?

11         A    CAE probably has 20 to 30 independent

12    contractors.

13         Q    Okay.  And does CAE have any other

14    full-time employees besides yourself?

15         A    No.

16         Q    How do you know Danika -- excuse me --

17    Danika Berry?

18         A    Danika and I -- Danika and Courtney

19    Ajinca have a personal friendship, and Danika Berry

20    has a business relationship with CAE.  She's the

21    publicist for CAE.

22         Q    How long have you had a personal

23    relationship personally with Danika?

24         A    The personal relationship began probably

25    a year into the business relationship.  The business

1    relationship happened -- it started in maybe January

2    of 2018.

3            Q      And so a year before January of 2018?

4            A      A year after.

5            Q      So in January of 2018 you personally

6    developed a relationship with Danika?

7            A      Absolutely.

8            Q      Okay.  A year after that you developed a

9    business relationship?

10           A      In 2018 we began the business

11   relationship and Danika --

12           Q      I see.

13           A      -- Danika Berry Public Relations.  And

14   around 2019 Courtney Ajinca and Danika Berry began

15   forming a personal relationship.

16           Q      How did you personally first meet

17   Danika?

18           A      Danika was introduced to Courtney Ajinca

19   Events through a mutual -- a mutual business

20   partner.  Not a business partner but a mutual

21   business associate.

22           Q      And when CAE developed a business

23   relationship with Danika Berry, what was that

24   relationship?  What did that relationship entail?

25           A      CAE formed the relationship with Danika

1   Berry Public Relations, not Danika Berry personally.

2   And that business relationship entailed full public

3   relations for CAE for submissions to magazines.  She

4   handled CAE's public appearances on television as

5   well as introducing to clients, potential clients.

6        Q    Is Danika Berry's -- is it Danika Berry

7   Agency?  Is that the formal name of her company?

8        A    Danika Berry Public Relations.

9        Q    Is Danika Berry Public Relations still

10  doing public relations services for CAE?

11       A    Yes, she is.

12       Q    And are you still personally friends

13  with or have a personal relationship -- do you still

14  have a personal relationship with --

15            The lights just went off.

16       A    Yes.

17       Q    Sorry about that.

18       A    Courtney Ajinca does still have a

19  personal relationship with Danika Berry.

20       Q    Thank you.  Sometimes -- let me pause

21  for a second.

22            (Off record.)

23       Q    (By Ms. Sperry) Does Ms. Berry attend

24  all the events that CAE plans and hosts for clients?

25       A    Danika Berry does not attend all of the

1    Courtney Ajinca events.

2          Q      Does Danika Berry PR do publicity for

3    all of your -- for all of CAE's events?

4          A      Danika Berry Public Relations does --

5    does public relations for the majority of my events,

6    unless it is specifically requested by a client to

7    not have relations, public -- those publicity for a

8    Courtney Ajinca event.

9          Q      And do you have a contract between CAE

10   and Danika Berry Public Relations?

11         A      Yes, there is a contract.

12         Q      Can you tell me what the contract

13   entails?

14         A      The contract between Danika Berry Public

15   Relations and Courtney Ajinca Events entails that

16   she would provide full publicity and public relation

17   services for Courtney Ajinca events, garnering

18   public press, garnering national press,

19   and making introductions between clients.

20         Q      Does CAE enter into a separate contract

21   with the Danika Berry Public Relations firm before

22   every event?

23         A      No, the contract between Danika Berry

24   Public Relations and Courntey Ajinca Events is the

25   same.  It has not changed.

1     Q     When you say it's the same, it has not

2  changed, so it's a -- it's not event specific; is

3  that right?

4     A     I retain -- Courtney Ajinca Events

5  retains Danika Berry monthly for public relation

6  services.

7     Q     So it's a monthly basis.

8            Okay.  I want to ask you about Frost

9  Bistro.  What is Frost Bistro?

10    A     Frost Bistro is a company that is owned

11 by a client of CAE, Rasheeda and Kirk Frost.

12    Q     And how did CAE first meet those

13 clients?

14    A     CAE first met Rasheeda and Kirk through

15 Danika Berry Public Relations who was their PR at

16 the time.  And Danika Berry Public Relations

17 introduced CAE to Rasheeda and Kirk to plan

18 Rasheeda's Pressed grand opening in Houston.

19    Q     When was the grand opening of Frost

20 Bistro?

21    A     Of Frost Bistro?  The grand opening of

22 Frost Bistro, I believe, was in June of 2019.

23    Q     And was CAE hired by Frost Bistro for

24 that grand opening?

25    A     CAE was hired by Frost Bistro.

1      Q      Can you tell me about what they were --

2  CAE was hired to do?

3      A      CAE was hired to plan, design, and

4  execute the grand opening for Frost Bistro that was

5  featured on Love & Hip Hop.

6      Q      What is Love & Hip Hop?

7      A      Love & Hip Hop is a reality TV show.

8      Q      And where is Frost Bistro located?

9      A      I'm not really familiar with Atlanta,

10  but it is -- it is located in Atlanta.

11      Q      It's in Atlanta?

12      A      Uh-hmm.

13      Q      How did you first meet -- excuse me.

14  How did CAE first meet Mr. Nick McElroy?

15      A      CAE was referred to McElroy.  CAE

16  searched on Instagram for a photographer.  CAE

17  called another photographer that I found, and that

18  photographer was unavailable and referred CAE to

19  Nick.

20      Q      Do you recall the first photographer

21  that was unavailable?

22      A      I do not remember the first -- Courtney

23  Ajinca Events does not remember the first

24  photographer's name.  I'm sorry.

25      Q      So once you decided -- excuse me.  Once

1    CAE decided to hire Mr. McElroy, how did you contact

2    him?  How was he contacted?

3         A    CAE was either given his phone number by

4    that photographer or that photographer gave the

5    phone number to Nicholas.

6         Q    And once CAE had the phone number, who

7    at CAE called Mr. McElroy?  Was it yourself?

8         A    Once I either received the phone number

9    or he received my phone number, one of us contacted

10   the other.  Either Courtney Ajinca contacted

11   Nicholas or he contacted Courtney Ajinca.

12        Q    Okay.  Do you remember when that phone

13   conversation occurred?

14        A    That phone conversation -- it was

15   actually a last-minute booking, and that phone

16   conversation happened probably -- I don't remember

17   the exact date of the event, but that -- he was

18   booked maybe three hours before the event.

19        Q    Okay.  And you were the one that had

20   conversations with Mr. McElroy on behalf of CAE; is

21   that right?

22        A    Absolutely.

23        Q    And do you recall -- what was discussed

24   during the conversation?

25        A    During the conversation with Nicholas it

1   was discussed that he would come to Frost Bistro to

2   take photos of the guests, of the decor, of the --

3   the cast of Love & Hip Hop.  It was also discussed

4   that these picture would be distributed, that we

5   would need them -- that CAE and Danika Berry Public

6   Relations would need them the night of the event so

7   that they could be distributed and pushed out to the

8   different publications.

9           He was excited and agreed.  He

10   discussed -- Nicholas discussed his rates with CAE.

11   They were agreed upon.  It was discussed that CAE

12   would pay at the end of the event.

13           Nicholas arrived to the event and was

14   excited and ready to take photos.

15       Q   During the conversation you mentioned

16   that you discussed what publications pictures would

17   be used with.  Did you specifically tell him what

18   those publications were?

19       A   During the conversation we told him -- I

20   told -- Courtney Ajinca Events told Nicholas that

21   they would be distributed to publications.  There

22   were no exact ones, but he -- Nicholas McElroy

23   was notified that they would be distributed to -- to

24   different magazines.

25       Q   During that conversation did you ask for

1    his permission to use those photos and distribute to

2    publications?

3         A    His permission was not directly asked

4    for, but it was implied through his agreeance and

5    through sending the photos that he would agree.  He

6    was also sent -- he was also told that night that he

7    would be sent the links from those publications, and

8    the links from those publications were sent to him

9    and he was very excited.

10             He said that he was so grateful to work

11   with CAE and, you know, he had such a great

12   experience and he had -- you know, was excited to be

13   in those publications.

14        Q    I want to focus a little bit more on the

15   phone conversation, then I have a couple of followup

16   questions.  Just so I'm clear, you did not ask for

17   permission to send those photographs to publications

18   during that phone conversation; is that correct?

19        A    We -- CAE told Nicholas McElroy that

20   they would be -- that they would be distributed to

21   the publications, and Nicholas McElroy did not

22   object.

23        Q    Did he say anything in response to the

24   statement that they would be used for publications?

25        A    "Oh, that's super cool," like --

1      Q      He said super cool?

2      A      I don't want to be quoted that he said

3    "super cool," but that's how Nicholas talks, yes.

4      Q      Okay.  Did you ever discuss during that

5    phone conversation whether CAE would be granted a

6    license to use the photographs?

7      A      There was no discussion for a licensing

8    during that conversation.

9      Q      Okay.  You mentioned that the links were

10   sent to Mr. McElroy.  Were those links sent the

11   evening of the event --

12     A      Yes, they were.

13     Q      -- to him?  Did you personally send him

14   the links?

15     A      Yes, I believe I sent him the first link

16   that was made available.

17     Q      How did you send the links to him?

18     A      Via text.

19     Q      To date we haven't received those texts

20   as part of your document production.  Do you still

21   have these texts?

22     A      I personally do not have those texts.

23   But if you subpoena Nicholas for those texts, you

24   will be able to see them because they were sent.

25     Q      Okay.  But to date you don't have a copy

1   of the texts as we sit here today?

2        A    My phone was -- was broken soon after

3   Cynthia's event.

4        Q    So just so I'm clear, as we sit here

5   today you don't have any copies of the texts; is

6   that correct?

7        A    I do not.

8        Q    I'm sorry.  Just bear with us as we have

9   the lighting issue.

10            Okay.  Which publications were the

11   photographs sent to from the Frost shoot?

12       A    That's -- I'm sorry.  That's not the job

13   of Courtney Ajinca Events.  That's the job of Danika

14   Berry Publications, so I'm unsure which publications

15   they were actually sent to.

16       Q    Okay.  But didn't you send him the links

17   containing those published photographs?

18       A    I probably sent him one link, and I

19   believe it was from Star.

20       Q    So --

21       A    But I do not remember exactly which

22   publication I sent him that evening.

23       Q    So today you're saying you probably sent

24   him a link.  Are you certain that you sent him a

25   link to the publication?

1      A      I am certain that I sent him a link to a

2  publication.   Which publication he received, I am

3  not sure.   But I am almost certain that it was Star

4  because that was the first one that was published.

5      Q      Okay.   So your testimony is that you did

6  send him a link to Star Magazine the day of the

7  event; correct?

8      A      My testimony is that he received a link

9  to a magazine.   Star Magazine was the first

10  publication that published the article.   And I

11  believe that's the link that I sent him.   Because I

12  don't remember and because I was blindsided by this,

13  I do not have proper documentation that that was the

14  exact link.

15          But if you get Nicholas's phone and he

16  has not deleted anything, you will see that that was

17  the publication that he was sent or that he was sent

18  a publication.

19      Q      I understand.   But I need to have your

20  full testimony.

21      A      That is my -- that is my testimony.

22      Q      I understand.   But you said you believe.

23  So can you tell me with certainty --

24      A      I sent him --

25      Q      Let me finish the question.

1        A       Okay.

2        Q       Can you tell me with certainty as you

3   sit here today testifying under oath that you sent

4   Mr. McElroy a link to the Star Magazine publication

5   of his photograph?

6        A       I sent Nicholas McElroy a link to a

7   publication.  Which publication he was sent to, I am

8   not sure.  However, the Star Magazine was the first

9   publication that was posted, if I remember

10  correctly.

11       Q       Okay.  So you cannot be certain that it

12  was the Star Magazine publication that you sent him

13  the day of the event; is that correct?

14       A       I sent -- I sent Nicholas McElroy a link

15  to a publication.

16       Q       I need -- I need you to answer my

17  question, please.  You cannot as you sit here today

18  tell me for certain which magazine publication you

19  sent a link to Mr. McElroy on the day of the Frost

20  shoot; is that correct?

21       A       I think you should subpoena his text

22  messages.

23       Q       I need you to answer the question.

24       A       I have answered the question on multiple

25  occasions.  Jeff?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        Q     Actually, you haven't.  As you sit here

2   today, you cannot testify with certainty that you

3   sent --

4             THE WITNESS:  Jeff, haven't I answered

5        this question multiple times?

6             MS. SPERRY:  Please let me finish.

7             THE WITNESS:  Because I'm answering it

8        to the best of my ability at this time.

9             MR. BARNES:  Right.  Right.  So let --

10        let's break this down.  Maybe ask the question

11        in the simplest way --

12             MS. SPERRY:  Sure.

13             MR. BARNES:  -- instead of like "you

14   cannot do this."  It's "can you say for sure."

15             MS. SPERRY:  Sure.  I'm happy to --

16             MR. BARNES:  I don't want to ask your

17   question for you.

18             MS. SPERRY:  Thank you.  No, I'm happy

19        to.

20             MR. BARNES:  But I think it's --

21             "Are you sure that ..." and then, you

22        know, if you're sure, then you say "yes."  If

23   you're not sure, you say "no."  Fair enough?

24             THE WITNESS:  That's fair.

25             MR. BARNES:  I just -- I think that's

Trustpoint.One  Alderson.        www.trustpoint.one
www.aldersonreporting.com        800.FOR.DEPO
(800.367.3376)

1          where the noise is here, so --

2                MS. SPERRY:  Sure.  Thanks.  I

3       appreciate it.

4       Q     (By Ms. Sperry) Can your testify for sure

5    today that you sent Mr. McElroy a link to Star

6    Magazine on the night of the Frost shoot?

7       A     No, not for sure.

8       Q     And you mentioned Star Magazine was one

9    of the publications where the Frost shoot photos

10   appeared; correct?

11      A     Yes.

12      Q     Do you know the name of the other

13   publications as you sit here today?

14      A     I do not.

15      Q     No, you do not.

16            Okay.  So during the phone conversations

17   where you discussed what Mr. McElroy would be doing

18   for the Frost shoot, you testified that you told him

19   that they would be sent to publications; correct?

20      A     Absolutely.

21      Q     Did you discuss whether they would also

22   be published in social media?

23      A     Absolutely.

24      Q     Okay.  So both social media and

25   publications were discussed with him during your

1    phone conversations; is that right?

2        A    Yes.

3            (Exhibit A was marked.)

4        Q    (By Ms. Sperry) Okay.  I'm going to be

5    handing you a document that's marked as Exhibit A

6    here.  If you could take a moment to review it.

7        A    (Reviewing.)  Okay.

8        Q    Do you recognize this document?

9        A    Yes, I do.

10       Q    And can you tell me, what is it?

11       A    This was the response to the demand

12   letter that was sent from your office, and this is

13   my attorney's response along with some

14   documentation.

15       Q    Okay.

16       A    My previous attorney's response.

17       Q    Okay.  Could you please review the third

18   paragraph starting on the first page ending at the

19   top of Page 2?  Take a moment to review that

20   paragraph.

21       A    (Reviewing.)  Okay.

22       Q    In particular, I'd like to ask you a

23   couple of questions and ask you if you could please

24   read starting on Line 3, that sentence starting with

25   "CAE informed."  Would you please read the next two

1   sentences.

2       A     The sentence that begins after that

3   sentence or --

4       Q     "CAE informed McElroy" --

5       A     The entire -- the entirety of the two

6   sentences?

7       Q     Yes, please.

8       A     "CAE informed McElroy that it would be

9   posting the pictures on social media and sharing

10  them with the owner of the boutique to do the same.

11  In fact, McElroy was enthusiastic about, aware of,

12  and agreed with my client's intent to use the photos

13  for marketing and promotional services to the

14  boutique on various social media, hereinafter

15  agreement."

16      Q     Okay.  How come your counsel and you did

17  not mention publications and media outlets in this

18  response in terms of what was the scope of the Frost

19  Bistro agreement?

20      A     I'm not sure.  That's a question that

21  you would have to ask my question -- my previous

22  attorney.

23      Q     So did you provide your previous

24  attorney with information about the scope of that

25  agreement when he prepared this letter?

1        A       I'm sorry?

2        Q       When you were working with your previous

3    attorney, Mr. Alston, before he prepared this

4    letter, did he ask you about the scope of the Frost

5    agreement or what was involved in that agreement

6    with Mr. McElroy?

7        A       He did.

8        Q       He did.  And based on your conversations

9    with him, he prepared this letter; is that right?

10       A       Yes.

11       Q       Okay.  So did you not tell him at the

12   time that the Frost shoot would also be used for

13   publications?

14       A       This was a miss -- this was a

15   miscommunication on his part because he was fully

16   aware, which is partially the reason why he's no

17   longer my attorney.

18       Q       Did you read this letter before he sent

19   it out?

20       A       I probably read it over quickly.  I'm

21   extremely busy.

22       Q       So are you sure you read it over before

23   he sent it out?

24       A       I read over it very quickly.  So if I

25   missed him saying "only to use on social media," I

1    did miss that.

2         Q       Okay.  Thank you.

3                 How do you define social media?

4         A       Social media is really any type of

5    person-to-person contact on the -- on the Internet.

6         Q       Okay.  I want to go back for a moment to

7    the Frost Bistro shoot.  Do you know who sent Mr.

8    McElroy's photograph to Star Magazine?

9         A       To my knowledge, Danika Berry Public

10   Relations sent that to the publications.

11        Q       Was Danika Berry Public

12   Relations working --

13        A       Sorry.  There's something in my eye.

14        Q       That's okay.  If you want to take a

15   break, please.

16        A       I'm sorry.  Go ahead.

17        Q       Was Danika Berry Public Relations doing

18   work for CAE for the Frost Bistro shoot to publicize

19   the event?

20        A       So I'm, like, reading --

21        Q       Sure.  No problem.  Let me rephrase.

22        A       I'm reading and processing.

23        Q       That was my bad.  My bad.

24        A       I'm sorry.

25        Q       Let me rephrase that.

1       A       Go ahead.

2       Q       For the Frost Bistro was Danika Berry

3   Public Relations assisting you with publicizing that

4   event?

5       A       Yes, Danika Berry was assisting CAE with

6   the publications -- with publicizing.

7       Q       Was Ms. Berry personally in attendance

8   at the Frost Bistro shoot?

9       A       Ms. Berry was not in attendance.

10      Q       How did she receive the photographs of

11  the event at the Frost Bistro shoot?

12      A       Danika Berry Public Relations received

13  those photographs after Nicholas McElroy sent them

14  to CAE, and then CAE sent the link to Danika Berry

15  Public Relations.

16      Q       And you were aware when CAE -- or CAE

17  was aware when they sent the link to Danika Berry

18  Public Relations that they would be sent to media

19  outlets and publications; is that right?

20      A       CAE was aware that they would be sent to

21  publications and Nicholas McElroy was also aware

22  that they would be sent to publications.

23      Q       Okay.  Do you -- so your understanding

24  is that Danika Berry Public Relations sent the Frost

25  photographs to Star Magazine; is that right?

1        A        Yes.

2        Q        Okay.   Do you know when Danika Berry

3   Public Relations sent that photograph to Star

4   Magazine?

5        A        As with every event, Danika Berry Public

6   Relations sends event photos out directly after the

7   event after we have received the links from the

8   photographers.

9        Q        Okay.   During your oral conversation

10   with Mr. McElroy on behalf of CAE when you spoke to

11   him on the phone before the event, did you discuss

12   how to credit him for photographs that would be sent

13   to publications?

14        A        Nicholas McElroy told us to -- to CAE

15   and DB Public Relations to credit his name

16   personally for those photographs.

17        Q        And that conversation happened during

18   the phone conversation you mentioned earlier?

19        A        That conversation happened via text.

20        Q        Via text?   Did that happen before the --

21        A        After.

22        Q        -- photo shoot.

23        A        After he sent us those photos.

24        Q        So after you sent you the photographs

25   from the event you --

1        A      After he --

2        Q      -- communicated via text with him and

3    asked how he should be credited?

4        A      Absolutely.  Yeah.

5        Q      And how did you he respond?

6        A      Nicholas responded that he wanted to be

7    credited as his name, Nicholas McElroy.

8        Q      Did those text exchanges occur before

9    the photographs were sent to Star Magazine?

10        A      Yes.  And to the best of my knowledge,

11    Danika Berry Public Relations sent over those

12    credits, and that was an error on the -- from Star

13    Magazine.

14        Q      Did you ever attempt to contact Star to

15    correct that error?

16        A      I don't have any communications with

17    publications.

18        Q      Did you inform Mr. McElroy that there

19    had been an error in the credit line?

20        A      We were not -- CAE and DB Public

21    Relations were not aware that there was an error

22    with the credits for the publications, for his

23    credit.  We were not aware until we were served ten

24    months later or however long it was.

25        Q      Okay.

Trustpoint.One  Alderson.        www.trustpoint.one
www.aldersonreporting.com        800.FOR.DEPO
(800.367.3376)

1          A      Nine.

2          Q      When you hire photographers for events

3    on behalf of CAE, is there a standard written

4    contract that you give them?

5          A      At that current time there was not a

6    standard contract that I gave.  The only -- the only

7    paperwork that I gave to any of my vendors,

8    including the photographers, is a non-disclosure

9    agreement, non-circumvention agreement.  And usually

10   when CAE works with photographers, the photographer

11   supplies their own photography contract, which I was

12   not supplied -- I was not given from Mr. McElroy.

13         Q      I forgot to ask you one question about

14   Frost Bistro.  Was there a written agreement entered

15   into between CAE and Mr. McElroy for the Frost

16   Bistro shoot?

17         A      There was no written agreement.  It was

18   verbal.

19         Q      All right.  So typically when you hire a

20   photographer, the photographer brings the written

21   agreement; is that correct?

22         A      Yes, that is correct.

23         Q      Over the past five years can you tell me

24   how many photographers you've hired for your events?

25         A      I cannot.

1          Q      You cannot.  Okay.  During the last five

2    years, how many photographers have you entered into

3    written agreements with?

4          A      I -- because I cannot give you a certain

5    number, I could give you a percentage.  And I would

6    you say that a percentage would be 90 percent.

7          Q      90 percent?  Okay.  And of those written

8    contracts, did they include a license to use the

9    photographs with media outlets and publications?

10         A      Yes.

11         Q      Okay.  And the other 10 percent, were

12   those oral contracts?

13         A      They were.

14                (Exhibit B was marked.)

15         Q      (By Ms. Sperry) Okay.  I am going to be

16   handing you a document marked as Exhibit B.  Could

17   you please take a moment to review it?  Just let me

18   know when you've had a chance -- have you had a

19   chance to review it?

20         A      Yes, I have.

21         Q      Do you recognize this document?

22         A      I do.

23         Q      What is it?

24         A      The response to the interrogations

25   [sic].

1        Q       It's the response -- your responses to

2    the interrogatories; is that right?

3        A       Yeah.

4        Q       Okay.  Could you please turn to Page 12

5    and Number 17 in particular.  Interrogatory 17 asks

6    you about other contracts you've entered into with

7    other photographers over the past five years.  I

8    just want to ask you a couple of questions about

9    your response.

10              Your first response mentions Dutchess

11   Lattimore birthday party, paid photographer $300 for

12   full event coverage and photos.  Photos were

13   distributed to magazines and social media blogs,

14   such as The Share Room, and that it was an oral

15   contract.

16              Can you tell me a little bit about that

17   event and what CAE was hired to do?

18        A       CAE was hired to design, plan and

19   execute a birthday party for Dutchess Lattimore.

20        Q       Okay.  And in that case do you recall

21   was the oral contract by phone or in person?

22        A       It was by phone.

23        Q       By phone.  And was that oral contract

24   entered into the day of the event?

25        A       That oral contract I do not remember.

1    That was two years ago.

2         Q     Do you recall if during the oral

3    contract you specifically discussed whether the

4    photographs would be used with publications, social

5    media?

6         A     No.

7         Q     Okay.  And why wasn't a written contract

8    entered into for the Lattimore event?

9         A     Because that's a photographer that I've

10   had a relationship with for over ten years.

11        Q     And have you done other -- have you

12   hired that photographer for other events?

13        A     I have not.

14        Q     So what is that personal relationship

15   based on with that photographer?

16        A     He was my -- I was a model formerly, and

17   he was my photographer.

18        Q     Okay.  The next answer you have given is

19   March 5th, 2018, the Rasheeda Frost Pressed grand

20   opening.  It says you paid a photographer a thousand

21   dollars for full event coverage, photos, and

22   60-second video event recaps.  The photographs were

23   distributed to many national publications as well as

24   The Shade Room.

25               Was that contract with that photographer

1    an oral or written contract?

2        A    That was a written contract.

3        Q    Written.  Okay.  Was Rasheeda Frost the

4    same client that was involved in the Frost Bistro we

5    spoke about before?

6        A    That is the same client.

7        Q    Okay.  And in terms of the written

8    contract for this Rasheeda Frost Pressed grand

9    opening, did you provide that contract to the

10   photographer?

11       A    The Rasheeda Frost grand opening, the

12   photographer provided the contract to CAE.

13       Q    And did that contract discuss the use of

14   the photographs with publications?

15       A    Yes, it did, or I'm not sure if that --

16   if it did, if the contract directly expressed that.

17   But the agreement was made with the photographers.

18       Q    So you don't recall the scope of the

19   contract in terms of how the photographs would be

20   used; is that right?

21       A    The -- I don't remember the exact scope

22   from that contract.  However, the agreement was made

23   with those photographers to be distributed -- for

24   those to be distributed.  And I believe within the

25   contract it says that they just have to be properly

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

 1   credited, and they were.

 2        Q     Do you still have that contract?

 3        A     I do.

 4        Q     Okay.  The next one is April 25th, 2018,

 5   Antonio Cromartie -- excuse my pronunciation if

 6   that's incorrect -- retirement party.  Was that an

 7   oral or a written contract?

 8        A     That was a written contract as well.

 9        Q     And did you provide the contract to the

10   photographer in that case?

11        A     No, I did not.

12        Q     Did that contract specify the use of the

13   photographs with publications?

14        A     It did.

15        Q     The next question is relating to the

16   October 26th, 2018, Cynthia Bailey's Seagram's

17   launch party.  Was that contract with the

18   photographer oral or written?

19        A     Written.

20        Q     Do you have a copy of that contract

21   still?

22        A     I do.

23        Q     And let me back up.  Do you also have a

24   copy of the Antonio Cromartie contract?

25        A     I do.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    Q    Then there was a May 9th, 2019, Quad
2  Webb Cooking and Miss Quad launch party.  Was that
3  an oral -- that was an oral contract you specify
4  here.  Was that entered into the day of the launch
5  party or beforehand?
6    A    The day of.
7    Q    And how come a written contract was not
8  entered into in that case?
9    A    Because of the relationship with the
10  photographer.
11    Q    Had you worked with that photographer
12  before?
13    A    I have.
14    Q    What was the name of the photographer?
15    A    I don't see how that's pertinent
16  information.
17         MR. BARNES:  Just answer it.
18         THE WITNESS:  Yeah?  Donald Wilson.
19    Q    (By Ms. Sperry) Donald Wilson?
20    A    I don't want -- I don't want my, you
21  know, personal contacts to be named in a lawsuit.
22    Q    Okay.  Donald Wilson.  And how long have
23  you known Mr. Wilson?
24    A    Since 2017 maybe.
25    Q    And has he done photography work for CAE

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  before?

2       A     He has.

3       Q     How many other events has Mr. Wilson

4  photographed for CAE?

5       A     I do not know.  Maybe five to ten.

6       Q     Five to ten?  Okay.  And were those

7  other events that Mr. Wilson photographed also oral

8  contracts?

9       A     They were.

10      Q     Were any of the contracts with

11 Mr. Wilson entered into written?

12      A     No.

13      Q     And of those other events that

14 Mr. Wilson photographed for CAE, did those oral

15 contracts include the use of the photographs for

16 publications in each event?

17      A     No, they were not -- they were not

18 distributed for those the events.

19      Q     And why not?

20      A     Because they were not celebrity clients.

21      Q     I'm sorry.  I didn't hear that.

22      A     They were not celebrity clients.

23      Q     Okay.  So the only reason that the

24 photographs that Mr. Wilson took for those events

25 was because it was not involving a celebrity client,

1    so that's why --

2         A     Outside of Quad, yes.

3         Q     So there was no discussion with

4    Mr. Wilson during the oral contracts that they would

5    be used for publications or possibly --

6         A     There was a discussion with Quad Webb's

7    event that they would possibly be distributed, but

8    Miss Webb decided that she did not want them

9    distributed.

10        Q     I had a question about -- in these

11   contracts that we discussed in your interrogatory

12   response, did you discuss how to credit these

13   photographers if their photographs would be used in

14   publications?

15        A     Each time that photos are taken of an

16   event, the photographers are asked how they would

17   like to be credited and they are credited

18   accordingly.

19        Q     Are they -- does that discussion happen

20   during the oral contract?

21        A     That discussion usually happens at the

22   end of the event before pictures are submitted.

23        Q     Okay.  So it happens after the oral

24   contract is entered into; is that correct?

25        A     Oral -- oral or written contract because

1   not all contracts are oral.

2        Q     Thank you for clarifying.  So after the

3   oral or written contract is entered into is when you

4   typically have discussions about credits?

5        A     Absolutely.  The discussion about

6   credits is -- it happens at the end of the event

7   after they have sent the photos and before they are

8   sent to publications.

9        Q     In these cases where some of the

10  photographs were sent to publications, was CAE also

11  given credit in any of those instances for the

12  photographs?

13       A     Yes, I believe so.

14       Q     Okay.  Do you know which events -- or,

15  excuse me -- yeah, for which events CAE was given

16  credit for in these photos?

17       A     I do not remember.

18       Q     In those cases where CAE was given

19  credit, were the photographers also given credit on

20  those photographs?

21       A     Absolutely.

22       Q     Okay.  How do you know Cynthia Bailey

23  personally?

24       A     I was introduced to Cynthia Bailey

25  professionally through CAE and through our

1   professional relationship we have created a personal

2   relationship.

3        Q     Who introduced Ms. Bailey to CAE?

4        A     CAE was introduced to Miss Bailey

5   through Danika Berry Public Relations.

6        Q     What is Danika Berry Public Relations'

7   relationship to Miss Bailey?

8        A     At the time DBPR was the PR for Cynthia.

9        Q     I'm going to say "DBR" when I mean

10  Danika Berry Relations.  Is that clear?

11       A     Yes.

12       Q     So I don't stumble on my words.

13       A     Thank you.

14       Q     Is DBR still the PR agency for Miss

15  Bailey?

16       A     She is not.

17       Q     She is not.  Do you know when that

18  relationship ended?

19       A     I do not.

20       Q     Can you tell me what work you've done --

21  what work has CAE done for Miss Bailey?

22       A     For Miss Bailey CAE has designed,

23  executed and planned her launch party for her custom

24  drink with Seagram's.  CAE has planned and designed

25  her engagement party.  However, CAE was not hired

1   Miss Bailey at that time.  I was hired by -- CAE was

2   hired by her fiance, Mike Hill.

3              And for the -- and CAE is currently

4   planning the wedding.

5        Q     What is the date of the wedding?

6        A     10/10/20.

7        Q     I want to ask you about the Cynthia

8   Bailey engagement party that Mr. Hill hired CAE to

9   plan.  What exactly was CAE hired to do for that

10  engagement party?

11       A     CAE was hired to design, plan and

12  execute the event according to the theme, and to

13  assist with the engagement concept and, like, the

14  execution of the engagement.

15       Q     When was CAE hired to plan the

16  engagement party?

17       A     A few days before.

18       Q     And what was DBR's involvement with the

19  Bailey engagement party?

20       A     DBR's involvement was, as every event,

21  to distribute photos on behalf of CAE.

22       Q     Was Ms. Berry present at the engagement?

23       A     Miss Berry was not present at the

24  engagement.

25       Q     When you say DBR's role is to distribute

1  photos, what was DBR -- let me rephrase that for

2  you.  Which -- can you explain more about what you

3  mean by distribute photos?  What exactly was DBR's

4  role there?  Can you give me a little bit more

5  details?

6        A    DBR's role was to distribute photos to

7  the publications -- to distribute photos to the

8  publications on behalf of Cynthia and CAE.

9        Q    And by publications do you mean national

10  media --

11        A    National media outlets --

12        Q    -- companies?  Thank you.

13            So Bravo didn't hire CAE to plan the

14  engagement party for Cynthia Bailey; is that right?

15        A    Bravo did not directly hire CAE, but CAE

16  has a personal -- has a relationship with Bravo.

17        Q    Okay.  Did Bravo know CAE was planning

18  the Bailey engagement?

19        A    They did.

20        Q    Did Bravo pay CAE for the planning of

21  the Cynthia Bailey engagement?

22        A    No.

23        Q    Who did CAE hire to photograph the

24  Cynthia Bailey engagement?

25        A    I'm sorry.  One more time?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        Q       Sure.  Who did CAE hire to photograph

2    the Bailey engagement?

3        A       Oh, CAE hired -- CAE contacted Nicholas

4    McElroy who then brought on Night Owl Post

5    Productions.  CAE was unsure as to why Night Owl

6    Post Productions was brought on to this event, but

7    that's who I paid -- who CAE paid.

8        Q       How did CAE contact Mr. McElroy?

9        A       CAE contacted Nicholas through text

10   messages.

11       Q       And was that you personally on behalf of

12   CAE that contacted Mr. McElroy?

13       A       It was.

14       Q       When did you text Mr. McElroy about the

15   event?

16       A       A couple of days before the event, like

17   two days before.

18       Q       Did CAE consider any other photographers

19   before contacting Mr. McElroy?

20       A       No.

21       Q       And why did CAE choose Mr. McElroy for

22   the job?

23       A       CAE chose Mr. McElroy for the job

24   because he seemed like a nice, honest person, and we

25   had a great experience beforehand.

1        Q        Okay.  And do you recall what you said

2   when you initially reached out via text to Mr.

3   McElroy about hiring him for the engagement?

4        A        I told him that we had such a great

5   experience last time and that I would love to bring

6   him on for this event -- for that event that I was

7   currently planning and that it would be the same

8   thing as before, pictures of all the important

9   people and decor, and he agreed and was excited.

10        Q        And that conversation was through text;

11   is that right?

12        A        It was.

13        Q        Okay.  In those text messages did you

14   discuss that the photographs would be sent to

15   publications and media outlets?

16        A        I'm sorry?

17        Q        In those text messages with Mr. McElroy

18   did you specifically tell him that those photographs

19   would be sent to media outlets and publications?

20        A        I don't recall, but he was told through

21   text that they would be distributed through media

22   outlets.  When that text message occurred, I'm not

23   sure.

24        Q        So you specifically told Mr. McElroy

25   that these photographs would be sent to media

```
 1    outlets --

 2         A      Yes.

 3         Q      -- in those text messages?

 4         A      Absolutely.

 5         Q      Do you still have those text messages?

 6         A      You -- yes, we have them.

 7         Q      Okay.  So a couple of days -- I'm

 8    focusing on a couple of days before the event.

 9         A      Okay.

10         Q      When you first reached out to Mr.

11    McElroy.  During that text exchange did you tell him

12    how the photographs would be used --

13         A      Yes.

14         Q      -- specifically in those texts?

15         A      Yes.

16         Q      And in those texts you specifically told

17    Mr. McElroy that the photos would be used with media

18    outlets; is that right?

19         A      Yes.

20         Q      Okay.  We do not have those texts, so

21    we'll follow up with counsel on those.  Do you still

22    have those texts occurring before -- a couple of

23    days before where it specifically says that these

24    photos will be used with media outlets?

25         A      Yes, they were sent to us.
```

1          MR. BARNES:  I think there's a little

2      bit of confusion.

3          MS. SPERRY:  Okay.  Sure.

4          MR. BARNES:  The texts that she's

5      referring to are the texts that you guys

6      produced to us.

7          MS. SPERRY:  Right.  Right.  And those

8      were the day of the event.  I'm focusing on a

9      few days before then when she first contacted

10     McElroy.

11         THE WITNESS:  That was two days before.

12         MR. BARNES:  Yeah, I believe that

13     those --

14         MS. SPERRY:  The texts that we have are

15     the night of the event.

16         MR. BARNES:  I believe that the texts

17     started on June --

18         THE WITNESS:  24th.

19         MR. BARNES:  -- on July 24th.

20         THE WITNESS:  July 24th.

21         MR. BARNES:  I need to look.  The texts

22     say what they say.  But to be clear, we don't

23     have any additional messages.  When the

24     cellphone was lost all of those were gone.

25     Q    (By Ms. Sperry) Okay.  So we haven't

1    received any texts that occurred a few days before

2    the event that discussed the terms of your contract.

3    We have texts occurring the day of the event between

4    the two of you.

5         A    You have texts from your client from two

6    days before the event, yes, when I initially

7    contacted him.

8         Q    We don't have those from you, though.

9         A    You have them from your client, not

10   directly from me.

11        Q    Right.  But just so I'm clear, you have

12   not produced texts regarding this text

13   conversation --

14        A    From two days before, I have not.

15        Q    -- this text conversation that occurred

16   a few days before the event; is that correct?

17        A    No.

18        Q    Okay.

19        A    I mean, yes, that is correct.  But, yes.

20        Q    Just so we have a clear record, sitting

21   here today you do not have texts discussing the

22   scope of the agreement with Mr. McElroy that you

23   sent two days before the event; is that correct?

24        A    We have those texts in our possession;

25   however, they did not -- they were not produced from

1    me.  They were produced from -- they were not

2    produced from CAE.  They were produced from Nicholas

3    McElroy.

4         Q     Okay.  In the -- in the text messages

5    you had with Mr. McElroy a few days before the

6    Bailey engagement you discussed in terms of the

7    event; is that right?

8         A     Yes.

9         Q     Okay.  You do not have those texts in

10   your possession on your phone still; is that right?

11        A     My phone broke soon after that event.

12        Q     So you do not have any texts in your

13   possession evidencing that text exchange a few days

14   before that photo shoot?

15        A     I do not.

16        Q     I'm sorry?

17        A     I do not.

18        Q     You do not.  Okay.  And you have not

19   produced those texts to us because they're not in

20   your possession; is that right?

21        A     Correct.

22        Q     What did you hire Mr. McElroy

23   specifically to do for the event?

24        A     Mr. McElroy, as the previous event, was

25   required to come take photos of decor, of the

1    important people, of the engagement itself.  He was

2    hired -- that was what he was exactly hired for, and

3    to produce video, I believe a 60-second video recap

4    of the event.

5                And it was agreed that he would give it

6    to us the same night for the publications.

7         Q    And what was the agreement in terms of

8    payment?

9         A    There -- I don't remember the exact

10   terms, but I do remember that for the video it was

11   like 250 per hour, something like that.  I did not

12   receive an invoice for that event until after the

13   event was finished and before I received the photos.

14        Q    You didn't receive --

15        A    Excuse me.  I'm sorry.  I actually

16   received the photos before I received that invoice

17   for those pictures.

18        Q    Okay.  The -- so what you recall is it

19   was $250 an hour for the video.  Do you recall what

20   the payment terms were for the photographs?

21        A    I believe that was the total amount for

22   both.

23        Q    For both.  Okay.  Was there a written

24   contract entered into between CAE and Mr. McElroy?

25        A    There was no written contract.  The only

1   written contract -- the only agreement that he was

2   given was a NDA and a non -- a non-circumvention.

3       Q    So there was no written agreement as to

4   a license to use the photographs with Mr. McElroy;

5   is that right?

6       A    There was written through text messages

7   where he give his consent.

8       Q    Okay.  But there was not a signed

9   written agreement, correct --

10      A    There was not a signed agreement,

11  correct.

12      Q    -- relating to -- let me just finish.

13  There was not a signed written license agreement

14  entered into with Mr. McElroy for the use of the

15  photographs; is that right?

16      A    Correct.

17      Q    During the text messages you exchanged

18  before the Cynthia Bailey engagement, did you

19  discuss with Mr. McElroy how he would be credited

20  for the photographs?

21      A    During what?  I'm sorry.

22      Q    A few days -- you reached out to Mr.

23  McElroy a few days before you hired him.  And your

24  testimony today is that you exchanged text messages

25  about what he would be hired to do.

1       A       Uh-hmm.

2       Q       During those text exchanges did you

3  discuss how Mr. McElroy should be credited for his

4  photographs if they were going to be published?

5       A       It was not discussed prior to the event

6  how he would be credited.  It was -- it was

7  discussed after the event and before those photos

8  were pushed out.

9       Q       How do you know Mr. Bryan Flores?

10      A       I do not know Mr. Bryan Flores.  CAE

11  does not know him, neither does Courtney Ajinca.

12      Q       Did Mr. Flores take photographs of the

13  Cynthia Bailey engagement party?

14      A       I believe so, yes.  I guess that's him.

15  I do not -- I have never formally met Mr. Flores, so

16  I am not sure who he is.  I need to see a photo.

17      Q       Okay.  So do you know if Mr. Flores

18  photographed any of the pictures that are publicized

19  on national media outlets at the Cynthia Bailey

20  engagement?

21      A       I'm not exactly -- I don't know who

22  Mr. Flores is, so ....

23      Q       So were you aware that Mr. Flores took

24  photographs at the Cynthia Bailey event?

25      A       We did receive -- we did receive his

1   name, but I've never formally met Mr. Flores.

2        Q     So you've never spoken to Mr. Flores.

3        A     No.

4        Q     Is that your testimony?

5        A     No, I don't -- I don't know who

6   Mr. Flores is.

7        Q     Okay.

8        A     I would need to see a photo to be sure

9   because my only relationship was with Mr. Nicholas

10  McElroy, and then he brought some people from Night

11  Owl Post Production who I do not know and I had

12  never met before.  And they would not be

13  recognizable to me.

14       Q     Did Mr. McElroy ever exchange texts with

15  you on the night of the event mentioning Mr. Flores?

16       A     He did mention a Mr. Flores.

17       Q     So you were aware he was taking

18  photographs based on those text messages; correct?

19       A     Yes, I was aware, but I do not know who

20  he is.

21       Q     Okay.  Aside from not knowing who he is

22  personally, you do know that somebody named Mr.

23  Flores took photographs of the Cynthia Bailey event.

24  Is that fair?

25       A     Yes.  Yes.

1      Q      You never asked Mr. Flores how to credit

2   his photographs; is that right?

3      A      Nicholas was -- Nicholas said how to

4   credit Flores.

5      Q      Okay.  But you never asked Mr. Flores

6   directly how he should be --

7      A      I did not have any communication with

8   Mr. Flores.

9      Q      And you never entered into any written

10  agreement with Mr. Flores?

11     A      I did not enter into a written or oral

12  agreement with Mr. Flores because I've never -- I

13  don't know who he is.  I've never talked to him.

14     Q      Okay.  But you are aware Mr. Flores took

15  photographs of the --

16     A      Absolutely.

17     Q      -- Cynthia Bailey event.  And your

18  testimony today is you've never entered into an oral

19  or a written contract with Mr. Flores regarding the

20  use of his photographs; is that right?

21     A      Not directly, no.  We -- CAE hired

22  Nicholas McElroy, and then it is my understanding

23  that he subcontracted Flores or -- and whoever else

24  who he brought from Night Owl Post Productions.

25     Q      Okay.  Can you tell me a little bit more

1   about what your understanding is that he

2   subcontracted?  What is that based on?

3        A     He never -- Nicholas McElroy never even

4   made mention that he was subcontracting -- that he

5   was bringing additional people.  I'm sorry.  He said

6   he was bringing additional people.  I was not under

7   the impression that they were -- that it was an

8   entire company until they arrived, and I found out

9   that it was Night Owl Post Production.

10       Q     Okay.  And did you ever then -- once you

11  found out that he had brought other photographers,

12  did you ever reach back out to Mr. McElroy and ask

13  him to confirm that the same terms in terms of the

14  use of the photographs applied to these other

15  photographers?

16       A     I did not, no.

17       Q     So you never discussed with Mr. McElroy

18  that the photographs that other photographers such

19  as Mr. Flores were taking would also be sent to

20  media outlets and publications?

21       A     I hired Mr. McElroy, so it was not -- it

22  was not explicitly discussed with him any other

23  photographers because, you know, that wasn't my

24  responsibility to -- to discuss with him what is

25  going on with his contracted individuals.

1           I contacted Mr. McElroy.  So what

2    happens to -- with his other, you know, clients or

3    whoever he brings upon, his associates, that was not

4    my concern.

5           Q      Okay.  Did he ever tell you that, yes, I

6    understand that my photographs will be used with

7    national media and the same terms will apply to my

8    other photographers?

9           A      He never discussed that directly.

10   When -- when we initially asked Nicholas for his

11   credit he were told to credit Night Owl Post

12   Productions as an entire company.  Later on once

13   the -- once the publication was made, he came back

14   and asked if we could credit Nicholas McElroy, Night

15   Owl Post Productions, and then Flores.

16           He was told -- I told him I would try.

17   And he was like, if it's -- if not, that's totally

18   fine, Night Owl Post Production is fine.  That's who

19   was credited.  And we were able to get Nicholas

20   McElroy his credit because that's who was initially

21   contacted.

22           And it was never made -- and he was fine

23   with Night Owl Post Productions being credited and

24   himself.  And he was sent the link showing where he

25   was credited.

1      Q     At any point did Mr. McElroy say that he

2 was representing Mr. Flores?

3      A     No.  I don't understand how people can

4 be so evil.  I'm like ...

5      Q     What do you mean by that, people can be

6 evil?

7      A     I do not understand.  This is clear

8 exploitation.

9      Q     Can you explain to me why you think it's

10 exploitation?

11      A     Absolutely.  Yeah.  This is -- this is

12 exploitation.  I believe that Mr. McElroy is an

13 opportunist.  He was given -- he was -- he has --

14            Mr. McElroy has never had his work

15 featured in a national publication or anything like

16 that.  He was given a -- you know, a great

17 opportunity.  And this is like a spit in the face

18 and a slap in the face.

19            And, yeah, this is exploitation because

20 he's trying to exploit CAE and Courtney Ajinca.

21      Q     Okay.  Who sent the photographs that Mr.

22 McElroy and his team, Mr. Flores, took to media

23 outlets?

24      A     I'm sorry.

25      Q     Who sent the photographs that McElroy

```
 1    and Flores took of the Bailey engagement to media

 2    outlets?

 3         A     It was sent by DBR.

 4         Q     DBR.  And was it sent by Danika on

 5    behalf of DBR?

 6         A     Yes.

 7         Q     Were you aware that she was sending

 8    those to the medical outlets?

 9         A     Yes, I was.

10         Q     And when were those photographs sent to

11    media outlets?

12         A     The photos were sent to the media

13    outlets the same night of the event.

14         Q     Okay.  How many media outlets were they

15    sent to?

16         A     I am not sure.

17         Q     Did one of the media companies have an

18    exclusive?

19         A     People magazine had the exclusive.  And

20    to my knowledge, I believe People was one of only a

21    few that were sent that -- the actual images.

22         Q     Were you involved in negotiating that

23    exclusive agreement with People?

24         A     I was not -- I did not have any contact

25    with any publication.
```

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1        Q      So was that DBR who arranged the
 2   exclusive with People?
 3        A      Yes.
 4        Q      Okay.  Bear with us for a minute.
 5               (Exhibit C was marked.)
 6        Q      (By Ms. Sperry) Okay.  I'm going to be
 7   marking -- handing you what's been marked as --
 8               Okay.  I'm going to give you a document
 9   that's marked as Exhibit C.  Could you please take a
10   moment to look at it?  Do you recognize this
11   document?
12        A      One moment, please.  I'm still working.
13   I'm sorry.  I have a very important --
14        Q      I'm sorry.  It's a deposition.  I'm
15   going to ask you to put your phone down.
16               MS. SPERRY:  Counsel?
17               THE WITNESS:  Yeah, I'm just --
18               MS. SPERRY:  Could you ask her to put
19          her phone down?
20               THE WITNESS:  Just one second.
21               MR. BARNES:  Yes, if you want to send
22          that and then put it down.  So tell them that
23          you're in a deposition.
24               THE WITNESS:  Yeah, I am.
25        Q      (By Ms. Sperry) Okay.  Just take a moment
```

1    to look at it and let me know when you've had a

2    chance to review it.

3         A    Okay.

4         Q    Okay.  Do you recognize this document?

5         A    I don't.

6         Q    Okay.  What is the document?  Let's

7    start there?

8         A    It looks like an email exchange.

9         Q    And who is it between?

10        A    E Magazine -- E! News and Danika Berry

11   PR.

12        Q    Okay.  Could you please read the email,

13   the two sentences?

14        A    "Danika:  I'm reaching out from E! News

15   to see if we can get Cynthia and Mike's engagement

16   photos from last night's party.  Courtney Ajinca

17   mentioned I should get in touch with you.  Thanks."

18        Q    Do you know who Spencer Lubitz is?

19        A    Not personally, but I believe he reached

20   out to me via Instagram.

21        Q    Okay.  What did he say when he reached

22   out to you on Instagram?

23        A    Is it okay for me to take my phone to

24   get?  Because I don't remember.  That was, you know,

25   almost a year ago.

1    Q     What do you recall -- what do you recall

2  generally that he asked you about?  It doesn't have

3  to be exact.

4    A     I think he was just asking for photos.

5    Q     Okay.  And what did you tell him?

6    A     From the email?  It looks like I told

7  him to get in contact with Miss Berry.

8    Q     Okay.  So your recollection is that you

9  did have an exchange, some type of communication

10 with Mr. Lubitz about the photographs of the Cynthia

11 Bailey engagement; is that right?

12   A     I would need to confirm, but it appears

13 so, yes.

14   Q     Okay.  And why did you tell him to get

15 in touch with Danika?

16   A     Because I don't deal with media outlets.

17   Q     So was this regarding publishing the

18 Cynthia Bailey photographs?

19   A     From the email, yes.

20         (Exhibit D was marked.)

21   Q     (By Ms. Sperry) Okay.  I'm handing you a

22 document marked as Exhibit D.  Please take a moment

23 to review it.

24   A     Okay.

25   Q     Is this an email exchange between

1   Mr. Lubitz and Miss Berry?

2       A     Yes.

3       Q     Okay.  Could you read the second

4   sentence of the first paragraph starting with "can

5   you"?

6       A     "Can you please use her image in your

7   stories since she owns the photos."

8       Q     Did you tell Miss Berry that you or CAE

9   owned the photographs that were taken at the Cynthia

10  Bailey engagement?

11      A     I do not.

12      Q     Do you know why she said this?

13      A     I do not.

14      Q     What did you tell Miss Berry in terms of

15  how to credit the photographs taken at the Cynthia

16  Bailey engagement?

17      A     Nicholas told Miss Berry and DBPR to

18  credit Night Owl Post Productions and then came back

19  later asking for a different -- a different thing.

20  She said she would try, but she was unable to credit

21  multiple sources, but she would get him his credit.

22      Q     Okay.  And you also advised DBR to

23  credit Courtney -- CAE?

24      A     I did not.

25      Q     You never told Miss Berry to credit your

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1    company, CAE?

 2         A     I did not.

 3         Q     Do you know why she credited your

 4    company in these emails?

 5         A     That's just general practice.

 6         Q     What -- I don't -- I'm not familiar.

 7    What do you mean, the general practice?

 8         A     That's just general practice.

 9    She credits her clients.

10         Q     Is that standard in the industry?

11         A     I'm not sure.  I'm not sure about

12    industry standards for publications.

13         Q     Okay.  You mentioned you have a

14    relationship with Bravo on behalf of CAE or CAE has

15    a relationship.  When did that relationship start?

16         A     The relationship with Bravo started in

17    October of 2018.  '18.

18         Q     Did you personally meet someone from

19    Bravo in 2018?

20         A     CAE has met their production staff and

21    their execs.

22         Q     How did you have the opportunity to meet

23    them for CAE?

24         A     CAE met them at the initial event for

25    Seagram's, Cynthia Bailey's Seagram event.
```

1        Q      And what type of work has CAE done with

2   Bravo since they met at the Seagram's event?

3        A      CAE has done events for Cynthia for Real

4   Housewives and Quad Webb for Married to Medicine.

5        Q      Okay.  So in terms of the events for

6   Cynthia Bailey, aside from the Seagram's and her

7   engagement party, have there been any other events

8   that CAE has done for Cynthia Bailey?

9        A      I'm currently planning her wedding.

10        Q      And the wedding.  And you mentioned

11   somebody else?

12        A      Quad Webb.

13        Q      What is Quad Webb's relationship with

14   Bravo?

15        A      She is a talent for Married to Medicine.

16        Q      Is she a star on the show?

17        A      She is.

18        Q      Married to Medicine it's called?  What

19   events has CAE done for Quad Webb?

20        A      CAE has done the book launch for Cooking

21   with Miss Quad.

22        Q      Book launch for what?  Cooking --

23        A      Cooking with Miss Quad.

24        Q      Any other events?

25        A      No.

```
 1        Q      Since the Cynthia Bailey engagement, has
 2   CAE done any events involving Bravo or its talent?
 3        A      No.
 4        Q      Okay.  When you have done the events
 5   involving Bravo's talent, for example, the Cynthia
 6   Bailey engagement, did you sign any event with Bravo
 7   on behalf of CAE?
 8        A      No.
 9        Q      Are you familiar with who Truly Original
10   is?
11        A      I am.
12        Q      Who is Truly Original?
13        A      Truly Original is a production company
14   for Real Housewives of Atlanta.
15        Q      Okay.  Have you -- since the engagement
16   photos of Cynthia Bailey were published in July of
17   2018, have you had any conversations with Truly
18   Original or has CAE had any conversations with Truly
19   Original?
20        A      Not professionally.  But personally,
21   yes.
22        Q      Okay.  And who did you personally have
23   those conversations with at Truly Original?
24        A      The executive producer, Marcus Burns, as
25   well as Lizzie -- I'm not sure of her name -- who is
```

1    also an executive producer.

2         Q    Okay.  And what did you discuss?

3         A    For -- I mean, various things.  For
4    Marcus I would say they are items that are not
5    pertaining to, like, business.  It's like strictly
6    social media, reactions to stories, et cetera, and
7    posts.  And for Lizzie I would say that we have
8    spoken about Cynthia's wedding.

9         Q    Did you discuss the current suit --

10        A    No.

11        Q    -- with either of them?

12        A    No, because this lawsuit is baseless and
13   embarrassing, to say the least.

14        Q    Did Truly Original ever reach out to CAE
15   to ask if they had the rights to publish the
16   photographs of the Cynthia Bailey engagement?

17        A    They did.  You're right.  Someone did
18   reach out to me from Truly Original.

19        Q    Do you know when that happened?

20        A    I do not.  I cannot remember exactly,
21   but they reached out before the show aired to try to
22   get approval.

23        Q    Do you recall if that was -- what month
24   it was?  Was it August or September of 2018?

25        A    I do not remember.  It was not in 2018.

Trustpoint.One   Alderson.   www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    It was in 2019.

2         Q    Excuse me.  2019.  I'm getting my years

3    mixed up.  So sometime in 2019 after the Bailey

4    engagement.

5         A    Yes.

6         Q    And who with Truly Original reached out

7    to CAE?

8         A    I cannot remember.

9         Q    Do you recall how they reached out?

10        A    Via email.

11        Q    Do you still have those emails?

12        A    I believe so, yeah.  I would have to

13   look.

14        Q    Okay.  We'll follow up with your counsel

15   about that afterwards.

16             Okay.  So what did you tell Truly

17   Original when they asked if you had the rights to

18   use the photographs?

19        A    I do not remember.

20        Q    You don't remember.

21             Do you remember what Truly Original told

22   you know in terms of what they were going to do with

23   the photographs?

24        A    I don't remember.

25        Q    Did they ask you to sign any agreement?

 1          A     I think so.  I can't -- I cannot say for

 2    sure.  That's so long ago.  I think so.

 3          Q     Do you recall if you did sign an

 4    agreement?

 5          A     I don't remember.

 6          Q     You don't know.

 7          A     If you will allow me to look through my

 8    messages, I would be able to tell you.  But I cannot

 9    tell you right now.

10          Q     Okay.  So this was through email,

11    though.  You can recall it was through email.

12          A     It was through email.

13          Q     So do you remember what the agreement

14    asked you to do?  Did it ask if you had the rights

15    to the photographs essentially?

16          A     I don't remember.

17          Q     You don't remember?

18                Okay.  Were you aware that Truly

19    Original also reached out to Mr. McElroy and

20    Mr. Flores about the photographs?

21          A     I was not aware.  Or actually, I think

22    they did say they did.  I don't remember.  That was

23    so long ago.  I do not remember.

24                (Exhibit E was marked.)

25          Q     (By Ms. Sperry) I'm going to hand you a

1    document that's marked as Exhibit E.  It has been

2    marked under a confidentiality designation in this

3    case, which means you can't share it outside of your

4    counsel and you.

5          A      Okay.

6          Q      I'm going to hand it to you right now.

7    If you could take a moment to take a look at it.

8          A      (Reviewing.)  Okay.

9          Q      Okay.  If you could turn to Page 3,

10   please.  What is -- first of all, what is this

11   document?

12         A      An email exchange between Night Owl

13   Studios and Brandon.

14         Q      Is Brandon with Truly Original?

15         A      He is.

16         Q      Could you turn to Page 3, please?  Do

17   you see an email at the bottom of Page 3 between

18   Brandon Brathwaite of Truly Original and Nick and

19   Bryan?

20         A      Yes.

21         Q      Okay.  Does the second line, is this

22   correct, say, my team is requesting clearance on the

23   use of the photos you took during Cynthia and Mike's

24   engagement?

25         A      Uh-hmm.

1          Q       And does it also say, I am attaching a

2    material release for your review?

3          A       Yes.

4          Q       What is the date of that email?

5          A       September 26th, 2019.

6          Q       Do you recall if Truly Original had

7    reached out to you about your rights to those

8    photographs before September 26th, 2019?

9          A       I cannot be certain of a date.

10         Q       Why would Truly Original be asking

11   Mr. Flores and Mr. McElroy for a clearance if you

12   had the rights to the photographs?

13         A       Because Nicholas McElroy was properly

14   credited on those photos.

15         Q       But your testimony is that you did tell

16   Truly Original that you had the rights to the

17   photographs; is that right?

18         A       I did not.  I never told Truly Original

19   that I had rights to any photographs.

20         Q       Okay.  I thought earlier you testified

21   that they had reached out to you via email to talk

22   about the photographs --

23         A       Yeah.

24         Q       -- and your rights to them.

25         A       Yes.  And I cannot be certain what my

1    response was or what their email said.

2         Q     Okay.  So you're not sure as we sit here

3    today what you told Truly Original in terms of your

4    rights.

5         A     I'm not sure.

6         Q     So you may have told them that you

7    didn't have the rights?

8         A     I'm not sure what I told Truly Original.

9         Q     So it's possible, though, that you told

10   them you didn't have the rights to the photographs?

11        A     I'm not sure what I told Truly Original,

12   and I will not go on record saying that.

13        Q     That's fair.  Was it Brandon that you

14   maybe -- that CAE spoke with in terms of those

15   emails?

16        A     Perhaps.

17        Q     Perhaps it was Brandon?  So do you think

18   if we reached out to Brandon he would have those

19   emails?

20        A     Yes, or you could ask me for them as

21   well.

22        Q     Okay.

23        A     And to not further destroy my

24   relationship with Bravo, Truly Original, or NBC

25   Universal.  Thank you.

 1        Q      So you mentioned "destroy my

 2   relationship," and I understand you have claimed

 3   defamation in this case in your counterclaim.  So

 4   that I can understand more, how has your

 5   relationship with Bravo, as you say, been destroyed

 6   personally?

 7        A      Personally through Courtney Ajinca, I

 8   would say that there is no personal.  But with --

 9   through Courtney Ajinca Events --

10        Q      Okay.

11        A      -- I'm no longer able to supply my own

12   photographers for the event because of this -- for

13   any event because of this.  I'm no longer able to,

14   you know, garner -- garner press or have

15   photographers, you know, in which in turn -- which

16   in turn decreases my ability to properly market my

17   events that I have worked very hard to establish a

18   name for myself in this industry.

19             And I've never had any other issues with

20   photographers out -- you know, outside of this

21   issue.  I've been personally affected with my

22   relationship with Cynthia Bailey.  My professional

23   relationship with CAE with Cynthia Bailey has been

24   affected.

25             I'm unable to -- you know, she was

1   extremely embarrassed to be named in this lawsuit

2   and was extremely upset that she was contacted, you

3   know, from -- by you guys for this lawsuit.

4            I don't know.  I mean, this has -- this

5   has -- this has really affected my business.  I have

6   not been able to negotiate contracts properly

7   through my personal reality TV contracts because of

8   this public record that's on file.  I've not been

9   able to -- I have lost bargaining power, so I've

10  lost tons of money.  I've lost clients.  Clients

11  have chosen not to work with me because they feel

12  like I'm unethical.

13           And I'm a very honest person.  I'm a

14  very truthful person.  I'm a very loyal personal.

15  And had Nicholas not done this -- I mean, I would

16  have always made sure that he was taken care of and

17  properly, you know, credited.  All he had to do was

18  contact me.  If there was an issue, all he had to do

19  was contact me.

20           I'm not sure if he felt like there was

21  some money being given or anything like that.  You

22  know, he had -- this his -- I mean, this is

23  extremely -- I mean, I'm hurt to say the least

24  because I don't do people like that.  I don't

25  operate like that.  I'm a genuinely good person.

1          So if he -- if there was ever any issue,

2   he could have directly contacted me to correct

3   anything that he felt he was wrongfully -- you know,

4   wrong -- anything that was wrongfully done to him.

5          And, yeah, I mean it's -- I mean, it's

6   really unfortunate all around, you know.  And the

7   fact that there was no written agreement, you know,

8   obviously hurts the situation.  But Nicholas knows

9   full well what -- you know, and that's what I'm

10  saying.  This was exploitation based upon who I am

11  and what my business does and my clients.

12          So this is a clear attempt at

13  exploitation and he's an opportunist.

14     Q     How does the fact there's no written

15  agreement hurt this situation?

16     A     I think there is -- you know, because

17  there's no direct outline for, you know, what

18  they're -- what there is to be expected.

19     Q     What do you mean for what there is to be

20  expected?

21     A     Scope of services.

22     Q     I want to focus a little bit more on

23  Bravo so I can understand the damage to you.  So in

24  terms of Bravo, the damage is as to Courtney -- is

25  to CAE.  That's for the damages, correct, not to you

1   personally with respect to Bravo?

2        A     Absolutely.

3        Q     Okay.  And is it the filing of the

4   lawsuit that has damaged CAE?

5        A     Yes.

6        Q     So you -- the damage to the relationship

7   is solely due to the lawsuit; is that correct?

8        A     Yes, and -- yeah.

9        Q     Okay.  And when you -- when you -- I

10  need to understand this a little better, so maybe --

11  excuse me for not understanding.  Did Bravo tell you

12  that you couldn't bring your own photographers to

13  Bravo events after the Cynthia Bailey engagement?

14       A     Okay.  During the Cynthia Bailey

15  engagement the Bravo photographers -- the Bravo and

16  Truly Original, you know, as a whole, they did not

17  want to allow any photographers in there.  But

18  because of my relationship with them and based on

19  who I am to them, they allowed my photographers to

20  go in and shoot.

21       Q     Okay.

22       A     After -- since this has now happened, I

23  am no longer able to bring my own photographers

24  because they feel like, you know, they got burned

25  or -- you know, because now they could not use the

1   photos that they needed to use on television.

2            They wanted to use the photos when they

3   aired her engagement, and they were not able to.

4   And then -- so that affects CAE because now I can no

5   longer bring my photographers.  Bravo is not -- when

6   they have their photographs they're not getting, you

7   know, nice photos of the decor and, you know,

8   specific photos.  They're only getting what they

9   need for their production needs.

10            So that personally hurts me and affects

11   me because I cannot longer promote my brand.  I can

12   no longer, you know, garner press for myself based

13   upon the fact I don't have proper images at that

14   point, and I won't have any type -- I won't receive

15   the images.  I will only receive images once they go

16   out into the press, if they go out into the press.

17            So I so longer have the ability to take

18   my own open photographers to a Bravo-related event

19   because of this.

20       Q     Did Bravo specifically tell CAE that

21   they couldn't bring their own photographers to Bravo

22   events?

23       A     Yes, they told -- they told me in

24   advance of the event that they're -- they were no

25   longer -- they would no -- they do not allow outside

1    photographers for their events.

2              Now because I have been told, not in

3    writing, but verbally, that I had cannot bring

4    event -- photographers to the event.

5        Q     Who told you verbally from Bravo that

6    you can't bring photographs to the events?

7        A     I believe it was a conversation with

8    Cynthia.

9        Q     Cynthia Bailey told you had that?

10       A     Yes.

11       Q     On behalf of Bravo you can't bring your

12   own photographers?

13       A     Yes.

14       Q     And when did that conversation occur?

15       A     I don't remember.

16       Q     So you haven't received anything in

17   writing from Bravo prohibiting you from bringing

18   your own photographers to their events; is that

19   right?

20       A     No, that they will not allow -- they

21   will not allow outside photographers.

22       Q     So they have a policy not to allow

23   outside photographers.

24       A     I'm not sure if they have a policy to

25   allow -- not allow outside photographers.  But

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    because of the sensitivity of, you know, certain

2    events, they requested that outside photographers

3    are not brought in to maintain the exclusivity of

4    the event.

5         Q    So is there --

6         A    But I was given -- I was given -- I

7    can't even think right now.  I was given -- what's

8    the word I'm looking for?  I'm so tired.

9              An exemption for myself.

10        Q    So is it fair to say that generally for

11   Bravo events Bravo does not permit event planners to

12   bring in their own photographers?

13        A    I would say "no" because I was able to

14   bring in my own photographers for her Seagram's

15   event as well.

16        Q    So you weren't -- you weren't an

17   exception, for example, in those two cases?

18        A    An exemption was made for me for her

19   engagement photos, absolutely.

20        Q    So -- but you have not been asked to

21   work any Bravo events since the Cynthia Bailey

22   engagement party; is that right?

23        A    I'm planning her wedding currently.

24        Q    But between the Cynthia Bailey

25   engagement party and to date, you haven't worked any

1    Bravo events; is that right?

2          A      No, I worked Quad Webb's --

3          Q      What was the date of that event?

4          A      The engagement party or the --

5          Q      Yeah, since --

6          A      Yeah.  No.

7          Q      Since Cynthia Bailey's engagement party

8    and today --

9          A      No.

10         Q      -- you have not worked or CAE has not

11   worked any events; correct?

12         A      Correct.

13         Q      Just so I have clear testimony just for

14   the record, let me ask it again, please.  Since the

15   Cynthia Bailey engagement party and today's date,

16   CAE has not planned or worked any Bravo events; is

17   that right?

18         A      That is correct.

19         Q      Thank you.  So just so I understand, how

20   much money losses are you alleging due to the

21   relationship damage with Bravo and CAE?

22         A      A hundred -- like a hundred thousand.

23   I'm no longer able to properly promote.

24         Q      Okay.  Just so I can understand that

25   hundred-thousand-dollar figure, if you haven't had

1    an opportunity to work a Bravo event since the

2    Cynthia Bailey engagement party, how could you have

3    experienced a hundred thousand dollars in losses?

4         A    Because I'm no longer -- I'm not able to

5    properly post those images, you know, from the event

6    to -- to garner the attention from other people.  I

7    can't use that as -- and so I've lost clients

8    because they have Googled my name and this thing has

9    come up.  And people have come to ask me questions

10   about it.

11              So, yes, I have asked -- I've --

12        Q    Sorry.  Keep going.

13        A    No, I have lost those --

14        Q    And I just need to understand the

15   hundred thousand dollars.  I want to focus just on

16   Bravo.

17        A    Okay.

18        Q    So is your testimony today that the

19   hundred thousand dollars is due to your inability to

20   post the photographs that were taken of the Cynthia

21   Bailey engagement party exclusively?

22        A    No, because I will not -- I will no

23   longer be able to bring in my own photographers to

24   properly garner press for myself and for the events.

25        Q    But there have been no Bravo events that

1    you've worked since the Cynthia Bailey engagement

2    party; correct?

3          A     Correct.

4          Q     So there would have been no opportunity

5    to even bring your photographers in; isn't that

6    right?

7          A     Yes.  Talking about for future events,

8    especially for -- especially for her wedding.

9          Q     So that helps.  So the

10   hundred-thousand-dollar figure is future monetary

11   losses, not current losses; is that right?

12         A     It's -- in terms of Bravo, yes.

13         Q     Okay.  So the hundred-thousand-dollar

14   figured that you testified to today in terms of the

15   Bravo monetary damages are future damages; correct?

16         A     Yes.

17         Q     So to date, as you sit here today, you

18   have not lost any money or -- strike that.  To date

19   CAE has not lost any money in terms of damage to its

20   relationship with Bravo; is that right?

21         A     No.

22         Q     Okay.  Has CAE lost any clients as a

23   result of -- first of all, what is the damage to

24   CAE's relationship based on?  Is it based on the

25   lawsuit only?

1      A      I'm sorry.  Say that one more time.

2      Q      Is the damage to CAE's relationship that

3  you've testified to today, what is the cause of

4  that?

5      A      The damage to CAE's relationship?  What

6  is the cause of the damages?

7      Q      Yes.  Yes.

8      A      The lawsuit, the public record.  They

9  have -- you know, because you guys have reached out

10  to the media outlets, those media outlets no longer

11  want to feature me because they're not certain about

12  images.  You know --

13      Q      Can I ask you a quick question before I

14  forget right there, or did you have more to say?

15      A      Go ahead.

16      Q      Sorry.  The media outlets that you

17  mentioned that won't hire you, have any of the media

18  outlets reached out to you and told you that they

19  didn't want to hire you?

20      A      No, they just don't pick up my press.

21      Q      Okay.  Can you tell me a little bit more

22  about that?  Did they used to pick up your press?

23      A      Absolutely, for every event.

24      Q      Okay.  And which media outlets in

25  relationship used to pick up your press?

1          A      I've been in every media outlet.  I

2     cannot think off the top of my head.

3          Q      So you can't tell me a single media

4     outlet in particular that has failed to pick up your

5     press?

6          A      People does not pick up my press.  Us

7     Weekly has not picked up my press.

8          Q      Okay.  But you haven't received any

9     communications from People or Us Weekly that they

10    won't --

11         A      There's no communication.  They just

12    fail to pick it up anymore.

13         Q      Okay.  Got it.  Have you lost any

14    clients as a result of the lawsuit?

15         A      Yes, I have.

16         Q      Okay.  What are the names of those

17    clients?

18         A      I have had people reach out that wanted

19    to work with me but that chose not to work me based

20    on this lawsuit that they found.  I've also

21    lost hundreds of thousands of dollars from VH1 and

22    Entertainment One because I no longer have the

23    ability to negotiate my contracts for television

24    shows that I am on.

25         Q      Who is Entertainment One?

Trustpoint.One   Alderson.          www.trustpoint.one
www.aldersonreporting.com          800.FOR.DEPO
(800.367.3376)

1          A     That is a production company that I work

2    with on a television show.

3          Q     What television show?

4          A     My Celebrity Wedding.

5          Q     Are you still working on that show?

6          A     I am.

7          Q     What do you -- what is your role on the

8    show?

9          A     A celebrity wedding planner.

10         Q     Do you have a contract with

11   Entertainment One?

12         A     I do.

13         Q     And how much are they paying you to be

14   on the show?

15         A     It varies.  It's per episode.  And what

16   I was able to finally negotiate with them was 5,000

17   per episode.  But I would have been able to

18   negotiate much more had they -- had this not come up

19   on my background check.

20         Q     When did you first enter into the

21   contract with Entertainment One for the show My

22   Celebrity Wedding?

23         A     I do not remember the exact date.  I'm

24   sorry.

25         Q     Was it in 2019, last year?

1          A       Uh-hmm, it was 2019.

2          Q       So it was not 2018.  It was sometime

3     last year.  Is that fair?

4          A       It was 2019.

5          Q       Okay.  Did you enter into this contract

6     with them before the Cynthia Bailey engagement

7     party?

8          A       We began discussing terms of contract,

9     and I began my relationship with them, I believe, in

10    March of 2019.

11         Q       Okay.

12         A       And I want to say -- I can't remember

13    the exact date for when we actually came to terms on

14    the contract.

15         Q       Do you recall if the contact was signed

16    after or before the Cynthia Bailey engagement party?

17         A       It was after.

18         Q       It was after?

19         A       Yeah.

20         Q       Okay.  Do you still have a copy of that

21    contract?

22         A       Uh-hmm.  I do.

23         Q       Okay.  Just so I can understand, you

24    mentioned you lost bargaining power with

25    Entertainment One as a result of the lawsuit.

1        A       I almost was not able to be on the show.

2    They were going to walk away.

3        Q       Okay.  Can you break that down for me

4    and tell me a little bit about the conversations

5    you've had with Entertainment One where your --

6    CAE's reputation was damaged and how that --

7        A       Absolutely.

8        Q       -- happened.

9        A       We had -- we have to undergo full

10   psychological and background checks for reality TV.

11   During my background check I had to fully disclose

12   that I was currently in a lawsuit situation.  And

13   because I was in that lawsuit I -- because that

14   was noted, they dug deeper and they found that out.

15            And because, you know, of the possible

16   liability of me releasing photos or, you know,

17   something that -- or releasing something that was

18   not approved to be released, I lost that bargaining

19   power.

20       Q       What exactly did Entertainment One say

21   to you about --

22       A       They spoke with my attorney.  I'm not

23   sure.

24       Q       So nobody from Entertainment One has

25   told you that they're going to pay you less money as

1   a result of the lawsuit; is that right?

2        A     They spoke with my attorney and he was

3   not -- unable to negotiate as he should have been

4   able to.

5        Q     And which attorney was this?

6        A     Alston.

7        Q     Mr. Alston.  So they -- Entertainment

8   One reached out to Mr. Alston regarding this

9   lawsuit; is that right?

10       A     He spoke directly with Entertainment

11  One's attorney.

12       Q     Okay.  Did he tell you what that

13  conversation was about and what was discussed?

14       A     I don't remember.  He never said exactly

15  what, but that's what -- that was the gist of it.

16       Q     So you have no written communications

17  that state that Entertainment One was going to pay

18  you less because of the lawsuit; is that right?

19       A     I would have to go back and check my

20  notes, my emails.

21       Q     But you have -- but you haven't produced

22  any to date, so --

23       A     You -- you don't have them, though.  You

24  don't have -- I have not produced them to you all,

25  no.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1      Q      Right.  Okay.  Okay.  How did -- what is

2  it in particular that Entertainment One is concerned

3  with?  Do you know what they said about what in

4  particular?  Is it because of the --

5      A      Privacy.

6      Q      -- lawsuit, the fact that a lawsuit was

7  filed?

8      A      The lawsuit was filed and also the --

9  the nature of the lawsuit.  It has to do directly

10  with photographs and events.

11      Q      Okay.  And --

12      A      And releasing events from a reality

13  show, like -- I mean photographs from a reality

14  show.

15      Q      How did Entertainment One find out about

16  the lawsuit, or the claims therein?

17      A      It's public record, and it was found out

18  on my background report.

19      Q      On the background report.

20      A      Uh-hmm.

21      Q      Okay.  So nobody from Entertainment One

22  ever contacted you directly?

23      A      They spoke with my attorney.

24      Q      They spoke with you -- they reached out

25  to your attorney directly?

1          A      Yeah.

2          Q      Do you have any communications between

3   you and Entertainment One?

4          A      Of course I have communications with

5   Entertainment One and myself, but nothing about

6   legal matters.

7          Q      Okay.  And is your testimony that they

8   offered you less money because of the lawsuit to

9   appear in the show?

10         A      Because of things in my background check

11   with the lawsuit, yes.

12         Q      And did they --

13         A      It affected my bargaining ability.

14         Q      Did they specifically tell you --

15         A      My negotiating ability.

16         Q      Did they tell you or your attorney that

17   they were giving you less money as a result of the

18   lawsuit?

19         A      Yes.

20         Q      And that is in writing between you and

21   your attorney?

22         A      I'm not sure if that's in writing, but

23   that's what I was told by my attorney.

24         Q      And how much less money did you earn as

25   a result of the damage to your relationship with

1    Entertainment One?

2         A     Around a hundred K.

3         Q     And they told Mr. Alston, your former

4    attorney, or you that we're going to pay you a

5    hundred thousand dollars less because of the

6    lawsuit?

7         A     He was unable to -- he was unable to

8    negotiate my contract to what it -- to its worth

9    because of things that were found out on the

10   background check, which is the public record.

11        Q     So that hundred thousand dollars is what

12   you think you should have earned, the extra hundred

13   thousand dollars?

14        A     That's what he was negotiating for me to

15   earn.

16        Q     All right.  Is it possible that they

17   offered you less for other reasons?

18        A     No.

19        Q     No.  So the only reason that they

20   offered you less money is because of the lawsuit; is

21   that right?

22        A     Yes, because of -- he was unable to

23   negotiate that deal for me.

24        Q     Okay.  Who at Entertainment One was

25   negotiating that deal?

1          A      The attorney, their attorney.  I'm not

2  sure.

3          Q      Okay.  What did your attorney say about

4  the lawsuit?  Did he try and explain it to

5  Entertainment One?

6          A      I do not know.

7          Q      Okay.  You also mentioned that CAE has

8  lost potential clients or prospective clients as a

9  result of the claims in the lawsuit.  Can you name

10  the prospective clients you've lost?

11          A      I've had potential clients, and I prefer

12  not to name them.  They've reached out, and I'd

13  prefer not to name my clients.

14          Q      So it's a discovery deposition.  That's

15  relevant to our claim.  So I need to ask you to name

16  the prospective clients you've lost.

17          A      I don't remember off the top of my head.

18          Q      Okay.  And how much money do you

19  testify -- how much money are you claiming you lost

20  to prospective clients as a result of the claims in

21  the lawsuit?

22          A      Fifty to a hundred K.  I make, you know,

23  substantial amounts per event.

24          Q      So you are claiming 50 to a hundred

25  thousand dollars in losses to potential clients, yet

1   you can't name a single potential client you lost

2   sitting here today; is that right?

3       A       Sure.

4       Q       So what do you base that number on if

5   you don't have a single client you can base it on?

6       A       Potential clients that I cannot name off

7   the top of my head right now.

8       Q       Okay.  Have you sent proposals to any of

9   these potential clients?

10      A       No.

11      Q       So there was no discussion with any of

12  these potential clients about the value of your

13  services that they didn't hire you for?

14      A       No.

15      Q       So where do you get the number 50 to a

16  hundred thousand dollars?

17      A       Because that's how much I charge based

18  on my typical fee per event, per client.

19      Q       But yet -- how do you know how to get to

20  that number if you don't know how many clients

21  you've lost or what the scope of the services were?

22      A       The scope of the services are the same

23  for every event.

24      Q       So you are testifying that you claim 50

25  to a hundred thousand dollars though you don't know

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

 1   who the clients are you lost or what events they

 2   were going to hire you for; is that right?

 3        A     The events were discussed, but I

 4   can't -- I can't specifically say exactly how

 5   many -- how many clients were lost.

 6        Q     Do you at least know what events were

 7   discussed for these potential clients?

 8        A     They were -- since you said "discovery,"

 9   they were discovery calls.  Like they were

10   consultations.  There was no, like, full discussion

11   for an event.

12        Q     And do you know who these potential

13   clients hired instead of you?

14        A     I do not.

15        Q     Okay.  Do you know whether they hired

16   another event planner?  Do you know whether they

17   didn't hire you perhaps for other reasons such a --

18        A     I do not know.

19        Q     So you -- so you can't be certain why

20   these clients didn't hire you; is that right?

21        A     I do not know.

22        Q     Okay.  Were there any written exchanges

23   with these potential clients that you allege you

24   lost?

25        A     No, my consultations are phone calls.

1        Q       But you don't remember the substance of

2   any of those phone calls as you sit here today?

3        A       I do not.

4        Q       How has your personal relationship with

5   Cynthia Bailey been damaged?

6        A       I think some of the trust was lost

7   between Cynthia and I because she trusted me to only

8   provide her with, you know, high quality vendors,

9   including photographers, and that someone would not

10  go and drag her into a lawsuit that she has no

11  business being a part of.

12             And it could have potentially damaged

13  her.  I know you guys were contacting media outlets,

14  you know, discussing her.  So that, you know, our --

15  our relationship was -- was definitely damaged

16  because of it, CAE and personally.

17        Q       But you're still planning her wedding;

18  is that right?

19        A       Absolutely.

20        Q       How often do you speak with Cynthia

21  about her wedding?

22        A       Daily.

23        Q       So it is fair to say that she trusts you

24  enough to plan her wedding; is that right?

25        A       We were under contract already.

1        Q      How much is the contract for the wedding

2    you're planning with her?

3        A      How is that relevant?

4        Q      It's relevant to the claims in the case

5    and your damages.

6        A      Her -- the contract is 10,000.

7        Q      You're charging 10,000 total to plan her

8    wedding?

9        A      I charge 20 percent of every event.  I

10   gave her a discount.  Her budget is 50 -- her budget

11   is 75K and charged her 10K to plan.

12       Q      Has your business been affected by

13   COVID-19?

14       A      Absolutely.

15       Q      Okay.  Can you tell me how it's been

16   affected?

17       A      The entire country shut down.  You know,

18   that includes events because those are large

19   gatherings of people.  I've had clients to cancel.

20   I've had, you know, weddings being canceled,

21   postponed, mostly canceled.  But I've lost, I mean,

22   tons of money this year because of COVID-19.

23       Q      How much would you estimate that you've

24   lost?

25       A      I don't know.  I mean, I don't know.  A

1    lot.

2         Q    Is there a percentage of your revenue

3    that you would be able to estimate that you've lost?

4         A    Yeah.  I mean, probably like close to

5    like 50 percent.

6         Q    Did you apply for the PPP small business

7    loan?

8         A    I did.

9         Q    And did you receive it?

10        A    I did not.

11        Q    No.  What is your average income for the

12   last five years?

13        A    CAE's income?

14        Q    Correct.

15        A    Last year it was 175K.  This year I was

16   set to double that, but due to COVID I was not.

17        Q    What is your current income to date for

18   2020 approximately?

19        A    I would -- I really do not know.

20        Q    Is it a hundred thousand dollars or

21   more?

22        A    I do not know.  I'd have to go -- I'd

23   have to check my books.  I don't count money as it

24   comes in.

25        Q    But it's fair to say that your business

1   has been damaged also by COVID-19; is that right?

2          A      Extremely damaged, yes.  I'm the same

3   as, I'm sure, most other businesses in this country

4   have been damaged and throughout the world.

5          Q      So is it possible that these potential

6   clients you've lost have not also not hired you due

7   to COVID-19 financial difficulties?

8          A      No, those -- that was before COVID-19

9   hit.

10         Q      So the potential clients you lost, was

11  it during a specific timeframe?

12         A      It's just been, you know, in general.

13  It was in 2019 for sure.

14         Q      Okay.

15         A      Late 2019 when I received inquiries.

16         Q      What is VH1's relationship to

17  Entertainment One?

18         A      Entertainment One is a production

19  company for VH1.

20         Q      I see.  Okay.  So the contract you had,

21  is it with Entertainment One or VH1 in terms of the

22  show, My Celebrity Wedding?

23         A      Entertainment One.

24         Q      Entertainment One.  Okay.  And is that

25  show --

1        A       Are you guys going to go and, like, talk

2    to -- talk to Entertainment One and destroy --

3    further destroy my relationship with them?

4        Q       I'm not here to answer questions, so --

5        A       Yeah.  Because, I mean, you've already

6    damaged me enough, you know, throughout this entire

7    process.

8        Q       I understand.  Is the show, My Celebrity

9    Wedding, still airing right now?

10       A       It has not aired yet.  We couldn't -- we

11   had to cease production because of COVID.

12       Q       When is it set to re-air?

13       A       I have no idea.  It was set to air in

14   the fall, and we are no longer doing that because

15   we're not finished filming due to COVID.

16       Q       Have you been paid yet for that

17   contract?

18       A       I've received some payments for the

19   contract, yes.

20       Q       And it's -- the contract is $5,000 per

21   episode; is that correct?

22       A       It is.

23       Q       How many episodes are set to run?

24       A       I do not know.

25       Q       And what have you been paid for if the

1    episodes haven't run yet?

2        A      Each event we have -- so there's -- I've

3    been the main planner for the event, so I've been

4    paid reimbursement as well as partial -- partial

5    talent fees.  But because we have not finished

6    filming, I have not received full payment.

7        Q      What events have you planned for My

8    Celebrity Wedding?

9        A      The weddings that are on the show.

10       Q      What are those weddings?

11       A      There's a wedding per episode and I plan

12   the weddings.

13       Q      How many weddings have there been?  So

14   that I'm clear, none of the shows have aired;

15   correct?

16       A      Exactly.

17       Q      But you --

18       A      We've only had the chance to film two

19   episodes due to COVID.

20       Q      So you've filmed two episodes but they

21   haven't aired.

22       A      Due to COVID.

23       Q      Okay.  So what are those weddings that

24   you've filmed for the first two?

25       A      They are weddings from the show.  I

1    mean, they're just regular people who get married.

2         Q    So the first one, it's a celebrity

3    wedding.  Who are the celebrities?

4         A    There are no celebrities.

5         Q    Oh, I didn't understand.  It's My

6    Celebrity Wedding.  So maybe you can tell me.

7    What is the premise of the show?

8         A    It's a show about guests -- about brides

9    who have inspirations for a celebrity wedding and

10   they want us, the celebrity planners, to compete and

11   decide who's going to plan their wedding.

12        Q    So there has been two weddings that have

13   been filmed so far?

14        A    Yes.

15        Q    How much were you paid per wedding?

16        A    My -- I have only -- I have not received

17   my full payment, so I've only received like $3,000.

18        Q    What would you -- according to the

19   contract with Entertainment One, how much are you

20   supposed to be paid for those two weddings?

21        A    Five thousand, I believe.  We don't get

22   paid per wedding.  We get paid per episode.

23        Q    Per episode.  Okay.  And you've only

24   received $3,000 of the 5,000?

25        A    I believe -- I believe so, yes.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1          Q       And when are you scheduled to be paid --

2     or how many weddings have you planned?   It's only

3     been two for those?

4          A       Yes.

5          Q       How many more are scheduled for the

6     show?

7          A       I do not know.

8          Q       What is the total amount your contract

9     will pay you with Entertainment One?

10         A       I do not know.

11         Q       You don't know how many -- how much

12    money you're supposed to make?

13         A       I don't.

14         Q       How many episodes did you say are

15    supposed to air?

16         A       I do not know.

17         Q       Okay.   Who is your main point of contact

18    with Entertainment One?

19         A       I do not know.

20         Q       You don't know who you talk to to air

21    the show?   You've never had a conversation with

22    somebody at Entertainment One about the show?

23         A       I've had conversations with multiple

24    people from Entertainment One.

25         Q       And who are those people?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        A      Madison Merritt is one.

2        Q      How do you spell her last name?

3        A      Merritt.

4        Q      M-E-R-I-T? [sic]

5        A      Sure.

6        Q      Are you -- do you know how to spell her

7    last name?

8        A      That's how you spell it.

9        Q      Okay.  Thank you.  Madison Merritt.

10   What is her title with Entertainment One?

11       A      I don't know her title.

12       Q      Okay.  Who else have you spoken with?

13       A      That's my main point of contact.

14       Q      Okay.  And what have the two of you

15   discussed?

16       A      Matters of the show.

17       Q      Okay.  Have you talked about your

18   contract with her at all?

19       A      No.

20       Q      Okay.  In this case you're also asking

21   for attorney's fees.  How much -- how many

22   attorney's -- how much in attorney's fees have you

23   incurred to date?

24       A      I don't know.

25       Q      Have you paid your attorney any fees to

1    date?

2        A    No.

3        Q    Is your arrangement with your attorney

4    contingency or are you paying for him hourly?

5        A    I don't.

6        Q    You don't know how you're paying --

7        A    I honestly do not.

8        Q    Have you made a single payment to your

9    attorney?

10       A    No.

11       Q    Has he sent you a single bill?

12       A    No.

13       Q    Is he working for free for you?

14       A    No.

15       Q    When do you expect to pay him?

16       A    At the conclusion of all of this, I

17   would believe.

18       Q    Is he going to -- is your payment due to

19   him only if you win the case?

20       A    I do not know.  I've never been in a

21   lawsuit, so I don't -- I honestly do not know how

22   this works, so --

23       Q    Do you have any idea how much you're

24   going to have to pay him at the end of the lawsuit?

25       A    It's probably going to be quite -- I

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
1   mean, a lot.

2        Q     Have you --

3        A     He's a very respected attorney.

4        Q     Have you ever discussed how much it will

5   cost to pay your attorney for this lawsuit?

6        A     No.

7        Q     So when you asked for attorney's fees,

8   you don't know what those are going to be; is that

9   right?

10       A     They're actually mounting right now as

11  we sit here.  So I'm not sure how much it's going to

12  be.

13       Q     They're mounting right now, yet you have

14  no idea what that amount is; is that right?

15       A     No.  In the past -- in the past my

16  attorney fees have been like upwards of $40,000,

17  so -- not with -- not with Attorney Barnes but

18  with previous attorneys that I've had for contract

19  negotiations and other things like that.

20       Q     But just so I'm clear, you have no idea

21  what your attorney's fees are in this case?

22       A     I do not know.

23       Q     Okay.  And you don't know if you're

24  paying your attorney hourly or contingency; correct?

25       A     I don't know.
```

1              MS. SPERRY:  At this point I want to

2        take a short break and then come back and just

3        have a couple of followup questions, and I

4        think we'll be almost done.

5              (Recess.)

6        Q     (By Ms. Sperry) In terms of Entertainment

7   One, is the damage to CAE's business a result of

8   Entertainment One finding out about the lawsuit?

9        A     Yes.

10       Q     Is there any other basis for the damage

11  to CAE's reputation and business relationship with

12  Entertainment One other than the lawsuit?

13       A     No.

14       Q     In terms of the potential clients that

15  CAE lost, how did any find out about the lawsuit?

16       A     It's public record.

17       Q     Did any of the potential clients tell

18  you that they found out about the lawsuit?

19       A     Yes.

20       Q     And how did they find out about the

21  lawsuit?

22       A     A simple Google search of my name.

23       Q     So did they specifically tell you that

24  they did a Google search and found your name

25  associated with a lawsuit in those Google results?

 1       A      Yes.

 2       Q      And why did they call you, then, if they

 3  weren't going to hire you after finding out about

 4  the lawsuit?

 5       A      Because we had already been discussing

 6  in advance of that.

 7       Q      So these prospective clients had spoken

 8  to you before the lawsuit -- finding out about the

 9  lawsuit; is that right?

10       A      Yes.

11       Q      And then did they call you back and say,

12  we're not going to hire you because we found out

13  about this lawsuit?

14       A      They had questions about the lawsuit and

15  then I was not hired.

16       Q      So there was never any specific

17  communication from these prospective clients saying

18  they were not going to hire you because they found

19  out about the lawsuit; is that right?

20       A      No.

21             MS. SPERRY:  At this time I don't have

22        any other questions.  I'll turn it over to

23        your counsel.

24             MR. BARNES:  I have no questions.

25             Well, actually one.

1                    DIRECT EXAMINATION

2        Q    (By Mr. Barnes) Just to be clear,

3   Courtney, when you're talking about the lawsuit and

4   the lawsuit being an issue, do you mean the

5   lawsuit -- the papers themselves, the filings, or do

6   you mean -- what do you mean exactly?

7        A    So -- yeah, so like the lawsuit itself

8   is one thing.  But the letters that were sent to all

9   the publications were extremely damaging.  The, you

10  know, publicity of -- like the high profile-ness of

11  the lawsuit is, you know, an issue.

12            And specifically like the letters

13  because lies were told about me, like I was libeled

14  and slandered, you know, throughout the contact with

15  those publications.

16            So, you know, that has greatly affected

17  my image.  I have a very clean image, you know, in

18  this industry and it has greatly affected my image

19  and my -- my relationships.

20            MR. BARNES:  Okay.  I have no further

21       questions.

22                    RECROSS EXAMINATION

23       Q    (By Ms. Sperry) I have one followup to

24  that.  Thank you.

25            You just testified that the damage was

1    due to -- or you just testified that the lawsuit

2    also encompasses some of the letters to the

3    publications; is that right?

4         A     Absolutely.

5         Q     In terms of the potential clients that

6    you allege losses for, did they not hire you because

7    of the filing of the lawsuit or because of those

8    letters to publications?

9         A     I think -- I think it's important to

10   note that the lawsuit is not just a single event.

11   Because there are so many events surrounding the

12   lawsuit that make up the defamation of my character

13   lawsuit this entire ordeal.

14        Q     Right.  But in terms of those potential

15   clients, did they say they weren't hiring you

16   because they found out in a Google search that you

17   were in a lawsuit; is that right?

18        A     In terms of -- in terms of potential

19   clients, yes.

20        Q     Yes.  Okay.

21        A     In terms of my relationships with other

22   people throughout this industry, it was a

23   culmination of all of the defaming tactics that were

24   done throughout this lawsuit.

25        Q     And who are the other parties throughout

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   this industry that you were damaged by?

2       A    Various publications, various other

3   media outlets, but specifically damaged by your firm

4   and your clients.

5       Q    Okay.  And Entertainment One where you

6   allege -- how much -- I'm going to have to look to

7   your testimony.  But in terms of the losses relating

8   to Entertainment One, is that loss due to

9   Entertainment One finding out about the lawsuit

10  through a Google search?

11      A    It was not find out through a Google

12  search.  It was found out through a background

13  check.

14      Q    Excuse me.  And that loss is due to

15  Entertainment One finding out about the filing of a

16  lawsuit through a background check; is that right?

17      A    And me having the inability to negotiate

18  my contract further, yes.

19      Q    Right.  But the cause of their concern

20  is they found out there was a lawsuit through a

21  background check; is that right?

22      A    Yes.

23          MS. SPERRY:  I don't have any further

24      questions.

25          MR. BARNES:  None from me.

1                    (Deposition concluded at 11:35.)

2                    (Signature not discussed.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          DISCLOSURE

2
    STATE OF GEORGIA              DEPONENT:  COURTNEY AJINCA
3   COUNTY OF FULTON

4          Pursuant to Article 10.B of the Rules
    and Regulations of the Board of Court Reporting of
5   the Judicial Council of Georgia, I make the
    following disclosure.
6
           I am a Georgia Certified Court Reporter.
7   I am here as an independent contractor for Alderson
    Court Reporting.  Alderson Court Reporting was
8   contacted by the offices of Marcy L. Sperry,
    Esquire, to provide court reporting services for
9   this deposition.  Alderson Court Reporting will not
    be taking this deposition under any contract that is
10  prohibited by O.C.G.A 9-11-28 (c).

11         Alderson Court Reporting has no
    contract/agreement to provide reporting services
12  with any party to the case, any counsel in the case,
    or any reporter or reporting agency from whom a
13  referral might have been made to cover this
    deposition.  Alderson Court Reporting will charge
14  its usual and customary rates to all parties in the
    case, and a financial discount will not be given to
15  any party to this litigation.

16

17  _____
    CARLA J. HOPSON, CCR# B-1816
18  July 13, 2020.

19

20

21

22

23

24

25

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1              C E R T I F I C A T E

 2    STATE OF GEORGIA:

 3    COUNTY OF FULTON:

 4

 5         I hereby certify that the foregoing deposition

 6    was taken down, as stated in the caption, and the

 7    colloquies, questions and answers were reduced to

 8    typewriting under my direction; that the foregoing

 9    transcript is a true and correct record of the

10    evidence given.

11         The above certification is expressly withdrawn

12    and denied upon the disassembly or photocopying of

13    the foregoing transcript, unless said disassembly or

14    photocopying is done under the auspices of Alderson

15    Court Reporting, Certified Court Reporters, and the

16    signature and original seal is attached thereto.

17         I further certify that I am not a relative or

18    employee or attorney of any party, nor am I

19    financially interested in the outcome of the action.

20         This, the 13th day of July, 2020.

21

22    _____

23    CARLA J. HOPSON, RPR
      Certified Shorthand Reporter
24    B-1816

25
```

Notice Date: 07/14/2020

Deposition Date: 7/8/2020

Deponent: Courtney Ajinca

Case Name: Nicholas McElroy v. Courtney Ajinca Events LLC

Page:Line            Now Reads              Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20__, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES: