

Transcript of **Bryan Flores**

Wednesday, July 8, 2020

*Nicholas McElroy v. Courtney Ajinca Events LLC*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 93551

1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3

4
    NICHOLAS McELROY, an individual, )
5   and BRYAN FLORES, an individual, )
                                      )
6        Plaintiffs,                  )
                                      )
7   vs.                               )CIVIL ACTION FILE
                                      )1:19-cv-05094-SDG
8   COURTNEY AJINCA EVENTS, LLC,      )
    a North Carolina limited          )
9   liability company, and COURTNEY   )
    AJINCA, an individual,            )
10                                     )
         Defendants.                  )
11  _____  )

12

13           The deposition of BRYAN FLORES, taken on

14      behalf of the Defendants, pursuant to the

15      stipulations set forth herein, before Carla J.

16      Hopson, RPR, Certified Shorthand Reporter, at

17      3017 Bolling Way, NE, Atlanta, Georgia, on the

18      8th day of July, 2020, commencing at 4:18 p.m.

19

20

21

22

23

24

25

```
 1                          Index

 2   EXHIBITS  (For the Defendants)            Page

 3   1:   Amended Complaint                    81

 4   2:   Photographs                          22

 5   4:   Defendants' First Request for

 6        Production of Documents (Flores)     89

 7   6:   Texts                                30

 8   8:   Texts                                77

 9   10:  Texts                                78

10   30:  NBC Universal 10/16/19 letter        76

11   31:  Meredith Corp. 10/16/19 letter       76

12   32:  All About the Tea 2/11/20 letter     76

13   33:  Atlanta Black Start 2/11/20 letter   76

14   34:  Bingeworthy 2/11/20 letter           76

15   35:  CNN 2/11/20 letter                   70

16   36:  Hip Hollywood 2/11/20 letter         76

17   37:  Hollywood Life 2/11/20 letter        76

18   38:  Meredith Corp. 2/11/20 letter        76

19   39:  Evolve Media 2/11/20 letter          76

20   40:  Straight From the A 2/11/20 letter   76

21   41:  The Jasmine Brand 2/11/20 letter     76

22   42:  Upscale Magazine 2/11/20 letter      76

23   43:  American Media 2/11/20 letter        76

24   44:  CNN license agreement and release    63

25   45:  American Media agreement and release 72
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
1                    INDEX (Cont.)

2  Exhibit No.                          Page

3  46:  NBC Universal agreement and release    72

4  47:  People Magazine agreement and release  72

5

6              E X A M I N A T I O N S

7                                       Page

8  Cross Examination

9       (By Mr. Barnes)                 5

10 Direct Examination

11      (By Ms. Sperry)                 90

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL:

 2    On Behalf of the Plaintiffs:

 3          MARCY L. SPERRY, ESQUIRE

 4          MELISSA FATIMA CASTRO, ESQUIRE

 5          ALEXANDRIA J. ARON, ESQUIRE

 6          Vivid IP

 7          3017 Bolling Way, NE

 8          Atlanta, Georgia 30305

 9          Email: marcy@vividip.com

10          Phone: (404) 788-1976

11    On Behalf of the Defendants:

12          JEFF BARNES, ESQUIRE

13          Barnes Firm, LLP

14          3280 Peachtree Road, N.E., Floor 7

15          Atlanta, Georgia 30305

16          Email: jeff@barnesattorneys.com

17          Phone: (404) 236-5000

18

19    ALSO PRESENT:

20          Courtney Ajinca

21          Nicholas McElroy

22

23

24

25
```

```
 1                   * * * * * *

 2           MR. BARNES:  This is the deposition of

 3       Bryan Flores taken for all purposes allowable

 4       under federal and state law.  And pursuant to

 5       agreement by counsel, we agree to waive all

 6       objections except to the form of the question

 7       until the time of trial or first use.

 8           MS. SPERRY:  Agreed.

 9           MR. BARNES:  All right.  If you would

10       swear in the witness.

11   THEREUPON,

12                   BRYAN FLORES,

13   having been first duly sworn, was examined and

14   testified upon his oath as follows:

15                 CROSS EXAMINATION

16       Q    (By Mr. Barnes) Would you state your name

17   for the record, please.

18       A    Bryan Flores.

19       Q    Okay.  How old are you, Mr. Flores?

20       A    I just turned 35.

21       Q    Thirty-five.

22       A    Yes, sir.

23       Q    Okay.  And what's your address?

24       A    239 Grant Street, Unit 134.  I'm sorry.

25   164.  Atlanta, Georgia 30312.
```

1        Q        Okay.  What's your highest level of

2   education?

3        A        I have an associate's degree in computer

4   science.

5        Q        From where?

6        A        Gwinnett Tech.

7        Q        And who do you currently -- are you

8   currently employed?

9        A        I started my own business.  I just moved

10  back from Peru.

11       Q        Okay.  So what business did you start?

12       A        Photography and videography.  Well,

13  restarting it.

14       Q        Restarting it.  Okay.  So when were

15  you -- how long were you in Peru?

16       A        Six months.  October through -- I got

17  repatriated in April.

18       Q        Okay.  All right.  Previous -- so that's

19  been your sole employment for the past six months

20  was --

21       A        Yeah.  I moved to Peru to start doing --

22  well, a YouTube show.  So I saved up money from the

23  job I had prior, moved down to Peru to start doing

24  YouTube videos and raise awareness and then for

25  filming and photography for clients down there.

```
 1          Q      Okay.  In the past five years any
 2   arrests for anything?
 3          A      No.
 4          Q      Have you ever been in any other
 5   lawsuits?
 6          A      I was in a class action lawsuit with a
 7   restaurant group years ago, probably maybe a decade
 8   ago.  I was a manager at a restaurant and I was
 9   putting myself through school at Gwinnett Tech.  And
10   the company -- the restaurant was, like, not paying
11   out overtime, and there was an attorney who got a
12   bunch of us in a class action.
13                 I never heard any outcome or anything
14   from that, so -- but, yeah, that was the only thing.
15          Q      Did you -- have you ever been deposed
16   before?
17          A      No.
18          Q      Okay.  So what's your relationship to
19   Mr. McElroy?
20          A      Friends, you know, photography
21   colleagues.
22          Q      Okay.  How many -- do you have any
23   business relationship with him?
24          A      I mean, we've done some work together
25   collaboratively.
```

1        Q       Okay.  So how many times or how many

2    jobs?

3        A       A handful of weddings -- I mean, not

4    even a handful of weddings.  A couple of weddings

5    and then the two -- the two projects that I can

6    remember that also included Night Owl.

7        Q       That also included what?  I'm sorry.

8        A       Night Owl.

9        Q       Night Owl.  Okay.  So with your -- for

10   those jobs with Mr. McElroy, did you have contracts,

11   or what were -- did you keep work under the same

12   agreement, or what was -- what were the terms of

13   those jobs?

14       A       Well, weddings were -- you know, he

15   sends all the photos to me.  Usually I edit them.

16   You know, I hired him to be a second shooter for a

17   wedding.

18       Q       What about -- what's your relationship

19   with George Barron Fox?

20       A       A friend, the same.  A friend, a

21   creative friend.

22       Q       Do you have any business with --

23       A       He's under Night Owl, so I guess

24   technically, yes.

25       Q       When you say he's under Night Owl, what

1    do you mean?

2         A    He's part of that organization.

3         Q    Okay.  Do you have any idea what his

4    role is?

5         A    No clue.

6         Q    Okay.  And what -- what is Night Owl?

7         A    A post house.  They do video editing.

8         Q    Video editing.

9         A    Uh-hmm.

10        Q    Okay.  Is that -- do they do anything

11   else?

12        A    No.  I mean, not under their umbrella.

13   They're just a post house.

14        Q    Just a post house.  So would a post

15   house have any reason to have cameras laying around?

16        A    Well, sure.  I mean, you're editing, so

17   there would definitely be, you know, cameras laying

18   around.

19        Q    But, I mean, I guess -- I guess what I'm

20   trying to get to is if you -- normally if you

21   call Night -- if I called Night Owl today and said,

22   hey, will you video my daughter's soccer game, would

23   they say, no, we don't do that kind of stuff?

24        A    They could say we could probably

25   facilitate it, I guess.  I don't know.  I don't know

1    what they would say.

2         Q     Okay.  Fair enough.  So let's start at

3    the beginning with the facts relating to this

4    lawsuit.  So at some point I presume it's Mr.

5    McElroy contacts you and says, hey, I have an

6    opportunity for you for the -- to photograph Cynthia

7    Bailey's engagement.

8         A     Well, I don't know if he mentioned her

9    per se.  But, I mean, he did ask me to come along

10   and help shoot an event.

11        Q     So do you remember when that was?

12        A     I think it was the day of or the day

13   before.  I'm not really sure.  It was so long ago.

14        Q     And that was the first that you heard

15   of this job, the engagement event?

16        A     It was.

17        Q     Okay.  So what happens then?  Did you

18   ever -- first of all, does he send you a text?  Does

19   he email you?  Does he call you?

20        A     I don't know.

21        Q     Do you remember?

22        A     I'm not sure.

23        Q     You're not sure.  So what happens next?

24   He gets in touch with you and says -- says what?

25        A     Once again, I think just "we have an

1  event to shoot, you know, do you want to come

2  along," you know.

3       Q     Okay.

4       A     This is very vague by the way.  I'm not

5  really too sure.  I mean, obviously this is -- I

6  don't -- I haven't -- it was so long ago, so ...

7       Q     Okay.  So then you -- presumably you

8  said, yes, I'll do it?

9       A     Yeah.

10      Q     So what were the terms of the deal?

11      A     He mentioned that, you know, it was --

12  you know, we were going to be taking photos of an

13  event and that, you know, these could be used, you

14  know, during social media -- for social media.  And

15  that was pretty much it.

16            I said, okay, cool.  I like -- I like

17  working.  I like doing what I do.

18      Q     So when did he -- when did he mention --

19  what did he say he was going to pay you?

20      A     I don't remember.  I didn't even -- I

21  don't know.

22      Q     Do you remember what you did get paid?

23      A     I'd have to look.  I'd have to see

24  what -- because I don't even know the means in which

25  he paid me.  I think it might have been cash.  I'm

1    not sure.

2         Q    Okay.  So you're -- so he says -- you

3    work out a deal for payment, you don't remember what

4    the payment arrangement was, but you're going to go

5    and you're going to shoot some photos.

6              How long?  Did he tell you how long you

7    would be there?

8         A    No.  This was just -- it was an event.

9    We showed up, and I was just kind of committed to it

10   at that point.

11        Q    What's a typical -- have you done other

12   events like that before?

13        A    Not like that, no.

14        Q    Okay.  Have you -- have you photographed

15   people's -- well, strike that one.

16             Okay.  And what was your understanding

17   of why the -- this engagement was being

18   photographed?

19        A    I think there was mention of like some

20   sort of TV show, that there was like someone

21   that's -- it was like an event.  I think it was some

22   sort of creative event?

23        Q    Okay.  But where were your -- the

24   pictures you were taking, who were they going to?

25   Who -- what was your understanding of who they were

1    going to?

2         A     Well, I knew that it was -- I'm sorry --

3    Courtney that had us coming out, I guess, through

4    the conversations or communications that she had

5    with Nick.  I was just -- like I said, just coming

6    out to help him, you know, to take photos and some

7    video.

8         Q     Okay.  So you were going to take some

9    photos and do some video.  And what were you going

10   to do with those photos and video?

11        A     Well, at one point Courtney came up to

12   me right after the engagement proposal and, you

13   know, asked me if I could edit these quickly and get

14   them to her.

15             And I happened to have my MAC there, so

16   I started editing them.  And, you know, I airdropped

17   them to her.

18        Q     Okay.  And what was your

19   understanding of where they were going?

20        A     I understood they were just going to be

21   used for social media.

22        Q     What do you mean by social media?

23        A     Facebook, Instagram, Twitter, I guess

24   anything that constitutes social media.

25        Q     Okay.  Would it have made a difference

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    to you if they were being used for something else?

2          A     I would have definitely liked to know,

3    yeah, for sure.

4          Q     Okay.

5          A     Made aware.

6          Q     But why would you like to know?

7          A     Because it's my work.  It's my passion.

8    It's what I do.  I like to know where my work is

9    going.

10         Q     So you'd like to see the -- you know,

11   like to see where it went?

12         A     Sure.

13         Q     So if -- if Nick called you up and said,

14   hey, I got this job, we're going to take the

15   pictures and we're going to put them up in a

16   billboard in Times Square, would that have changed

17   your mind about doing the job?

18         A     I would have asked for a lot more money.

19         Q     Okay.  And why is that?

20         A     Well, it just depends on the situation.

21   If you tell me a billboard, I may have to rent a

22   Hasselblad.  I might have to rent him a MIA that has

23   like --

24         Q     I'm sorry.  You might have to what?

25         A     Rent a Hasselblad or a MIA, a type of

1  camera that's designed to use for that, you know.

2  So therefore, there would be more cost.  You have to

3  have more skill to use a camera like that, so --

4          I mean, yeah, there's a lot of different

5  factors; but sure.

6      Q    What if he just said, give me -- you

7  know, come on over with the equipment you have, take

8  some pictures for us and we'll -- you know, they'll

9  do with them what they want?

10     A    Super vague.  My contracts normally

11 state that I have full copyright.

12     Q    Okay.  So do you have a -- did you have

13 any contract with CAE, with Courtney Ajinca Events?

14     A    No.

15     Q    Did you have any contract with Courtney

16 herself?

17     A    No.

18     Q    Did you have any contract with Mr.

19 McElroy?

20     A    I mean -- I mean, just the understanding

21 that I was going to come out and take some photos

22 and they were going to be used for social media.

23     Q    So what happens?  You speak with Mr.

24 McElroy, make this deal.  And then what happens

25 next?

1          A      I come out.

2          Q      Okay.  When you get there, who is there?

3    Who comes with you?

4          A      I think I drove myself, I guess.  I'm

5    usually pretty -- pretty independent when it comes

6    to getting places.  I like to drive.

7          Q      Okay.

8          A      So if I had to guess, I probably drove

9    myself.

10         Q      Okay.  So you drove, you got there.

11   From your -- Mr. McElroy is there, or did he get

12   there later?

13         A      I'm not sure.

14         Q      So who's your -- who's with you, meaning

15   like your group?  Mr. McElroy, you.  Anyone else?

16         A      And people from Night Owl.

17         Q      Okay.  Who was there from Night Owl?

18         A      I know Danny for sure.  Maybe George.

19         Q      What were they -- what were they doing

20   there?

21         A      Watching our gear for the most part.

22   They would -- we had a, you know, little area set

23   up.  There was a lot of people.  There was -- it was

24   open to the public.  It was like an event center but

25   attached with like little shops.  I don't know how

1  to describe it, but --

2      Q     Sure.

3      A     Yeah, there were watching the

4  equipment --

5      Q     Okay.

6      A     -- for the most part.

7      Q     So you're there.  What are you doing

8  while you're there?

9      A     Videoing and photographing.

10     Q     And what are you videoing and

11 photographing?

12     A     We were told to not video anything other

13 than like decor and stuff first before like the

14 actual event started.  And then once the event

15 started, we were told not -- we were not allowed to

16 have video.  And then we were given permission to

17 take photos during the engagement.

18     Q     Okay.  So who told you not to take any

19 video?

20     A     I don't recall.  I think it was some

21 producer or someone that had a walkie-talkie that

22 seemed like he was in charge.

23     Q     Okay.  Was that the same person who gave

24 you permission to take the photos?

25     A     I believe so.  It was -- it was a really

1    weird day because there was so much going on, so

2    many people walking around.  I mean, I'm -- it's

3    kind of hard to recollect.

4         Q    So you take the photos.  The event --

5    what causes you to stop taking photos?  Does the

6    event end?  Does somebody --

7         A    I believe the event ended, but there was

8    still people hanging around.

9         Q    So what do you do then?

10        A    Probably got in my car and went home.

11   After a shoot I'm pretty tired.

12        Q    Well, you said that at some point you

13   airdropped some photos.  So when did that happen?

14        A    I think as the event was wrapping up.

15        Q    As it was wrapping up.  Did you take any

16   more photos after that?

17        A    I maybe took some drum footage when I

18   was leaving.

19        Q    So then you said after the event you got

20   in your car and went -- you think you went home?

21        A    Yeah, probably.  Either home or back --

22   yeah.  I don't know.

23        Q    Okay.  Did you sent out any other photos

24   that night?

25        A    I probably uploaded them to my SmugMug

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    account.

2         Q     Okay.

3         A     And I believe -- I'm sure at some point

4    I probably sent that link out to Nick.

5         Q     Okay.  So why did you send the link to

6    Nick?

7         A     Just to share the photos that I had

8    taken so he could see them.

9         Q     What did you think that he was going to

10   do at that point?

11        A     What we had discussed, you know,

12   distribute them for the client for use on social

13   media.

14        Q     Distribute -- okay.  Do you know if he

15   actually did send them?

16        A     I'm not sure what Nick has done on the

17   phone or not.  I completed my duty at that point.  I

18   kind of just -- when I'm done with a job, I usually

19   just finish and, you know, continue on looking for

20   more work.

21        Q     Okay.  So when you took the photos did

22   you put any watermarks on them?

23        A     At that time, no, because it was just so

24   quickly that she asked for them while I was there,

25   so --

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

1      Q      Was there any discussion about what they

2  could or couldn't be used for?

3      A      Not with her, no, because I had already

4  had that, like, prior verbal discussion with Nick.

5      Q      So you made a deal -- so your deal with

6  Nick was social media.

7      A      Well, that's usually like our MO.  Like

8  it was just -- that's how it was mentioned to me, it

9  was going to be used in social media.

10     Q      Okay.  So Nick is the one -- did

11 Courtney ever tell you it was going to be social

12 media?

13     A      I didn't speak to her in regards to

14 that.  I -- she did ask me for like a photo that she

15 had with Cynthia and she wanted it because it was

16 personal to her, so ....

17     Q      So what about, did you ever -- CAE,

18 which is Courtney's company -- you know, if it's the

19 same to you --

20     A      Okay.

21     Q      Did you have any conversation with

22 anyone at CAE --

23     A      This is -- today is the first day I've

24 heard of CAE as a whole.  But I -- no.  So I don't

25 know.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        Q        Okay.  So photos -- so the deal -- the

2   understanding you had for the photos was based on

3   what Mr. McElroy told you?

4        A        (Nodding.)

5        Q        And you distributed the phones to Mr.

6   McElroy based on the deal between you and Mr.

7   McElroy?

8        A        Well, I originally distributed them to

9   her via airdrop.

10        Q        Okay.

11        A        Based on the fact that, you know, she

12   was the point of contact, she was the one that

13   hired, you know, us to do what we were doing.  So I

14   didn't feel, you know ...

15        Q        Okay.  She never said, oh, social

16   media -- she never said anything about, I know this

17   is for social media only?

18        A        No, not that I can recall.

19        Q        Okay.  So did you give Mr. McElroy any

20   rights, licenses, or anything in any of those

21   photos?

22        A        No, I maintain all that.

23        Q        Okay.  And how would he know that?

24        A        Well, usually it's whoever snaps the

25   photos owns the rights to the photos.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    Q    Okay.  And what makes you -- do you have

2    any idea why Mr. McElroy would believe that that was

3    the deal for this job?

4    A    Well, yeah, that's how he explained it

5    to me.  It was going to be used for social media

6    purposes.

7              (Exhibit Number 2 was marked.)

8    Q    Okay.  So let's look at Exhibit 2, if

9    you can go through that.  Those were exhibits that

10   were attached to the lawsuit.  And what I'd like you

11   to do is pull out the ones that you took.

12   A    (Complies.)

13   Q    So I'm going to mark these photos that

14   you've pulled out.  The first one is Page 7 of 67.

15   I'm going to mark that one F-1.  The next one is

16   Page 8 of 67.  I'm going to mark that one as F-2.

17             The next one, Page 9, I'm going to mark

18   that one as F-3.  The next one is Page 10, F-4.  And

19   the last one is Page 11, and I'll mark that as F-5.

20             Okay.  So we'll -- lay these out there.

21   And I don't know if you had --

22             You came in kind of in the middle of Mr.

23   McElroy's deposition, so I'll repeat the

24   instructions.  But I'm going to ask you a bunch of

25   questions about the photos.  And I'm really asking

1   questions about each of them individually.

2        A    Okay.

3        Q    But they could all -- your answers could

4   be different for each different photo, but if it's

5   the same for all of them, you know, you can just say

6   "all of them."  But if you are -- if, for example,

7   you say this one was -- you know, I told somebody to

8   do something with this one, just identify it as F-3

9   versus, you know, to differentiate them.

10            But there's no need -- if everything is

11   identical, then you can just say all -- all the same

12   for everybody.  And if the way I'm asking these

13   questions seems to be in any way confusing, stop me.

14        A    Okay.

15        Q    Because I'm not -- all I'm trying to get

16   to is facts.  I'm not trying to confuse you --

17        A    Sure.

18        Q    -- or get you to say anything that isn't

19   accurate.

20        A    Okay.

21        Q    Okay?  So you took the photos in front

22   of you that are marked F-1 through 5?

23        A    Correct.

24        Q    Correct?  Okay.  Did anyone else assist

25   you need in taking these photos?

1       A       Not those, no.  I took these on my own.

2       Q       Okay.  So who do you contend owns the

3   copyright to these photos?

4       A       I would say me.

5       Q       Okay.  And you actually registered a

6   copyright for these photos; correct?

7       A       Correct.

8       Q       Okay.  So what caused you to register a

9   copyright?

10      A       Legal counsel.

11      Q       Okay.  Let's back up for a second.

12  After you finished the job you said you went home,

13  you sent the link, and that was it.

14      A       No.  No.  I airdropped them to her at

15  the location.

16      Q       You airdropped them and then later sent

17  Mr. McElroy a link and then that was it.  So when

18  did this come -- when did those photos or event come

19  to your attention again?

20      A       I don't recall when, but Mr. McElroy was

21  the one that made me aware it was on People

22  magazine.

23      Q       So you mean like a day later?

24      A       Maybe within 24 hours.  I think they had

25  the exclusive.

1       Q       So what did you -- how did he tell you

2    that?

3       A       I think via phone call.

4       Q       A phone call?

5       A       Yes.

6       Q       What did you say?

7       A       I was in shock.  I -- I was just,

8    like -- I didn't know what to think.  It was a very

9    long day, super tiring.  But I was -- I was just in

10   shock.  I didn't know what to think.

11      Q       Were you excited?  Were you --

12      A       I was just in shock.  I don't really

13   have another way to describe it.

14      Q       Okay.  So shocked in a good way?

15   Shocked in a bad way?  It is a feeling you want to

16   have again?

17      A       I mean, not when you don't see your name

18   written on any of it.  Like it's -- that was -- it

19   kind of pissed me off.

20      Q       Okay.  Did you have any idea your name

21   wasn't attached?

22      A       No clue.  I don't even know why the

23   photos were on People.

24      Q       Did you ever come to learn anything

25   about how the photo credit was given for those

1   photos?

2        A     No.

3        Q     If I told you that Mr. McElroy

4   instructed CAE's publicist to credit Night Owl as

5   opposed to you, would that be -- what do you think

6   about that?

7        A     I mean, they were already credited on

8   that photo.  So they were --

9        Q     What if I told you they were credited

10  because he told them -- he told the publicist to

11  credit Night Owl, not you, Night Owl?

12       A     You know, I -- I'm sure it was an honest

13  mistake if he did.  You know, I've worked -- I

14  believe Mr. McElroy has high integrity, so --

15       Q     Okay.

16       A     I don't think -- if he did that, it

17  wasn't maliciously.

18       Q     Okay.  So he tells you that they're in

19  People.  You take a look, and you get pissed because

20  your name's not on there.  What happens -- what do

21  you do next?

22       A     I'm not really sure what I did next.

23  I'm trying to think.  I mean, I guess process.  You

24  know, I was still busy doing other work.

25       Q     Okay.  Did you say anything to -- what

 1    did you say to Mr. McElroy during that conversation?

 2         A    I don't recall.  It was so long ago.

 3         Q    Okay.  So the next couple of days you

 4    process it.  When did this come back to your

 5    attention again?

 6         A    I think the 48 to 72 hours when I was

 7    getting messages or I was being told by Nick that

 8    there was other publications that had our photos.

 9         Q    Okay.  Was he excited?  Was he angry?

10    Was he happy?  Sad?

11         A    I think he was more concerned because

12    I -- I was concerned from the getgo because of the

13    whole --

14         Q    Concerned how?

15         A    Just crediting at first.

16         Q    Okay.  So what concerned you about the

17    crediting?

18         A    It was improper.

19         Q    Okay.  How so?

20         A    My name wasn't on it.

21         Q    Okay.  And why -- do you have any idea

22    why he was concerned?

23         A    Just because it wasn't within the scope

24    of what we had thought was going on with these

25    photos.

1       Q       Okay.  So how -- how would it have --

2   how did that change your thoughts about the --

3   strike that.  That's a bad question.

4               So your -- your concern is that your

5   name is not being properly credited to the photos.

6       A       That was one of my first concerns, sure.

7       Q       So what was -- what were your other

8   concerns?

9       A       Well, I mean, later as we started

10  realizing that, you know, these photos were being

11  pushed out there and improperly tagged, I just -- I

12  felt bad about the situation.

13      Q       What do you mean by that?

14      A       I felt like I was taken advantage of.

15      Q       How so?

16      A       I had photos published that weren't

17  credited to me.

18      Q       Okay.  Photos published that weren't

19  credited to you.  Anything else?

20      A       I mean, the fact that they were

21  published at all.  Like I didn't know about them.  I

22  wasn't told about it.  It was kind of upsetting.

23      Q       Okay.  Was there any kind of an

24  arrangement where -- that you had to be notified of

25  the publication?

1        A      Well, I mean, like, you know, Nick and

2    I -- Nick had told me it was going to be for social

3    media, so ....

4        Q      Okay.  So let's suppose hypothetically

5    that a picture was posted on social media and then

6    it was picked up by People.  Would that have been

7    fine with you?

8        A      Yeah, because they probably would have

9    called me.  Most of the time when anybody wants to

10   use my publication I get a call.  I've had websites

11   that have used my photos before, and they'll call me

12   and ask beforehand and they'll try and either buy it

13   or, you know, lease it somehow.

14       Q      Okay.

15       A      But it's usually etiquette and

16   respectful to go to the first person that created

17   it.

18       Q      Okay.  So what angers you most?  The

19   fact that it was used at all, or the fact that your

20   name wasn't attached to it?

21       A      I think I stated it was a combination of

22   both.

23       Q      Okay.  So who do you hold responsible

24   for your name not being attached?

25       A      I guess the person who published it in

1    People, the editor, for not checking the sources.  I

2    don't know.  I don't know who to place blame to at

3    this point.

4         Q    Okay.  I want you to take a look at some

5    of these messages.  They might not be -- well, they

6    were attached to your -- attached to the

7    counter-claim.

8              I'm sorry.  Mr. McElroy previously --

9    there was some discussion during his deposition

10   where he knowledged these text messages, and they're

11   messages between him and Danika Berry whose DB

12   Agency is the publicist for CAE.  Okay?

13        A    Okay.

14             (Exhibit Number 6 was marked.)

15        Q    And these are marked as Exhibit 6.  So

16   if you look there in Exhibit 6, I've got it on

17   Page -- I have it at Page 6 right now.  You will see

18   where -- actually, let's start at Page 5, if you

19   don't mind turning back one.

20             You'll see where Mr. McElroy is saying,

21   "This one is for Bryan."  And then the following

22   page carries through, "This one is for Bryan," and

23   it keeps going.  And then Danika says, "It's going

24   to be hard with all these different pics.  Is it the

25   same company?"

1           I mean, this is talking about photo

2   credit.  And then Mr. McElroy says, "We can just do

3   Night Owl Post on all of them."

4           Did you give Mr. McElroy permission

5   to take your -- to remove your name as a photo

6   credit?

7       A    I don't recall.

8       Q    You don't recall?

9       A    Hmm-hmm.

10      Q    You testified a few minutes ago that you

11  were quite angry that your name didn't appear on the

12  photos.

13      A    That's correct.

14      Q    And you don't remember if you gave him

15  permission?

16      A    I don't.

17      Q    No?

18      A    This is well over a year ago.  So it's

19  kind of hard to remember what we discussed.

20      Q    Well, if you looked at the pictures and

21  saw your name wasn't attached to them and the first

22  thing was being upset that it wasn't attached, why

23  would you be upset if you gave him permission to not

24  have you credited?

25      A    I -- I don't know if I knew about this.

 1          Q      Didn't you take a look and say, hey --

 2          A      I don't know if I knew about this.  This

 3     is with -- a conversation with who?

 4          Q      This is a conversation with Danika, the

 5     publicist.

 6          A      Okay.  I don't --

 7          Q      This is where the photos are being

 8     distributed.

 9          A      Okay.

10          Q      And she's asking about photo credits.

11     He initially says "Bryan" and then he later says

12     "Let's just do Night Owl, Night Owl Post."  And

13     he tells Danika to remove your name from the photo

14     credit and just do Night Owl Post.

15                 So you're saying you don't remember if

16     you gave him permission to do that or not?

17          A      Correct.

18          Q      Okay.  So based on this, who do you hold

19     responsible for your name not appearing in the photo

20     credits?

21          A      I mean, I think I stated the editor

22     originally.

23          Q      Okay.  So why would -- the editor of

24     what?

25          A      People.

1      Q     How would the editor of People know who
2  you are if Mr. McElroy said to credit Night Owl
3  post?
4      A     No clue.  I feel like if an editor posts
5  information, she'd probably do research, right?
6  Just like news reporters or whatnot.
7      Q     So how would they find out if the photo
8  credit -- if I take the photo off of the Internet
9  right now, okay --
10      A     That's not where the photo came from,
11  though.
12      Q     If I took a photo off of your camera
13  right now, a raw file, and turned it into a JPEG or
14  whatever, emailed it to myself --
15      A     Well, the photo was sent to somebody who
16  knew who took it.
17      Q     Sure.
18      A     So I would hope that they would send the
19  proper information.
20      Q     Sure.  Well, Mr. McElroy said the proper
21  information was Night Owl Post?
22      A     Correct.  I can't control what he says.
23      Q     So I guess what I'm saying is:  How
24  would People magazine -- if Mr. McElroy said use
25  Night Owl Post for the photo credit, how would

 1    People magazine -- why would they --

 2          A       Where did People get the photo from?

 3          Q       People got it from Danika.

 4          A       Where did she get them from?

 5          Q       From Mr. McElroy.

 6          A       Okay.  Well, I sent them all to her

 7    originally, so she knew I took those photos.  She's

 8    friends with Danika.  They should have communicated.

 9          Q       Okay.  So you hold Ms. Ajinca

10    responsible --

11          A       Sure.

12          Q       -- because she would have communicated

13    with Danika?

14          A       I mean, she was using my photos.

15          Q       Okay.  So did you have a contract

16    with --

17          A       I didn't have a contract with anyone.

18          Q       Okay.  So you don't hold Mr. McElroy

19    responsible at all for the photo credit --

20          A       No.

21          Q       -- being Night Owl and not you?

22          A       (Nodding.)

23          Q       No.

24                  Okay.  So back to -- back to this

25    timeline.  You were upset.  You're upset.  You and

1    Mr. McElroy had a phone conversation.  You hang up.

2    At this point you're somewhat upset because your

3    photo is not credited, your photo -- your name is

4    not on the photo as credit and you're somewhat upset

5    because they were on People magazine.

6            So what happens next?  You hang up with

7    him.  What do you do next?

8        A    I don't recall.

9        Q    You don't recall.  So how do you end up

10   getting a copyright?

11       A    Through legal counsel.

12       Q    Okay.  So what caused you to go to legal

13   counsel?

14       A    Having a verbal discussion with Nick,

15   and we both felt -- you know, after all the

16   publications came out, we felt that we were taken

17   advantage of.

18       Q    When did that take place?

19       A    I don't know.  Sometime after the event.

20       Q    So how -- never mind.  When you had this

21   conversation with Nick, was it by phone?  In person?

22   Text message?

23       A    If I had to guess, possibly a phone

24   call.  I'm not really sure.

25       Q    So what did you say?  What did you guys

1    discuss?

2         A      What did I say?  Just how I didn't feel,

3    like, right about the situation.  I felt like we

4    were taken advantage of.

5         Q      Okay.  So what did you -- so that caused

6    you to go to a lawyer?

7         A      Nick -- Nick was seeking out counsel.

8         Q      Okay.  So how did you end up getting a

9    copyright?

10        A      My legal counsel advised me.

11        Q      Which legal counsel?

12        A      Marcy.

13        Q      Okay.  Did you use the same company for

14   the copyright that Mr. McElroy did?

15        A      Our attorneys took care of all of that.

16        Q      Okay.  How -- approximately when did you

17   first consult with legal counsel?

18        A      I have no clue.

19        Q      You have no clue?

20        A      I was wrapping up, about ready to leave

21   the country.  Like I was in the last couple of

22   months of living in the States, so I had a lot going

23   on.

24        Q      So when did you leave?

25        A      October 12th.

1        Q      You left October 12th.

2        A      Uh-hmm.

3        Q      So you talked to legal counsel --

4        A      Sometime between July and then.

5        Q      Sometime between July and October.

6   Okay.  Did you ever try to communicate with CAE or

7   Courtney or --

8        A      I don't have her contact information.

9        Q      Okay.  So are you aware if they had your

10  contact -- if they ever had your contact

11  information?

12       A      I have no clue.

13       Q      Okay.  So if you had no way to

14  communicate -- when you airdropped the photos from

15  your MAC, where did you airdrop them to?

16       A      I believe her cellphone.

17       Q      Okay.  So that wouldn't necessarily

18  leave your cell -- your contact information when you

19  airdrop them.

20       A      Well, a lot of times what I try and do

21  when I export in Lightroom is try and put that in

22  metadata.  But I was so rushed to try and get these

23  out that I don't think any of that was attached to

24  it.

25       Q      Okay.

1       A       So it was just a quick edit, export.

2       Q       Okay.  So she would have no idea how to

3    contact you either.

4       A       Yeah, if I had, you know, normal -- my

5    normal timeframe to return the photos, everything

6    would have been on there.

7       Q       Okay.  But when you started the job you

8    understood that you -- that they needed to be turned

9    out fast?

10      A       Yeah.  I mean, generally pretty quickly,

11   you know.  I've never -- right after a shoot I've

12   never had to do that.

13      Q       Did you know that before you started the

14   shoot?

15      A       No.

16      Q       When -- how long did you think you had?

17      A       Usually 24, 48 hours.

18      Q       Okay.

19      A       We rarely do same day, though.  I mean,

20   it's just a lot of work.

21      Q       Did Mr. McElroy tell you that these

22   photos needed to be delivered on the same day?

23      A       Usually it's -- he just -- if he did

24   mention, it would be quick turnaround time.  Usually

25   I try and -- if he says "quick," then I try and do

1  it --

2      Q     But did he say that as part of the terms

3  for CAE?

4      A     No, she -- she wanted them right then.

5  I was just going to shoot.

6      Q     Okay.  Did you say anything to her, like

7  no, I don't do that, I -- I didn't know we needed to

8  move -- we needed to move quickly or --

9      A     No.  I mean, obviously I did it.  She --

10 she asked me for them and I airdropped them to her.

11     Q     Did you say anything about the use --

12 how much -- you know, what she could do with them or

13 what she couldn't do?

14     A     No, I don't believe I had that

15 conversation.

16     Q     Okay.  So you started the copyright

17 process after you consulted with legal counsel.

18     A     Correct.

19     Q     And that was a result of conversations

20 with Mr. McElroy?

21     A     Correct.

22     Q     Okay.  Prior to the engagement shoot,

23 did he ever tell you anything about the photo shoot

24 he did for the Frost Bistro?

25     A     What is that?

1      Q      It's a restaurant.  He didn't mention
2  that --
3      A      Is that the Star Magazine stuff?
4      Q      Yeah.
5      A      After the fact when counsel discovered
6  it.
7      Q      Okay.  So let's go back to these photos
8  now, part of Exhibit 2, I believe, 1 through 5.
9      A      Uh-hmm.
10     Q      Okay.  Who was the author of these
11 photos?
12     A      I would say me.
13     Q      Okay.  Who told you to take photos of
14 these subjects, or what caused you to take photos of
15 these subjects?
16     A      Well, we were just told to take photos
17 of the event.
18     Q      Okay.
19     A      So -- and we were the only two
20 photographers allowed in there.
21     Q      Okay.  And you were taking -- do you
22 have any idea why that was, that you were the only
23 two photographers allowed in there?
24     A      We were mentioned at the end that there
25 was like a proposal going on.  But, you know, it was

1   to photograph the event, decor, and then this became

2   an opportunity.

3       Q    So looking at those photos, would you

4   consider these to be pictures of essentially

5   capturing -- capturing images of what's taking place

6   at an event?

7       A    I would consider these like -- I'm

8   sorry.  Can you restate the question?

9       Q    Let me ask -- make it easier.  What type

10  of photos would you call these?  What kind of

11  category, if you had to describe generally the style

12  or the type?

13      A    Lucid creativity?  I mean, you know, I

14  do about 14 -- 14 different steps before I take a

15  photo.  You know, you can't just hand somebody a

16  photo -- you know, a camera and take pictures, you

17  know, especially if you want them to be proper on

18  the sensor.

19      Q    Okay.  So what are the 14 steps you

20  take?

21      A    Well, the first one is I like to custom

22  white balance.  I like to set the camera on raw.  I

23  like to make sure to set the ISO, the aperture, you

24  know, all the different settings, you know, how are

25  we shooting the trigger, you know, my positioning,

1    the lenses that I'm using, the F stop.

2          You know, all that I take into

3    consideration before I start doing this.  It's a

4    process for me.

5    Q    Okay.  So once you're done with that

6    process, then that's when you take the photo?

7    A    Yes.  Once I realize, yeah, the color

8    conditions of the room, so on and so forth, and I

9    feel comfortable, I start taking photos.  I like to

10   consider myself an on-sensor photo -- photographer.

11   So I'm not doing too much in post.

12   Q    Okay.  So what about -- I notice with a

13   lot of these photos there's heads and stuff in the

14   way.  Do you ever worry about getting a clear shot

15   of the subjects?

16   A    I mean, in this one I'm between two

17   arms.  I'm crouched over.  You know, you have to

18   position yourself creatively.  You have to be

19   creative and think on the spot when you're a

20   photographer.

21         I'm literally crouched below two people

22   that are standing right next to each other.  So it's

23   just from years of experience.

24   Q    Right.  And these are photos, would you

25   say, trying to capture a moment?

1      A      An emotion.  Real, true, raw emotion.

2      Q      Okay.  So what -- which of those photos

3  between F-1 and F-5 captures emotion the best in

4  your opinion?

5      A      F-1 and F-2.

6      Q      Okay.  Did you in any way influence

7  those -- those poses, what the people were doing in

8  those photographs?

9      A      You know, I didn't ask her to marry me,

10 so no.

11     Q      Did you say, hey, guys, I need you take

12 a picture -- you know, I need you to --

13     A      Not during photos, no.  Some of the ones

14 after the fact.

15     Q      For any of F-1 through F-5, for any of

16 these photos in front of us, did you say to any of

17 the subjects, hey, I need you to turn this way, look

18 this way, I need you to --

19     A      So I believe on this one --

20     Q      -- smile?  Frown?

21     A      -- I, like, nodded at him.  Because we

22 were the only two ones with cameras in the room.  So

23 everyone else -- the only other cameras that were in

24 the room were video cameras.  So as far as still

25 photography, you know --

1        Q        Okay.  So you were the only two with

2    cameras.  Was it your decision that none of those

3    photos had any of the subjects looking in your

4    direction, or was it --

5        A        I believe the bottle placement on this

6    one was.

7        Q        Okay.

8        A        Yeah.  Because I would -- after the

9    engagement and everyone was walking, I was trying to

10   capture their attention, hey, let me, you know --

11               So, yeah, I would say I had some

12   direction on some of these.  Obviously none of these

13   (pointing), but --

14       Q        Okay.  So did you have any influence on

15   what any of these people were wearing, any of the

16   subjects in any of these?

17       A        No.

18       Q        How about generally their position?  Did

19   you move anyone around or ask anybody to --

20       A        The bottle placement on these two.

21       Q        The bottle.  You said --

22       A        I was just trying to capture the

23   attention so I could at least get these photos

24   clear.  If you'll notice, I'm a lot closer on these.

25   These were during the asking of it, so --

1        Q        But what do you mean bottom placement?

2        A        I mentioned earlier that I would try and

3    capture his attention by either nodding my head or

4    saying, hey, look at me real quick.

5        Q        But did you tell him to hold the bottle?

6        A        Well, I was just trying to get -- get

7    the image of that.  You know, he was holding it

8    around.

9        Q        So you're kind of passive?  You know,

10   you're taking -- you're taking what's coming up in

11   front of you?

12       A        Yeah, and then trying to get some stuff

13   that I've directed.  Slight direction.

14       Q        Okay.  So, you know, after a wedding the

15   -- when everybody is together at the altar or

16   whatever and you move the bride and groom around and

17   everybody else.  Was it that kind of situation?  Was

18   it anything like that for any of those photos posed

19   by you?

20       A        No.  None of these, no.

21       Q        Okay.  And these were all taken at the

22   same location; correct?

23       A        Yes.

24       Q        And they were all at an event center?

25       A        I don't know what it was.  It was

1    like -- there was shops.  There was this room that

2    they had decorated with all this cool stuff.

3          Q      It wasn't your studio, was it?

4          A      No, it wasn't.

5          Q      It wasn't anyone else's studio, was it?

6          A      I don't -- no, obviously it wasn't mine.

7    I don't know whose it was, but --

8          Q      Did you say to anyone, hey, I want

9    this -- I need -- to do my best work I need this

10   green grass in the back?  Did you have anything to

11   do with the decor or the setting?

12         A      No.

13         Q      Okay.  Did you control any of the

14   lighting, anything --

15         A      Within the camera, yes.

16         Q      -- other than your camera?

17         A      Yeah, within the camera.

18         Q      Other than the camera.

19         A      No.

20         Q      Okay.  Did you say to anybody, hey, it's

21   too dark over here, crank up the lights?

22         A      No, they already had it set forth that

23   because there was already a video crew in there.

24         Q      Okay.  So when you created these photos,

25   you did them at the request of CAE or someone else?

1          A       Well, Nick asked me to come along and

2     take photos, so I did.

3          Q       Okay.

4          A       And then once I was there I took

5     direction from, you know, Courtney and I guess other

6     people with walkie-talkies that seemed like they

7     knew what they were doing.

8          Q       Okay.  So you delivered photos to Mr.

9     McElroy; correct?

10         A       To her, Miss Courtney.

11         Q       You also delivered them to Mr. McElroy?

12         A       Well, I sent him a link to the photos,

13    yes.

14         Q       And you understood that those pictures

15    were going to be distributed?

16         A       To social media, yes.

17         Q       And you were okay with them being

18    distributed to social media; correct?

19         A       Correct.

20         Q       Prior to sending any of the photos to

21    Courtney did you say, hey, here's the copyright,

22    don't -- you know, you can use them for this or you

23    can't use them at all, or here are the limits?

24                 Did you give Mr. McElroy any such

25    limiting before you distributed them?

1      A      It was just agreed upon that these were

2   going to be photos that I took and, you know, his

3   client was going to distribute them via social

4   media.

5      Q      And that was agreed upon between you and

6   Mr. McElroy?

7      A      Correct.

8      Q      So if they were published outside of

9   social media Mr. McElroy broke his agreement with

10   you.  Would that be accurate?

11      A      I wouldn't say that.

12      Q      Well, if you give photos to Mr. McElroy,

13   a link to photos, and then he gives them to somebody

14   else and then they get -- they go beyond what you

15   expected, whose fault is that?

16      A      Well, he was deceived by it, too, so I

17   don't -- we were both under the impression that they

18   were to be used for social media.

19      Q      Did she ever tell you that -- we already

20   went through that.  So you're saying you were both

21   deceived and you're relying completely on the word

22   of Mr. McElroy?

23      A      Yeah.  I think I said before he has --

24   he's always had great integrity with me.

25      Q      Okay.  And that's also -- his great

 1    integrity is why you don't hold him responsible for

 2    you're not being in the photo credit?

 3         A     I believe I already answered that.

 4         Q     Okay.  So you -- I think you spoke --

 5    you didn't -- metadata wasn't attached to any of

 6    those photos?

 7         A     It was so quickly.  Like I said, it

 8    was -- I was asked to deliver them right then and

 9    there.

10         Q     So what -- when you delivered the photos

11    right then and there, what steps did you take so

12    that CAE or Courtney would know what the limits were

13    or what -- or that they were copyrighted?

14         A     I believe I answered that as well.

15         Q     Okay.  Did you ever send or attach or

16    otherwise give some kind of copyright notice or

17    declaration, you know, putting it into the shared

18    folder that you shared with Mr. McElroy or --

19         A     I answered that question already as

20    well.

21         Q     Okay.  So let me make sure.  So the

22    answer is no?

23         A     What I referred to earlier.

24         Q     Okay.  So how do you -- who did you

25    license -- well, did you license any of the photos?

1           MS. SPERRY:  Objection.  Calls for a

2     legal conclusion.

3           Q     (By Mr. Barnes) Did you give anyone

4     permission to use the photos?

5           A     Well, I mean, I guess sending them

6     to Courtney for use for social media when I

7     airdropped them to her.

8           Q     Okay.  But, again, that giving -- you

9     gave them to Courtney for use for social media based

10    upon an agreement between you and Mr. McElroy is

11    what happened.  And you were aware then -- I mean,

12    social media is online; correct?

13          A     By the definition, I believe so.

14          Q     Okay.  So did you have any

15    understanding -- CAE wants to publish these on their

16    social media profile is what you're told.  So

17    they're -- you know that the photos -- or you

18    believe the photos are going to be published online,

19    released on a social media --

20          A     Via social media, correct.

21          Q     And the photos published online, they

22    can be copied by other Internet users; correct?

23                Do you have an Instagram page?

24          A     Sure.

25          Q     So you could -- if you see something you

1    like, you could click on it and you could save the

2    image.

3         A    You can screen-shot a low resolution

4    version of the image, sure.

5         Q    Okay.  So by putting it out there on the

6    Internet at all there is always a risk that it's

7    going to go everywhere; right?

8         A    (Nodding.)

9         Q    Okay.  And knowing that there was that

10   risk that it could go anywhere, you didn't see the

11   need to put any copy -- attach any copyright

12   information to it.

13        A    Yeah.  Like I said, it was very quick.

14   I was on the spot, asked to edit and deliver them.

15   So I didn't have the time.  I was super tired.  We

16   had just finished filming, photographing.

17        Q    Okay.

18        A    I don't know if you know, but I'm -- I'm

19   pretty heavy.  So I'm pretty tired after a shoot.

20   Out of shape, fat, so ...

21        Q    Fair enough.

22        A    Yeah.

23        Q    So you share something -- like when you

24   share something on your Instagram page, you're

25   sharing it for your followers; right?

1        A        I share my photography for me.  If

2    people like my work and they want to follow me,

3    fantastic.

4        Q        Okay.  But you're trying to reach a

5    larger audience than you already have?

6        A        I'm trying to capture emotion and be

7    able to sell that to my clients.

8        Q        Okay.  So the link to the photos that

9    you sent to Mr. McElroy, did that allow download

10   access to those files?

11       A        It depends how the browser was set.

12   Normally I have a password protection, and depending

13   on whether clients have paid or not, I allow

14   download access.  But I'm not sure how it was set

15   when I sent them over.

16            I know that I'm able to set those

17   parameters within my gallery, but I don't know how

18   they were sent.

19       Q        Okay.

20       A        It's the similar situation.  They can

21   still screen-shot it, though.

22       Q        So how many -- how many photos have

23   you sold?  And what I mean by that, not private

24   commission where you're paid -- like wedding photos,

25   things like that.  But you take a picture of a

1   sunset and somebody wants to buy it, photos like

2   that.  How many have you sold?

3        A      Tangible photos?  Digital photos?

4        Q      Either way.

5        A      A handful.

6        Q      Okay.  What's the most you ever got for

7   a photo you sold?

8        A      Well, I sold a print.  I think it was

9   close to two grand for a canvas.

10        Q      And does that include the production

11   cost?

12        A      That was with the production -- well,

13   that was just the cost of the canvas and --

14        Q      That's what I meant.  So somebody gave

15   you $2,000 and you gave them the canvas with the

16   photo?

17        A      That they have, yeah.

18        Q      Okay.  So your -- do you have any idea

19   how much the canvas part, the production of the --

20        A      It was a couple of hundred dollars.

21        Q      A couple of hundred dollars.

22               All right.  And you said that you've

23   been contacted in the past from people looking for

24   commission for photos?

25        A      Yes.

1     Q     How often does that happen?

2     A     It was a lot more back before I left for

3     Peru.  You know, when you leave the country you kind

4     of lose a lot of clients.  And, you know, I

5     dispersed a lot, too, so ...

6     Q     Okay.  So how did -- when people would

7     call for those, were they wanting to buy photos or

8     just rights to put them somewhere else?

9     A     Use them.

10     Q     Use them.  Use them for what?

11     A     Maybe a website.

12     Q     Okay.  So you -- did you ever turn

13     anybody down and said, no, you don't have my

14     permission?

15     A     I mean, I believe one time I -- well,

16     the person that asked for that website I didn't

17     allow them to.

18     Q     Okay.  When people are asking, do you --

19     generally would you say, yes, in exchange for money

20     or something else, or would just say, sure, I would

21     be happy --

22     A     I'm always open to the discussion.

23     Q     Okay.

24     A     But it's never set in stone.  I mean, it

25     just depends on the situation.

1          Q        Okay.

2          A        I don't have like a set price for

3    photography either.

4          Q        Okay.  Well, what determines your price?

5          A        It depends.  If I'm going to Japan,

6    my -- I have to rent equipment.  It really just

7    depends.

8          Q        Okay.  So in all of these -- all of the

9    instances where any of your photos, F-1 through 5,

10   where they were shown online, were they ever shown

11   without a caption or any explanation or story?  Was

12   it just images somewhere, this is it?

13         A        I don't -- I don't remember.

14         Q        Were they part of a news article or some

15   kind of an article or --

16         A        What do you mean?  I'm sorry.

17         Q        Like when your -- when your photos

18   appeared, when you see -- like in your complaint you

19   have a list of a bunch of different instances where

20   these photos appeared online.  In all of the --

21   you've looked at the --

22                  You know what's in the complaint;

23   correct?

24         A        For the most part, yes.

25         Q        Okay.  So in any of the ones that you

1    found, did you find it -- were your photos typically

2    accompanying an article or some kind of a blurb?

3         A     I believe so.  I believe they were

4    magazines that were publishing it with words.

5         Q     So, I mean, it wasn't like somebody, you

6    know, just offering to sell a canvas or anything

7    like that.

8         A     There's so many that infringed that I

9    don't know.

10        Q     Okay.  You said that you found out about

11   the use of the photos or the photos were on People a

12   day or two after --

13        A     I think it was whenever -- whenever Nick

14   called me to tell me that they were on there.  I

15   don't remember when that was.

16        Q     Okay.  And did you -- did you say to

17   him, listen, you've got to get them on the phone and

18   tell them to do something or --

19        A     Not that I recall.

20        Q     Did you say, hey, you've got to make

21   them knock this off?

22        A     I'm not sure.

23        Q     You're not sure if you wanted -- if you

24   vocalized that you wanted the conduct to stop?

25        A     No.  I mean, I'm not -- I'm not sure.

1       Q       Okay.  So you never actually personally

2   said -- after you found out about this, you never

3   went to Courtney or CAE or emailed anybody on that

4   side and said, stop sending out these photos?

5       A       I wouldn't have had a way to contact

6   them.

7       Q       Okay.  Did you ever advise Mr. McElroy

8   to do that on your behalf?

9       A       Do what?  Ask them to stop?

10      Q       Tell them to stop, yeah.

11      A       I mean, I'm not really sure what we had

12  discussed at that point in time.

13      Q       Did you ever ask him for the contact

14  information?

15      A       No.

16      Q       Say, hey, this is crazy, I'm going to

17  deal with this myself?

18      A       That's just out of professional

19  courtesy.  I don't do that.  Because a lot of times

20  photographers try and steal clients.

21      Q       So what -- okay.  So it was Mr.

22  McElroy's client?

23      A       I mean, he's -- he was the point of

24  contact for Miss Courtney.  I didn't have any

25  contact with her outside of the actual event.

1        Q      Okay.  So if Mr. McElroy made a deal

2   with CAE for the use of these photos, that was

3   different than the deal you made with Mr. McElroy?

4        A      I don't know.

5        Q      I said if that was the case.

6   Hypothetically he tells you social media, and for

7   one reason or another it's billboards all the way to

8   the top, you know, Times Square billboard.  Is it

9   Mr. McElroy -- whose fault is it if it gets used in

10  a billboard without your --

11       A      I'm not -- I'm not a judge.

12       Q      Okay.  So what took between -- I believe

13  you started the copyright process in Exhibit 2.  It

14  looks to be about October 24th, late October of

15  2019.

16       A      Uh-hmm.

17       Q      So what -- what took so long to get

18  those copyrighted, to register the copyright?

19       A      I have no clue.  Like I said, I was very

20  busy getting my affairs in order to leave the

21  country, so ...

22       Q      When did you first order the copyright

23  or hire somebody to take care of the copyright?

24       A      I'm not sure.

25       Q      What about -- why were these the only

1   photos that you copyrighted?

2        A      Recommended by counsel.

3        Q      Okay.  So did you have -- you weren't

4   concerned about all the other photos that were sent

5   to CAE?

6        A      A lot of them were just decor.

7        Q      So it wouldn't have bothered you if

8   there was a picture of decor in People magazine?

9        A      As long as it was still used for social

10  media, I would have been fine with it.  But if it

11  would have ended up in Home & Design magazine, I

12  probably would have been upset about that, too.

13       Q      Okay.  Why didn't you take any steps to

14  register the copyright?

15       A      We did.  It just took a while.

16       Q      But why not for any of the decor ones?

17       A      I'm not sure.  I don't know how the

18  answer to that.

19       Q      Okay.  So with the copyright being

20  registered in October, that obviously was after the

21  pictures were published; correct?

22       A      Uh-hmm.

23       Q      Are you aware of any picture in any of

24  F-1 through F-5 being published after October?

25       A      I'm not sure.  Unfortunately the

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   Internet's large and a lot of places things can get

2   published.  So I don't know.

3        Q     Okay.  So just to be clear for the

4   record, did you ever have CAE or Courtney sign any

5   nondisclosure agreement?

6        A     No.

7        Q     Any resale agreement?

8        A     No.

9        Q     Okay.  Did ever talk with CAE or

10  Courtney and say, hey, do you promise you're not

11  going to distribute these photos beyond what we've

12  talked about?

13       A     No.

14       Q     Okay.  So who do you -- like for this

15  job, the engagement party, who do you consider --

16  who were you working for?

17       A     I work for myself.  I'm an independent

18  contractor.

19       Q     You're an independent contractor.  But

20  you were there -- somebody hired you to be there;

21  right?

22       A     Someone paid me to come along to take

23  photos.

24       Q     So who is that?

25       A     Nick.

1      Q      Okay.

2      A      But he's not my boss.  I'm an

3  independent contractor.

4      Q      Well, in this case had you gotten to the

5  site and he said, go away, I don't need you anymore,

6  would you have continued working?

7      A      If I wanted to.  I mean, it's a free

8  country.  He doesn't own the venue, so ....

9      Q      Even if it's a private event?

10      A      Well, it was a public place.  There was

11  other shops around.  If I wanted to stay and

12  continue shopping --

13      Q      Yeah.  I'm talking about for the

14  engagement party itself.

15      A      Okay.

16      Q      What I'm getting at here is Mr. McElroy,

17  if he would have said "go home," if he would have

18  said, "you're not needed" --

19      A      He's not my boss.  He asked me to come

20  along and take photos.

21      Q      Who is your boss then?

22      A      Myself.  I'm my boss.

23      Q      Okay.  So if it was just you out of the

24  blue --

25              Okay.  You're your own bos.  How did you

```
 1   get paid for this?

 2        A     I don't remember.  Maybe cash.  I'm not

 3   sure.

 4        Q     By who?

 5        A     Nick.

 6        Q     Okay.  So if you're your own boss and

 7   Nick -- why would Nick be paying you?

 8        A     Because he was the point of contact.

 9        Q     The point of contact.

10              Okay.  Were you doing any of this work

11   on behalf of Night Owl?

12        A     No.

13        Q     Okay.  Would Mr. McElroy have any reason

14   to believe you were doing any of this work on behalf

15   of Night Owl?

16        A     No.

17        Q     Okay.  So do you have any agreement with

18   Mr. Flores regarding the --

19        A     I am Mr. Flores.

20        Q     I'm sorry.

21              -- with Mr. McElroy regarding the

22   proceeds of any claims or case regarding these

23   photos?

24        A     No, not -- I don't recall.

25        Q     Do you have a piece of the action in his
```

 1   photographs?  Do you benefit -- do you gain any

 2   benefit from any of the proceeds of the lawsuit for

 3   these photographs that are marked M-1 through 4 that

 4   Mr. -- that Mr. McElroy identified earlier as being

 5   taken by him?

 6        A     I don't recall.  I do have -- I was --

 7   received wire transfers, but I don't know for which

 8   cases.  And it was BCB Bank in Peru that it was

 9   wired to, so if you need to pull a subpoena for

10   them ...

11        Q     Okay.  So let's start then with the

12   settlement agreements.  You settled with CNN; right?

13        A     I believe so, yes.

14        Q     Do you remember how much --

15        A     No.

16        Q     -- the total settlement was?

17        A     I think you guys mentioned it earlier

18   with Nick.  I don't remember, no.

19              (Exhibit Number 44 was marked.)

20        Q     Okay.  Take a look.  It's Exhibit 44.

21        A     It says $3,000.

22        Q     $3,000.  Okay.  So how much of -- how

23   much of that settlement did you receive?

24        A     I have no clue.  Again, I --

25        Q     With the CNN I'm going to show you a

1    demand letter that says -- look at that.  Take a

2    look at the photos that accompany it.

3         A    Yep.

4         Q    Okay.  Is that photograph any of yours?

5         A    No.

6         Q    No?

7         A    It is, yes.  I'm sorry.  That's it.

8         Q    Which one?

9         A    F-2.

10        Q    F-2.  Do you see any of Mr. McElroy's

11   photographs in that demand?

12        A    I do not.

13        Q    Okay.  Do you know if Mr. McElroy

14   received any money --

15        A    I no clue.

16        Q    -- from CNN as part of the settlement?

17        A    I don't have access to his bank

18   statements, so I have no clue.

19        Q    Well, you sign a settlement agreement.

20        A    Correct.

21        Q    You signed a deal with CNN for work you

22   were saying was infringed -- that your copyright was

23   infringed.

24        A    Correct.

25        Q    Would you agree that as far as CNN is

1    concerned, the only copyright that could have been

2    infringed on was yours?

3        A      According to the paperwork, yes.

4        Q      So if it's the -- I'm caveating this.

5    I'm saying infringed -- this is your allegations.

6    I'm not saying that my client's saying it was

7    infringed.  But you -- you're claiming that

8    Photograph F-2, your phorograph, was -- your copy of

9    it was infringed on by CNN.  The case was settled

10   for $3,000.  And you're -- and you don't know if Mr.

11   McElroy got any of that money?

12       A      I'm not sure.  Like I said, we've had

13   several different cases.  So, I mean, different --

14       Q      What's the date on that?

15       A      February 25th, 2020.

16       Q      Look -- well, look at -- when was it

17   signed, the settlement agreement?

18       A      Was that this one?

19              MS. SPERRY:  Yes.

20       A      2/26/2020.

21       Q      Okay.  So you're saying that less than

22   five months ago you have no recollection of whether

23   or not Mr. McElroy received any money?

24       A      I was living out of the country.  The

25   country I was living in was put in a pandemic

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1   shutdown because of COVID right around this time.

2   So I had a lot going on.

3        Q     Okay.  Would you -- do you believe that

4   Mr. McElroy would be entitled to any money for the

5   use of -- for CNN's use of your photographs?

6        A     I am not a judge to that.

7        Q     It's your photograph.

8        A     Sure.

9        Q     Would Mr. McElroy be entitled to any

10  money for its use?

11       A     I mean, this photograph wouldn't exist

12  if he hadn't brought me along.

13       Q     Okay.

14       A     So I still don't --

15       Q     So do you have a deal -- what I'm trying

16  to get to here -- and we can go through this all

17  night just like we did with Mr. McElroy is, is there

18  any agreement for any compensation -- does he have

19  any piece of any of these photos?  Does he have any

20  rights to collect anything?

21             That's what I'm trying to ask you.

22       A     Like I said, I don't know what was

23  distributed, so I don't know if -- who got what from

24  which.

25       Q     If we look at CNN --

1          A       Okay.

2          Q       So you're saying your just blindly

3    signed documents?

4          A       I never said that.

5          Q       So what was -- did you read the

6    settlement agreement before you signed it?

7          A       I skimmed it.

8          Q       You skimmed it?

9          A       Uh-hmm.

10         Q       Okay.  And this is a -- this is a

11   document where you're getting paid?

12         A       Yes.

13         Q       How much?

14         A       I don't know.

15                 MS. SPERRY:  Objection.  Asked and

16         answered.  He's asked -- he's answered it

17         several times.

18         Q       (By Mr. Barnes) You're getting -- okay.

19   So you -- you don't know how much you're getting

20   paid, but you just skimmed this.

21         A       (Nodding.)

22         Q       Is it possible that the agreement you

23   made with -- regarding the photos, F-1 through F-5,

24   your memory is flawed about the terms of that

25   agreement?

1             MS. SPERRY:  Objection.

2        Q    (By Mr. Barnes) How do you have such a

3   vivid memory of that -- the terms of that agreement,

4   but you can't remember something you signed five

5   weeks ago?  Were you getting a check five months

6   ago?

7             MS. SPERRY:  Objection.  What agreement

8        are you talking about with the memory?  That's

9        not his testimony.

10        Q    (By Mr. Barnes) Okay.  You have a vivid

11   memory -- you said that you -- you specifically

12   remember social media only posts for an event that

13   happened pretty much a year ago.

14        A    Well, that's just normal MO.  That's

15   just kind of how -- the work that we've done has

16   been social media work.  That's just pretty

17   standard.

18        Q    What -- what other work did you -- I

19   thought you said the other work you did with

20   Mr. Flores was a wedding.

21        A    I'm Mr. Flores.

22        Q    I mean, with Mr. McElroy was a wedding.

23        A    Okay.

24        Q    So if you did two jobs with Mr. McElroy,

25   a wedding and this, you're telling me that the

1   wedding was a social media only license?

2        A     Yeah, nobody's posting that on People

3   magazine.  No one's -- yeah, that's all being posted

4   on social media and print for their home and their

5   use.

6        Q     Sure.  Sure.  But that's a totally

7   different deal than just social media posts only.

8        A     So why are we comparing them?

9        Q     Because you said that they were -- you

10  said there was -- you said it was a year and up.

11       A     Yeah, the contracts that I have with

12  my -- with my wedding clients state that I will

13  retain all the copyrights to the photos.

14       Q     Okay.  And did you have -- did you sign

15  a contract like that with the -- with the deal with

16  Mr. McElroy with the photos?

17            MS. SPERRY:  Objection.  Asked and

18       answered.

19       A     Yeah, I've already answered that.

20       Q     So you have no explanation -- if Mr.

21  McElroy received money as part of the CNN

22  settlement --

23       A     I don't know.  I've already answered

24  that.

25       Q     You don't know that.  But if he did,

1   would -- in your opinion is he entitled to any money

2   for the use of your photo -- CNN's use of your

3   photo?

4        A    I would feel like I owe him something

5   for getting me the opportunity to take these

6   pictures.

7        Q    Okay.  So you -- what do you mean by you

8   owe him something?  You owe him a percentage?  You

9   owe him a flat fee?  You owe him a thank you?  You

10  owe him a beer?

11            MS. SPERRY:  Objection.  Compound.

12        Q    (By Mr. Barnes) Who do you owe him?

13        A    It would be hard to say.

14            (Exhibit Number 35 was marked.)

15        Q    And you would agree -- let's look at the

16  -- what we've marked as Exhibit 35.  Yes, 35.  It's

17  a letter from your lawyer to CNN.

18            Have you seen that before?

19        A    I believe digitally.

20        Q    So would you agree that the

21  settlement from CNN was -- came about due to demands

22  made by you and Mr. Flores through your lawyer?

23        A    I'm Mr. Flores.

24        Q    I mean Mr. McElroy.  Sorry.

25        A    Repeat the question.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1          Q      Would you agree that the settlement with

2     CNN came about because of the demand that you and

3     Mr. McElroy made on CNN, made upon them for payment

4     for copyright infringement?

5          A      I mean, we hired our lawyers to -- to do

6     this.  I mean, that's what --

7          Q      I mean, CNN didn't just call up out of

8     the blue and say, hey, let me send you some money;

9     right?

10         A      Yeah.  My lawyers sent this.

11         Q      You guys sent this letter and said, pay

12    us, you owe us; right?

13         A      Yeah, my attorney sent this.

14         Q      Sure.  At your direction?

15         A      Yes.

16         Q      So that letter says in there that

17    there's -- that you and Mr. McElroy have an interest

18    in these nine photos and that Photo 1 -- one of the

19    photos was used and that you and Mr. McElroy are

20    entitled to be compensated.  So why was Mr. McElroy

21    entitled to be compensated?

22         A      Well, it's mentioning one of nine, so

23    there's five here and four there, so --

24         Q      Did you take any pictures jointly with

25    Mr. McElroy?

1        A     That's impossible.

2        Q     Okay.  I mean, I'm just trying to

3    understand the deal with you guys.  We're making

4    this very, very difficult.

5              MS. SPERRY:  He's already testified he

6         doesn't know.  So he can't --

7        Q     (By Mr. Barnes) Okay.  I'm going to ask

8    you about each one of these again, and we'll sit

9    here all night.

10             MS. SPERRY:  I'm going to ask you not to

11        throw documents at my client.

12             MR. BARNES:  I'm going to set --

13             MS. SPERRY:  It's unnecessary.

14             (Exhibits Numbers 45 through 47 were

15    marked.)

16       Q     (By Mr. Barnes) -- 45, 46, and 47, all of

17    those.  So let's go through them one at a time.

18       A     Okay.

19       Q     Tell me what you remember about 45.

20       A     I don't.

21       Q     You don't remember anything?

22       A     No.

23       Q     Do you remember signing it?

24       A     Possibly.

25       Q     Possibly.

```
 1          A     When was this?  When was this?

 2                MS. SPERRY:  If it helps, it tells you

 3          who are the parties are in the top paragraph.

 4                THE WITNESS:  No, I'm looking for a

 5          date.

 6                MS. SPERRY:  Oh, the date for the

 7          signature page?  That's where the exhibits

 8          start.

 9                THE WITNESS:  Yeah, this -- I was in the

10          middle of quarantine, like a military

11          lockdown, quarantine lockdown during this

12          time.  So I don't remember.  I had other

13          things on my mind in my life going on that

14          were a lot more important than this.

15          Q    (By Mr. Barnes) Okay.  When did you get

16    back to the U.S.?

17          A     April 20 something.

18          Q     April 20 something?

19          A     Uh-hmm.

20          Q     Okay.  Let's look at Exhibit 47.

21          A     Yes.

22          Q     What do you remember about that one?

23                MS. SPERRY:  The first page will tell

24          you who the parties are.

25                THE WITNESS:  This is recent.  We
```

 1          haven't received --

 2          Q     (By Mr. Barnes) The question is:  What do

 3    you remember about this one?

 4          A     That I signed it.

 5          Q     Okay.  So how much are you getting --

 6    what's the total amount?

 7          A     I don't know.  I haven't received any

 8    money from this one yet.

 9          Q     Okay.  What is -- so what's your

10    understanding of how much you're going to get from

11    this?

12          A     I won't know until I receive it.

13          Q     So you signed a deal that you -- and you

14    have no idea how much you're going to receive?

15          A     On this one?

16          Q     Look at Paragraph 1.  It says the total

17    payment is $6,300.  Do you see that?

18          A     Uh-hmm.

19          Q     So you signed and agreed along with Mr.

20    McElroy to settle for $6,300.  So how much of that

21    $6,300 are you getting?

22          A     I don't know.  I'd be perjuring myself

23    if I even tried to guess right now.

24          Q     Then why did you sign the document?

25          A     Because I knew I was getting money.

1      Q      Okay.  Is that why you -- that's why you

2  agreed to do the photos, because you were getting

3  money?

4      A      Part of it.

5      Q      Okay.  So you didn't -- so it's possible

6  that back when you made the photo agreement you

7  didn't actually have the -- a solid and detailed an

8  agreement as you think; right?

9              MS. SPERRY:  Objection.

10     A      I never said that.  I never said that.

11     Q      Okay.  So all those settlement

12 agreements that we're looking at right now, they all

13 came about because letters were sent by your

14 attorney --

15     A      Correct.

16     Q      -- demanding payment that you believe

17 that you were entitled to?

18     A      Correct.

19     Q      Okay.  And later on if the court was

20 found -- if it was found that CAE has a license and

21 they had the right to send those photographs, would

22 you agree that you would not -- you would not be

23 entitled to that money?

24              MS. SPERRY:  Objection.

25              MR. BARNES:  On what grounds?

1          MS. SPERRY:  It calls for a legal

2     conclusion.

3          Q    (By Mr. Barnes) Why were you getting paid

4     under Exhibit 47?  Why are they paying you?

5          A    Infringement.

6          Q    Infringement.  And how -- how was it you

7     were fringed on?

8          A    Per this letter, yeah.

9          Q    The infringement was then publishing

10    photos without your permission?

11         A    (Nodding.)

12         Q    But if you had gave CAE permission to

13    distribute these photos --

14         A    I never gave them permission.

15         Q    But you don't -- I'm just asking.  Down

16    the road if it's determined that they had permission

17    to publish the photos, they published them, and you

18    request money for infringement, they -- you

19    hadn't -- there was no infringement in that case.

20    Is that correct?

21         MS. SPERRY:  Objection.  What's the

22    question?

23         (Exhibit Numbers 31 through 34 and 36

24    through 43 were marked.)

25         Q    (By Mr. Barnes) Let's just move on,

1    please.  All these -- take a look.  Take a look.

2    It's Exhibits 30, 31, 32, 33, 34 -- I believe 35 is

3    already out -- 36, 37, 38, 39, 40, 42 -- 41, 42 and

4    43.

5              So just take a look and see if you --

6    the question is if you know -- if those all seem

7    like they were letters that you authorized to be

8    sent out to the various publications.

9        A    I believe these look familiar.

10       Q    Okay.  And those -- you would agree that

11   those are all letters that were sent out demanding

12   payment for infringement that you are alleging?

13       A    Yes.

14            (Exhibit Number 8 was marked.)

15       Q    Okay.  Okay.  I want you to take a look

16   at what's marked as Exhibit 8.  That's a document

17   that you provided to us in discovery.  Do you

18   recognize that?

19       A    Am I in the blue or what?

20       Q    Well, actually it looks like -- is that

21   a picture of you at the top?  It says "Maybe:

22   Brian."

23       A    Uh-hmm.

24       Q    So looking at Page 1, somebody in the

25   blue on the right says, "Got asked to shoot for Real

1    Housewives of Atlanta Friday.  BTS.  What do I

2    charge?"

3              So do you think that was Mr. McElroy or

4    you?  Do you know?

5         A    I'm not sure.

6         Q    You're not sure?

7         A    It could be McElroy.  I don't know.

8         Q    Okay.  Do you know of anyone else --

9    look at this correspondence in general.  Do you

10   remember any of this?

11        A    That's my link.  But I don't remember

12   this conversation.

13        Q    You don't remember this?

14        A    Uh-hmm.

15        Q    Will you look at the one that says July

16   26th, 2019?  It starts on the third page.  Somebody

17   says, "Can I catch a ride to the job today?"  Do you

18   have any idea -- were you asking Mr. McElroy to

19   catch a ride or was he asking you?  Does this

20   refresh your memory at all?

21        A    No.

22             (Exhibit Number 10 was marked.)

23        Q    Okay.  Then we can move on.  Let me show

24   you what's marked as Exhibit 10, which is another --

25   do you recognize that?

1        A        Yes.

2        Q        What is it?

3        A        It's when I reached out to the publicist

4    or the person who wrote the CNN article.

5        Q        When did you do that?

6        A        I don't know.

7        Q        You don't know?

8        A        After -- obviously after this was

9    printed or published, but I don't know when exactly.

10       Q        What was the purpose of reaching out to

11   that person?

12       A        Trying to get more business.

13       Q        Do you say in this message, hey, that's

14   my photo, I own it, why are you publishing it?

15       A        That's where I wanted to lead that to.

16       Q        I thought you just said a second ago

17   that you were trying to get more business?

18       A        Yeah.  I can do both.

19       Q        Okay.  So can you point to where you

20   made any objection to that photo being used?

21       A        Well, I hadn't yet.  She hadn't received

22   the letter.  I didn't want to go in guns blazing,

23   so --

24       Q        Okay.  So what -- did you ever actually

25   have any -- did Ms. France ever respond to you?

1        A      No, this -- no, she didn't even receive

2   it.

3        Q      Okay.

4        A      So I pursued it no further.

5        Q      Okay.  So what do you mean by you didn't

6   want to go in guns blazing?

7        A      Well, I mean, if I eventually wanted to

8   ask her to change the name on something, I'm going

9   to get more bees with sugar than vinegar.

10       Q      Well, why didn't you ask CAE to have the

11  name changed?

12       A      I don't know who CAE is.  I know

13  Courtney.

14       Q      You knew Courtney.  Why didn't you ask

15  Courtney?

16       A      I didn't have her contact information.

17       Q      Why didn't you ask Mr. McElroy for her

18  contact information?

19              MS. SPERRY:  Objection.  Asked and

20          answered.

21       Q      (By Mr. Barnes) Okay.  How much did you

22  get paid for the job?

23       A      I don't know.  I don't know.

24       Q      You don't know how much you got paid?

25       A      No.  No.

1        Q        Okay.  So you don't know how much you

2    got paid.  You don't know which messages are you in

3    the text messages.

4        A        No, I said that these -- that that was

5    my link.  I told you that that was my link at the

6    end.  Obviously that was sent to me.

7        Q        Okay.

8        A        So don't put words in my mouth.

9                 (Exhibit Number 1 was marked.)

10        Q        Okay.  I just want to go through what's

11    marked as Exhibit 1, which is the complaint.  Let's

12    start with Paragraph 7.  In Paragraph 7 --

13        A        Yeah.

14        Q        -- you said that you have garnered

15    widespread commercial success.  So please tell me

16    about your widespread commercial success.

17        A        Well, I've been doing photography since

18    I was in sixth grade.  So I entered contests with a

19    35-millimeter Minolta and I've been taking photos

20    ever since.

21        Q        Okay.  Have you won any awards for that?

22        A        I did win an award for a photo for Anna

23    Ruby Falls when I was like 12, so --

24        Q        Was it published commercially?

25        A        I'm not sure.  That was so long ago.

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1          Q       Well, what did you mean by widespread

2    commercial success?

3          A       Well, I mean, that just stems from --

4    commercial work could be headshots for a business,

5    you know, working with Verizon Wireless.  I've

6    worked with AT&T.  I've worked with some of the

7    Fortune --

8          Q       Okay.

9          A       Nothing as glamorous as People, but --

10         Q       So it says here that you worked as an

11   independent -- Paragraph 8, you work as an

12   independent contractor for Night Owl.  Is that true?

13         A       With Night Owl.

14         Q       Well, here it says you work as an

15   independent contractor for them.  So that's a

16   mistake in the complaint?

17         A       I guess --

18         Q       It's okay if it is.  I'm just asking --

19   trying to understand.

20         A       Because we work with them.

21         Q       You work with them?

22         A       (Nodding.)

23         Q       Paragraph 16 says that they're wholly --

24   that the copyrighted works are original,

25   exclusive -- you're the exclusive owner of all

1    rights, title and interest.

2              So nobody else has any right, title or

3    interest in any of the photos marked F-1 to F5?

4              MS. SPERRY:  Objection.  I think that

5         calls for a legal conclusion.

6         Q    (By Mr. Barnes) Well, what does that mean

7    to you then?  What --

8         A    This just looks like standard copyright.

9         Q    So F-1, who has the rights to use F-1 as

10   we sit here today?

11        A    I do.

12        Q    Who else?

13        A    I'm not sure what the stipulations were

14   with some of these other cases, so I don't know.  I

15   know for certain I do.

16        Q    Okay.  So you do.  But you don't know

17   who -- you don't know who has the right to your

18   photographs?

19        A    Well, yeah, because -- I mean, I don't

20   know if we made -- what arrangements were made with

21   some of these settlements.

22        Q    So you gave -- you don't know what you

23   did with your -- so you're saying you settled the

24   case for an amount of money that you didn't know how

25   you're going to receive and you don't know what

1    terms and conditions there were for these

2    photographs.  So you might not even own them at all.

3            MS. SPERRY:  Objection.  That's not his

4       testimony.

5       Q    (By Mr. Barnes) So let me -- your head

6    was taking, so let's make sure I get that.

7       A    I had to, like, pop my neck.

8       Q    No.  I just want to make sure you're

9    saying like either yes or no out loud because the

10   court reporter can't --

11      A    If I'm shaking my head it's -- I'm just

12   absorbing what you're saying.  I'm not answering a

13   question.

14      Q    So your testimony is that as you sit

15   here you do not -- you don't know who has the

16   rights -- you don't know all of the people who have

17   rights to F-1 and what rights they have?

18      A    Correct.

19      Q    What about F-2?

20      A    The same.

21      Q    F-3.

22      A    The same.  The same for all.

23      Q    Okay.  Paragraph 19 says, "The

24   copyrighted works are of significant value."

25           So how much are F-1 through F-5 worth?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

1    Give me a price on F-1.

2         A     I mean, I leave that up to the judge to

3    see what they say.

4         Q     The same for F-2, for the rest of them?

5         A     For all of them, yes.

6         Q     Okay.  So how -- so a judge is in a

7    better position to value your work than you are?

8         A     This is what we hired, you know, counsel

9    for is to have them educate us on what the worth is

10   based on the infringement.

11        Q     Well, what's it worth to you?

12        A     I seek to legal for that.

13        Q     Okay.  Do you plan on bringing any

14   claims against Mr. McElroy?

15        A     No.

16        Q     Did you make any agreement with Mr.

17   McElroy for why you wouldn't bring claims against

18   him?

19        A     I'm sorry.  What?

20        Q     Do you have any agreement with Mr.

21   McElroy for why you would not bring any claims

22   against him?

23        A     I'm afraid I don't understand the

24   question.

25        Q     You're upset that your name wasn't

1   attached to the photos.  But Mr. McElroy was the

2   person that made that happen.

3               MS. SPERRY:  Objection.

4        Q    (By Mr. Barnes) You're upset.

5               MS. SPERRY:  He didn't testify to that.

6        That's not his testimony.

7        Q    (By Mr. Barnes) Your testimony was that

8   you're upset because your name wasn't attached to

9   the photos.  I showed you some text messages where

10  it shows you why it's not attached to the photos.

11  And the reason why I -- according to me and the

12  texts that were sent was Mr. McElroy made it that

13  way.

14              MS. SPERRY:  Objection.  That's your

15       testimony.

16       Q    (By Mr. Barnes) Okay.  So you hold Mr.

17  McElroy not responsible at all for any of -- any of

18  your losses?

19       A    I've already answered that question.

20       Q    Okay.  What are your damages?

21       A    I seek to counsel for that question.

22       Q    You seek -- so you don't know how -- how

23  have you been damaged?

24       A    I don't know how much they've wracked up

25  in legal fees.  I don't -- I don't know any of it

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
1    right now.  I'm -- I just got back into the country
2    not long ago, like I'm still working on --
3         Q    You got back in the country in April?
4         A    Yeah.  I did, but I wasn't planning --
5         Q    You were gone for six months and --
6         A    Yes, I sold my car, sold my entire life.
7    I was planning to be there for several years, and I
8    came back because of COVID.
9         Q    Okay.
10        A    So, yeah.  And I had to restart my life
11   again coming back, and I'm still doing that.  So --
12        Q    Okay.  So you have no idea --
13        A    I don't know if you've ever moved out of
14   the country, but it's kind of difficult.
15        Q    So you have no idea what your damages
16   are?
17        A    No.
18        Q    And you have no -- how much do you owe
19   your lawyers right now?
20        A    No clue.
21        Q    What's the deal with the lawyers?
22             MS. SPERRY:  Objection.  Asked and
23        answered.
24        Q    (By Mr. Barnes) You don't -- you have no
25   clue --
```

1          MS. SPERRY:  Objection.  Asked and

2       answered.

3       Q    (By Mr. Barnes) -- how they're going to

4   be compensated?

5          MR. BARNES:  I mean, I'm asking these

6       over and over again because --

7          MS. SPERRY:  He's already -- and he's

8       already testified he doesn't know.  He doesn't

9       know the arrangement.  He doesn't know how

10      much he's spent.

11         MR. BARNES:  So I'm not going to be

12      getting an affidavit from you guys later on

13      when I file summary judgment stating --

14         MS. SPERRY:  Your client has no idea how

15      much she's paid you similarly.

16         MR. BARNES:  Yeah, I understand that.

17      But we just have a whole lot of "I don't

18      knows" here and I don't want to --

19         MS. SPERRY:  So did your client.

20         MR. BARNES:  -- have to deal with coming

21      back here later because all of a sudden

22      everything is clear.

23         MS. SPERRY:  Likewise.  Likewise.

24         MS. AJINCA:  You were allowed to ask me

25      multiple times without objection.

1          Q     (By Mr. Barnes) Okay.   In the document

2    requests, I asked you --

3                (Exhibit Number 4 was marked.)

4          Q     I'm going to show you Exhibit 4.   Did

5    you ever see that before?

6          A     Possibly.

7          Q     Well, take a look at it.   I mean, these

8    are the document requests that I sent through your

9    lawyer asking you to produce certain documents.

10         A     Okay.

11         Q     So did anyone say, please produce these

12   documents to you?  Did anyone ever ask you to gather

13   the documents requested?

14         A     Yeah, I was asked to -- to gather

15   certain documents.

16         Q     Okay.  Did you get everything that was

17   on that list or anything you could?

18         A     No.  I replaced -- well, yeah,

19   everything I could that I had via social media.  But

20   anything that was on my phone I replaced before I

21   moved to South America, so --

22         Q     Okay.  So what -- anything that you have

23   that you need to add that you might not have

24   attached?  Anything that comes to mind --

25         A     Not that I'm aware of.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1      Q     -- that you found?  Okay.  So you said

2  social media.  You -- or you said that you replaced

3  your phone, so no text messages.  Were there any

4  text messages between you and CAE or Courtney?

5      A     (Nodding.)

6            MS. SPERRY:  Answer verbally.

7            THE WITNESS:  Oh.  No, sorry.

8            MR. BARNES:  Okay.  Just give me minute

9       here to talk to her.

10           (Recess.)

11           MR. BARNES:  All right.  I believe that

12      is the end of our questions.

13           MS. SPERRY:  I have just actually a

14      couple of followups.

15           Is the court reporter ready?

16               DIRECT EXAMINATION

17      Q     (By Ms. Sperry) Do you have an employment

18  agreement with McElroy?

19      A     No.

20      Q     And you don't consider him your

21  employer, do you?

22      A     Absolutely not.

23           MS. SPERRY:  That's all the questions I

24      have.

25           (Deposition concluded at 5:57 p.m.)

1                    (Signature not discussed.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                        DISCLOSURE

 2
     STATE OF GEORGIA           DEPONENT:  BRYAN FLORES
 3   COUNTY OF FULTON

 4            Pursuant to Article 10.B of the Rules
     and Regulations of the Board of Court Reporting of
 5   the Judicial Council of Georgia, I make the
     following disclosure.
 6
              I am a Georgia Certified Court Reporter.
 7   I am here as an independent contractor for Alderson
     Court Reporting.  Alderson Court Reporting was
 8   contacted by the offices of Marcy L. Sperry,
     Esquire, to provide court reporting services for
 9   this deposition.  Alderson Court Reporting will not
     be taking this deposition under any contract that is
10   prohibited by O.C.G.A 9-11-28 (c).

11            Alderson Court Reporting has no
     contract/agreement to provide reporting services
12   with any party to the case, any counsel in the case,
     or any reporter or reporting agency from whom a
13   referral might have been made to cover this
     deposition.  Alderson Court Reporting will charge
14   its usual and customary rates to all parties in the
     case, and a financial discount will not be given to
15   any party to this litigation.

16

17   _____

     CARLA J. HOPSON, CCR# B-1816
18   July 13, 2020.

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2       STATE OF GEORGIA:

3       COUNTY OF FULTON:

4

5           I hereby certify that the foregoing deposition

6       was taken down, as stated in the caption, and the

7       colloquies, questions and answers were reduced to

8       typewriting under my direction; that the foregoing

9       transcript is a true and correct record of the

10      evidence given.

11          The above certification is expressly withdrawn

12      and denied upon the disassembly or photocopying of

13      the foregoing transcript, unless said disassembly or

14      photocopying is done under the auspices of Alderson

15      Court Reporting, Certified Court Reporters, and the

16      signature and original seal is attached thereto.

17          I further certify that I am not a relative or

18      employee or attorney of any party, nor am I

19      financially interested in the outcome of the action.

20          This, the 13th day of July, 2020.

21

22

23      CARLA J. HOPSON, RPR
        Certified Shorthand Reporter
24      B-1816

25

Notice Date: 07/15/2020

Deposition Date: 7/8/2020

Deponent: Bryan Flores

Case Name: Nicholas McElroy v. Courtney Ajinca Events
LLC

Page:Line            Now Reads                    Should Read

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the
foregoing transcript, and the same is a true and
accurate record of the testimony given by me.
Any additions or corrections that I feel are
necessary, I will attach on a separate sheet of
paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing
himself/herself to be the above-named individual,
appeared before me this \_\_\_\_\_ day of _____,
20\_\_, and executed the above certificate in my
presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES: