IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NICHOLAS MCELROY, ET AL

     Plaintiffs,

v.

COURTNEY AJINÇA EVENTS LLC,
*et al.*

     Defendants,

Civil Action No.
1:19-cv-05094-SDG

## OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment [ECF 30 and ECF 38]. After careful consideration of the parties' briefing, and with the benefit of oral argument, the Court **DENIES** Plaintiffs' motion for summary judgment on their claims of copyright infringement; **GRANTS** Defendants' cross-motion for summary judgment on Plaintiffs' claims of copyright infringement; and **GRANTS IN PART** and **DENIES IN PART as moot** Plaintiffs' motion for summary judgment on Defendants' counterclaims.

## I.    BACKGROUND

The material facts in this case are largely undisputed. Plaintiffs Nicholas McElroy and Bryan Flores are independent contractor photographers based in

Atlanta, Georgia.[1] Plaintiffs have worked together a handful of times, twice as independent contractors for Night Owl Post Productions (Night Owl).[2] Defendant Courtney Ajinça is the founder and owner of Defendant Courtney Ajinça Events, LLC (CAE), a North Carolina LLC that specializes in designing luxury events primarily catered to celebrities.[3]

In June 2019, CAE, acting through Ajinça, hired McElroy to photograph the Frost Bistro Grand Opening event (the Frost Bistro event).[4] CAE and McElroy never entered into a written agreement for this photo shoot.[5] After the Frost Bistro event, McElroy sent Defendants the photographs he took and CAE forwarded those photographs to its publicist, Danika Berry.[6] The photographs taken by McElroy of the Frost Bistro event were published in Star Magazine.[7]

---

[1]   ECF 36, ¶ 1.

[2]   *Id.* ¶¶ 2–3.

[3]   *Id.* ¶ 4.

[4]   *Id.* ¶ 5.

[5]   *Id.* ¶ 29.

[6]   *Id.* ¶ 9.

      Although Berry was initially a defendant in this case, she was later dropped as a party. ECF 5.

[7]   ECF 36, at ¶ 9.

Pleased with McElroy's services, Ajinça reached out to McElroy via text message on July 24, 2019, to hire him for a second photography job on July 26, 2019.[8] The text message read:

> I had such a great experience with you last time and wanted to see if I could book you for an event on Friday. This one is for real housewives and these pics will be everywhere!! Will be the same as before décor shots and shots of important people and moments.[9]

The event to be photographed was a wedding engagement between a Real Housewives of Atlanta television star and a Fox Sports Broadcaster (the engagement shoot), which CAE planned.[10] McElroy agreed to the engagement shoot and also agreed to bring a "three team crew" to assist with putting together a 1 minute "social media vid" of the event.[11] McElroy brought Flores and two videographers from Night Owl to assist.[12] Defendants did not know that Flores was going to be photographing the engagement shoot along with McElroy.[13]

---

[8]  *Id.* ¶¶ 11–12.

[9]  ECF 41, ¶ 5.

[10]  *Id.* ¶ 4.

[11]  *Id.* ¶ 6.

[12]  ECF 36, ¶ 19.

[13]  *Id.* ¶ 18.

Immediately after the wedding proposal during the engagement shoot, Ajinça  and two producers from the Real House Wives of Atlanta requested photographs of the event.[14] McElroy handed Ajinça a sim card containing the photographs and Flores transferred his photographs to Defendants via air drop and a link to a webpage.[15] Several hours after the event, McElroy texted Ajinça instructions on how to credit the photographs.[16] Ajinça informed McElroy: "K I'm trying to get it changed. They put night owl," and McElroy responded, "No it's totally fine if it's already posted. Where can we see it?"[17] CAE later notified McElroy that People.com published some of the photographs McElroy and Flores had taken of the engagement, which credited "Night Owl Post Productions Nick McElroy and Courtney Ajinça Events."[18] Four of the nine photographs published by People were taken by McElroy and the other five were taken by Flores, who was not credited.[19]

---

[14]  *Id.* ¶ 24.

[15]  *Id.* ¶¶ 27–29.

[16]  ECF 41-3, at 3.

[17]  *Id.*

[18]  ECF 36, ¶ 31.

[19]  *Id.* ¶ 33.

Shortly after being notified that the photographs were published on People.com, McElroy exchanged texts with CAE's publicist, Danika Berry, regarding the photographs.[20] Berry requested photographs of different parts of the engagement shoot, and McElroy complied by texting links to the photographs in a Google Drive folder.[21] After receiving the photographs, Berry reached out again to see if there were additional photographs because "[a] lot of really good pics of her and him with the ring are blurry . . . I can't use these for the other outlets."[22] McElroy apologized and then asked Flores for additional photographs of the event.[23]

The last conversation between McElroy and CAE regarding the engagement shoot was on July 28, 2019.[24] McElroy emailed CAE and Berry a Google Drive link containing a video of the evening, stating, "Let us know if we can make any other changes for you! Thank you again for this incredible opportunity. We look forward to working with you more in the future!"[25] The same day, McElroy texted

---

[20] ECF 41, ¶ 18.

[21] *Id.* ¶19–20.

[22] *Id.* ¶ 21.

[23] *Id.* ¶ 24.

[24] *Id.* ¶ 25.

[25] *Id.*

his soon-to-be brother-in-law: "Didn't know [the photographs] would be sold to the media lol or else I would have charged a lot more. She probably made bank on them . . . Should have charged her double. She probably made quite a few stacks off those photographs. Lesson learned."[26]

Following the event, the photographs taken by McElroy and Flores were published in at least thirteen different media outlets.[27] On September 26, 2019, Truly Original, LLC, the production company for the Real Housewives of Atlanta emailed McElroy and Flores requesting permission to use the photographs and attaching a release.[28] At this point, McElroy and Flores sought the advice of legal counsel.[29] On October 24, 2019, Plaintiffs registered the engagement shoot photographs with the Copyright Office.[30] Plaintiffs then sent demand letters to the media outlets that had published the photographs, claiming copyright infringement.[31]

---

[26]   ECF 36, ¶ 47.

[27]   *Id.* ¶ 48.

[28]   *Id.* ¶ 51.

[29]   *Id.* ¶ 54.

[30]   *Id.* ¶ 55.

[31]   *Id.* ¶ 58.

Plaintiffs filed suit against Defendants on November 8, 2019, alleging copyright infringement under 17 U.S.C. § 501, and amended their Complaint on January 29, 2020.[32] Defendants answered the Amended Complaint and asserted seven counterclaims for (1) a declaratory judgment that Defendants had been granted a non-exclusive license to use the engagement shoot photographs; (2) tortious interference with business relations in connection with the demand letters sent by Plaintiffs to media outlets and the filing of the instant lawsuit; (3) breach of contract; (4) libel; (5) slander; (6) punitive damages; and (7) attorneys' fees.[33] The parties have cross-moved for summary judgment on the question of Defendants' liability for copyright infringement and Plaintiffs have moved for summary judgment on Defendants' counterclaims.[34]

## II.   LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*,

---

[32]   ECF 1, ¶¶ 36–43; as amended, ECF 5, ¶¶ 36–43.

[33]   ECF 8, ¶¶ 102–36.

[34]   ECF 30; ECF 38.

477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III.   ANALYSIS

#### a.   Plaintiffs' Claims for Copyright Infringement

To prevail on a claim of copyright infringement, Plaintiffs must show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Montgomery v. Noga*, 168 F.3d 1282, 1288 (11th Cir. 1999) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). However, the existence of a license to copy and distribute the copyrighted work is an affirmative defense to a claim for infringement. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Therefore, "[w]hether the copyright owner of an original work of authorship has granted a license . . . is a threshold question that must be answered." *Id.* Defendants do not dispute that Plaintiffs own a valid copyright of their photographs or that Defendants distributed the photographs, but argue that Plaintiffs granted an implied license to distribute the photographs to the various media outlets.

#### i.   Defendants Did Not Waive the Implied License Affirmative Defense.

Plaintiffs argue that Defendants have waived their implied license defense by not asserting it as an affirmative defense in their Answer pursuant to Rule 8(c) of the Federal Rules of Civil Procedure. According to Plaintiffs, Defendants needed to explicitly claim an *implied* license as an affirmative defense, as opposed

to the asserted affirmative defense of "Plaintiffs' Complaint is barred because CAE holds a valid license to the subject photographs."[35]

"[I]t is plain that the purpose of Rule 8(c)—'simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate'—was satisfied here." *Bergquist v. Fid. Info. Servs., Inc.*, 197 F. App'x 813, 815 (11th Cir. 2006) (citing *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988)). A party does not waive an affirmative defense where the opposing party "has notice that an affirmative defense will be raised at trial," and, therefore, "the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Hassan*, 842 F.2d at 263.

The Court finds that Defendants have not waived the affirmative defense of implied license. Plaintiffs' argument that the absence of the word "implied" in Defendants' affirmative defenses waives Defendants' right to assert the existence of an *implied* license is unpersuasive. Considering the undisputed facts, the central issue of the entire dispute is whether Defendants, by implication, had permission

---

[35]   ECF 8, ¶ 44.

to distribute Plaintiffs' photographs to media outlets. Plaintiffs have admitted that "McElroy granted Defendants a verbal non-exclusive license to use his Photographs for social media only."[36] None of the conversations between Plaintiffs and Defendants mention a license, however, and McElroy repeatedly refers to his "understanding" of the license granted,[37] meaning the license Plaintiffs concede existed as to social media use was itself an implied license. Indeed, at oral argument, counsel for Plaintiffs cited *Latimer v. Roaring Toyz, Inc.*, a case involving implied licenses, as authority for the proposition that Plaintiffs could verbally limit the scope of the license granted to Defendants. 601 F.3d at 1235. The remaining question is what that implied license permits, which has been briefed by the parties. Plaintiffs, therefore, are not prejudiced by Defendants' assertion of this defense. *See Bergquist*, 197 F. App'x at 816 (finding no waiver of affirmative defense given that the basis for the defense "was a central issue of dispute between the parties").

---

[36]   ECF 30, at 10.

[37]   ECF 30-2, at 11 ("So my understanding was that it was going to be the same as last time and that that—they would be posted on social media . . . I mean, there's some understanding here, but there's also some understanding from our verbal conversation the first time she hired me.").

### ii.   Plaintiffs Granted Defendants a Non-Exclusive Implied License.

Although the Copyright Act requires all exclusive transfers of copyright to be in writing, 17 U.S.C. § 204(a), "non-exclusive licenses are exempt from this writing requirement, 17 U.S.C. § 101, and may be granted orally, or may even be implied from conduct." *Latimer,* 601 F.3d at 1235 (internal citation and punctuation omitted). "An implied license is created when one party (1) creates a work at another person's request; (2) delivers the work to that person; and (3) intends that the person copy and distribute the work." *Id.* The existence of an implied license is a question of law for the Court. *See Wilchcombe v. Teevee Toons, Inc.*, 515 F. Supp. 2d 1297, 1304 (N.D. Ga. 2007), *aff'd sub nom.*, 555 F.3d 949 (11th Cir. 2009) (finding implied license as a matter of law on motion for summary judgment). The party claiming an implied license has the burden of establishing the necessary elements. *Latimer,* 601 F.3d at 1235.

### 1.   Intent of the Parties

The grantor of an implied license may limit its scope "and a defendant who exceeds the scope of an implied license commits copyright infringement." *Id.* "[A]n implied license will be limited to a specific use," however, "only if that limitation is expressly conveyed when the work is delivered." *Id.* "Courts focus on objective evidence revealing the intent of the parties to determine if an implied

license exists." *Id.* In *Latimer,* for example, the Eleventh Circuit found that an artist specializing in custom motorcycle paint granted an implied license when he delivered a painted motorcycle to a manufacturer, by way of the company that hired the artist, and knew the manufacturer sought as much media exposure as possible. Thus, the court held, "it is reasonable to infer that [the artist] intended that his artwork be photographed and distributed by [the manufacture and the third party] and the media. At a minimum, [the artist] granted [the manufacture and the third party] an implied license to copy and distribute his original work." *Id.*

It is undisputed that McElroy created work at CAE's request, delivered the work to CAE, and intended CAE to copy and distribute the work.[38] McElroy, therefore, granted CAE an implied license. Whether Flores granted an implied license to use his photographs is a closer question. Flores was never in direct contact with Defendants except for when he was at the engagement shoot. Instead, McElroy served as a middleman between Flores and CAE, and also followed up with CAE on Flores's behalf to secure payment.[39] The undisputed facts show, however, that Flores was aware his photographs would be used by CAE, and,

---

[38]   *See, e.g.*, ECF 30, at 16.

[39]   ECF 41, ¶ 10.

while he was at the event, he delivered his photographs to CAE.[40] Therefore, the undisputed evidence demonstrates that Flores granted an implied license to CAE to use the photographs from the engagement shoot.

### 2.    Scope of the Implied Licenses

Turning to scope, the objective evidence revealing the intent to grant an implied license "also reveals the scope of the license." *Latimer*, 601 F.3d at 1235. Plaintiffs make much of the fact that *they* believed the photographs were only going to be used on social media, but Plaintiffs misunderstand the nature of the intent requirement. The Court must make an objective inquiry into whether the party granting the implied license intended the license to be limited to a certain use. *Id.* In other words, what the Plaintiffs *actually* intended is irrelevant.

Here, there is ample evidence from before and after the engagement shoot showing that Plaintiffs did not intend to limit their implied licenses to social media. First, when Ajinça first reached out to McElroy regarding the engagement shoot she informed him "these pics will be everywhere!!"[41] Again, whether McElroy subjectively understood this to mean "everywhere on social media" is irrelevant. "Everywhere" is an expansive term and, by agreeing to have his

---

[40]   ECF 36, ¶¶ 17, 29.

[41]   *Id.* ¶ 12.

photographs "everywhere," McElroy agreed to broad use of his photographs. Second, Plaintiffs continued to send photographs from the engagement shoot to Defendants and CAE's publicist after (1) they knew some photographs had been published on People.com,[42] (2)  publicist told McElroy "all mags need diff pics,"[43] and (3) the publicist requested non-blurry pictures "for the other outlets."[44] The Court does not need to parse out which photographs were delivered after which communication to determine that Plaintiffs intended the scope of the implied license for the photographs to be broader than for use in social media.

Specifically concerning Flores, although he did not communicate directly with Defendants, his intent can be inferred through his willingness to deliver his photographs to Defendants without limitation and through his communications with McElroy. Both Plaintiffs testified that McElroy communicated the purpose of the event to Flores, and that Flores knew his photographs were going to be used by CAE for publicity.[45] Flores's position parallels the custom paint artist in *Latimer*, who was found to have granted an implied license to the motorcycle manufacturer

---

[42]   ECF 41, ¶ 15.

[43]   *Id.* ¶ 16.

[44]   *Id.* ¶ 21.

[45]   ECF 36, ¶ 17; ECF 30-3, at 14-15.

even though his only communications were with the motorcycle customization company that hired him. 601 F.3d at 1236. The Eleventh Circuit found that the artist "constructively delivered" his artwork to the manufacturer through the company and that his dealings with the company evidenced his granting an implied license to both the company and the manufacturer. *Id.* Flores delivered his work directly to Defendants and constructively delivered his work to defendants through McElroy, all while knowing that the photos would be used for publicity.

By contrast, the only objective evidence Plaintiffs offer reflecting their understanding of the scope of the license is a text message McElroy sent days after the event, which only indicates that McElroy "didn't know [the Photographs] would be sold to the media,"[46] not that he intended for the use of the photographs to be limited only to social media. This situation differs from *Latimer*, where the Eleventh Circuit found, separately from the issue of whether the artist granted an implied license, that there was an issue of material fact as to whether the manufacturer and the company exceeded the scope of the implied license granted by the plaintiff, who photographed the custom motorcycle. 601 F.3d at 1238. In *Latimer*, the plaintiff presented testimony that he expressly told an intermediate

---

[46]   *Id.* ¶ 47.

that his work was not to be "leaked" or published in a way other than what was discussed, and further testified that he marked photographs with metadata containing his contact information and stating "all rights reserved." *Id.* All Plaintiffs can point to here is their subjective understanding of the scope of the implied license, which is insufficient to preclude summary judgment. Indeed, any consideration given to McElroy's so-called "smoking gun" text message with his about-to-be brother-in-law (who was not involved in the engagement shoot) is tempered by the other communications between McElroy and Defendants after the photos were delivered and published online, none of which reflect displeasure in the photos being published.[47] McElroy's text message fails to raise a question of material fact as to his intent. Plaintiffs have also not pointed to any evidence that they "expressly conveyed" that they were limiting the scope of the implied license to use in social media "when the work [was] delivered." *Id.* at 1235.

Given the expansive scope of the implied license, Defendants did not infringe on Plaintiffs' copyright by distributing the photographs to media outlets. Had Plaintiffs wanted to more fully protect, and profit from, their photography,

---

[47]   McElroy thanked Defendants for the "incredible opportunity" and, seemingly on behalf of himself and Flores, expressed an interest in working with them again. ECF 41, ¶ 25.

they should have been explicit about their intentions. As McElroy put it, "[l]esson learned."[48] The Court grants summary judgment in favor of the Defendants and dismisses Plaintiffs' claims for copyright infringement.[49]

### b. Defendants' Counterclaims

Plaintiffs have also moved for summary judgment as to each of Defendants' counterclaims, which include (1) declaratory judgment; (2) tortious interference with business relations; (3) breach of contract; (4) libel; (5) slander; (6) punitive damages; and (7) attorneys' fees. Defendants conceded at oral argument that, if the Court granted their motion for summary judgment on the issue of liability, which it has done, the counterclaims for declaratory judgment and breach of contract would be mooted. Those claims are, therefore, dismissed as moot. The Court now considers Plaintiffs' motion for summary judgment on the remaining counterclaims.

---

[48]   ECF 36, ¶ 47.

[49]   Since the Court is dismissing Plaintiffs' claims against Defendants, it will not determine whether Ajinça would have been personally liable for CAE's copyright infringement. The Court notes, however, that a corporate officer will be held liable, jointly and severally, with her company for copyright infringement if "the officer has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Broad. Music, Inc. v. Ga. Rib Co., Inc.*, 166 F. Supp. 3d 1329, 1333 (N.D. Ga. 2014).

Defendants failed to materially address Plaintiffs' motion for summary judgment, arguing instead that the issues are neither fully briefed nor properly before the Court because Plaintiffs improperly sought dismissal of the counterclaims.[50] The Court is perplexed by Defendants argument, for which they cite no authority, that the Court cannot dismiss the Defendants' counterclaims as a matter of law on a motion for summary judgment. It is clear to the Court that Plaintiffs seek summary judgment as to Defendants' counterclaims.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The difference between a motion to dismiss and a motion for summary judgment is not the relief sought, which is often dismissal of claims at issue, but the standard applied. *See Massie v. Cobb Cnty., Ga.*, 255 F. Supp. 3d 1302, 1307 (N.D. Ga. 2017) ("Because Defendants' motion was filed after the close of discovery and both parties have fully briefed the motion as one for summary judgment (i.e., by submitting the statements of material facts required by Local Rule 56.1 and basing their arguments on the substantive evidence rather than Massie's allegations), the Court will analyze it as such.");

---

[50]   ECF 38.

*Steadman v. Calhoun Cnty. Bd. of Educ.*, No. CV 04-BE-1148-E, 2006 WL 8437346, at *1 (N.D. Ala. Jan. 10, 2006) ("A motion to dismiss assumes Plaintiff's allegations to be true, while a motion for summary judgment tests the sufficiency of the actual evidence."). The parties have submitted statements of material facts,[51] and the only reason summary judgment as to Defendants' counterclaims is not fully briefed is because Defendants have declined to address Plaintiffs' arguments on the merits.

Initially, the Court notes that it is acting within its discretion to rule on these counterclaims even though the federal causes of action have been dismissed. Defendants' counterclaims are sufficiently related to Plaintiffs' copyright claims for the Court to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367. A district court may decline to exercise supplemental jurisdiction, however, where "it has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In deciding whether to exercise jurisdiction, the Court considers "judicial economy, convenience, fairness, and comity." *Bio-Med. Applications of Ga., Inc. v. City of Dalton, Ga.*, 685 F. Supp. 2d 1321, 1340 (N.D. Ga. 2009) (declining to exercise jurisdiction over plaintiff's state law claims and defendant's counterclaim after granting summary judgment on the only federal claim). Here, in

---

[51]   ECF 30-1; ECF 37.

consideration of these factors, the Court finds that it is appropriate to exercise jurisdiction because this case has been pending for over a year, discovery is complete, and the issues to be resolved are not complicated.

As noted, Defendants have entirely failed to respond to Plaintiffs' arguments for summary judgment as to Defendants' counterclaims. "[A] non-movant's failure to respond to a defendant's motion for summary judgment is not fatal; rather, the court must determine if the facts in the record illustrate that the movant is entitled to summary judgment." *Ogwo v. Miami Dade Cnty. Sch. Bd.*, 702 F. App'x 809, 810 (11th Cir. 2017) (citing *Dixie Stevedores, Inc. v. Marinic Maritime, Ltd.*, 778 F.2d 670, 673 (11th Cir. 1985)). However, "when the non-movant fails to properly address a party's factual assertions, the court may consider those facts undisputed and grant summary judgment if the facts in the record—including those considered undisputed—illustrate that the movant is entitled to judgment in its favor." *Id.* (citing Fed. R. Civ. P. 56(e)). In consideration of the undisputed facts, the Court finds that Defendants' counterclaims should be dismissed.

### i.   Tortious Interference with Business Relations, Libel, and Slander

Defendants' counterclaims for tortious interference with business relations, libel, and slander relate either to this litigation or Plaintiffs' other efforts to enforce their copyright interests in the engagement shoot photographs. These claims fail

because Plaintiffs are not subject to liability for actions taken in good faith to protect their legal interests.

As for the claim for tortious interference with business relations, there is no evidence that Plaintiffs attempted to enforce "sham" or baseless rights, and, therefore, sending demand letters to the media outlets and filing this lawsuit are actions shielded from liability. *Miracle 7, Inc. v. Halo Couture,* LLC, No. 13-61643-CIV, 2014 WL 11696708, at *4 (S.D. Fla. Jan. 17, 2014) ("Courts routinely reject tortious-interference claims based on good-faith efforts to enforce intellectual property rights.") (collecting cases); *Autumn Vista Holdings, LLC v. Timbercreek Autumn Vista, L.P.*, No. 1:17-CV-03038, 2019 WL 3997147, at *5 (N.D. Ga. Aug. 23, 2019) (under Georgia's "court filings privilege" tortious interference claim cannot arise from threatening or filing allegedly improper lawsuits).

Further, under Georgia law, "[s]tatements made in the good faith performance of a legal or moral duty" and "allegations . . . contained in regular pleadings filed in a court of competent jurisdiction" are privileged and cannot form the basis of a claim for libel or slander. O.C.G.A. §§ 51-5-7(2), -8. *See H&R Block E. Enters., Inc. v. Morris*, 606 F.3d 1285, 1296 (11th Cir. 2010) ("In Georgia, a statement generally may support a claim for defamation only if it is false, published, and unprivileged.") *FieldTurf USA Inc. v. TenCate Thiolon Middle E.*, 945

F. Supp. 2d 1379, 1392 (N.D. Ga. 2013) (granting summary judgment as to libel claim because allegedly libelous letters repeated allegations in lawsuit and were therefore privileged).

Plaintiffs' motion for summary judgment as to Defendants' tortious interference, libel, and slander claims is granted. Moreover, Defendants' cause of action for punitive damages is predicated on the tortious interference, libel, and slander claims, and so the Court will grant Plaintiffs' summary judgment as to Defendants' request for punitive damages as well. L*ewis v. Meredith Corp.*, 293 Ga. App. 747, 750 (2008) ("Under Georgia law, a plaintiff cannot recover punitive damages when the underlying tort claim fails.").

> ### ii.   Attorneys' Fees

In Georgia, attorneys' fees may be awarded "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." O.C.G.A. § 13-6-11. "A refusal to pay in bad faith means a frivolous and unfounded denial of liability. If there is any reasonable ground to contest the claim, there is no bad faith." *Jeff Goolsby Homes Corp. v. Smith*, 168 Ga. App. 218, 221 (1983) (internal citation and punctuation omitted). Further, "stubborn litigiousness and causing the plaintiff unnecessary trouble and expense

refer to a defendant's forcing of the plaintiff to sue where no bona fide controversy exists." *Id.* (internal citation and punctuation omitted).

Defendants have failed to come forward with any evidence that Plaintiffs acted in bad faith in seeking to enforce their copyright interests in the engagement shoot photographs. Defendants, therefore, have failed to create a fact issue with respect to their claim of attorneys' fees. Plaintiffs' motion for summary judgment as to Defendants' claim for attorneys' fees is granted.

## IV.   CONCLUSION

The Court **DENIES** Plaintiffs' motion for summary judgment on their claims for copyright infringement and **GRANTS** Defendants' cross-motion for summary judgment on Plaintiffs' claims for copyright infringement. The Court **GRANTS IN PART** and **DENIES IN PART as moot** Plaintiffs' motion for summary judgment as to Defendants' counterclaims. Plaintiffs' claims and Defendants' counterclaims are **DISMISSED**.

The Clerk is **INSTRUCTED** to close this case.

**SO ORDERED** this the 12th day of January 2021.

Steven D. Grimberg
United States District Court Judge